IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PLANNED PARENTHOOD OF
WISCONSIN, INC., SUSAN PFLEGER,
MD, FREDRIK BROEKHUIZEN, MD, and
MILWAUKEE WOMEN'S MEDICAL
SERVICES d/b/a AFFILIATED MEDICAL
SERVICES,

      Plaintiffs,      OPINION &ORDER

 v.

                13-cv-465-wmc

J.B. VAN HOLLEN, ISMAEL OZANNE,
JAMES BARR, MARY JO CAPODICE, DO,
GREG COLLINS, RODNEY A. ERICKSON,
MD, JUDE GENEREAUX, SURESH K.
MISRA, MD, GENE MUSSER, MD, KENNETH
B. SIMONS, MD, TIMOTHY SWAN, MD,
SRIDHAR VASUDEVAN, MD, SHELDON A.
WASSERMAN, MD, TIMOTHY W. WESTLAKE,
MD, RUSSELL YALE, MD, and DAVE ROSS,

      Defendants.

   Before the court is plaintiffs' motion for temporary restraining order, seeking an order from the court enjoining the enforcement of Section 1 of 2013 Wisconsin Act 37, which requires that physicians who provide abortion services to have admitting privileges at a hospital within 30 miles of the abortion clinic.  The enactment of this legislation was precipitous:  the legislation was proposed on June 4, 2013; the Governor signed the Act last Friday, July 5, 2013; and the Act went into effect today, July 8, 2013.  Plaintiffs filed the present lawsuit and motion for TRO July 5, 2013.  As a result, there is a troubling lack of justification for the hospital admitting privileges requirement, which is important because the United States Supreme Court has explained that the State of Wisconsin

bears the burden of proving that a medical requirement is "reasonably directed to the preservation of maternal health." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 900-01 (1992); *City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 430-31 (1983), *overruled on other basis*, *Casey* 505 U.S. 833 (citing *Roe v. Wade*, 410 U.S. 113, 163 (1973), for the proposition that a state "may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health"). Moreover, the record to date strongly supports a finding that no medical purpose is served by this requirement.

Having reviewed plaintiffs' submissions and having held a hearing at which plaintiffs' counsel and counsel for the principal defendant, Wisconsin Attorney General J.B. Van Hollen, were permitted to address the merits, the court will grant plaintiffs' motion for a temporary restraining order as to the application of the Act's admitting privileges requirement for abortions performed at PPW's Appleton-North and Milwaukee-Jackson centers and AMS's centers pending a full preliminary injunction hearing can be held on July 17, 2013.

ALLEGATIONS OF FACT

**I. The Parties**

Plaintiffs consist of two health care providers -- Planned Parenthood of Wisconsin ("PPW") and Milwaukee Women's Medical Services d/b/a Affiliated Medical Services ("AMS"), both of which provide abortion services -- as well as two physicians who are affiliated with these clinics. Plaintiff Susan Pfleger, MD, is a licensed Wisconsin

physician, board-certified ob-gyn with over twenty years of experience. She performs abortions at PPW's Milwaukee-Jackson center and is scheduled to provide abortions at Appleton North beginning this month. She does not have admitting privileges within 30 miles of either the Appleton North or Milwaukee-Jackson clinic. Plaintiff Fredrik Broekhuizen, MD, is the Medical Director of PPW. All plaintiffs sue on their own behalf as well as on behalf of their patients.

Defendants consist of J.B. Van Hollen, the Attorney General of the State of Wisconsin, Ismael Ozanne, the District Attorney for Dane County, Dave Ross, the Secretary of the Department of Safety and Professional Services, and the thirteen members of the Wisconsin Medical Board. All defendants are sued in their official capacity.[1] Plaintiffs also seek to certify a class of defendants consisting of the 71 elected district attorneys representing each of Wisconsin counties, with Ozanne as the class representative.

## II. The Act

Plaintiffs challenge Section 1 of 2013 Wisconsin Act 37, to be codified at Wis. Stat. § 253.095 (the "Act"), which provides in pertinent part:

> SECTION 1. 253.095 of the statutes is created to read:
>
> **2253.095 Requirements to perform abortions.** (1) Definition. In this section, "abortion" has the meaning given in s. 253.10 (2) (a).
>
> (2) Admitting privileges required. No physician may perform an abortion, as defined in s. 253.10 (2) (a), unless he or she

---

[1] For purposes of this motion, defendant Van Hollen will be referred to as "the State."

has admitting privileges in a hospital within 30 miles of the location where the abortion is to be performed.

(3) Penalty. Any person who violates this section shall be required to forfeit not less than $1,000 nor more than $10,000. No penalty may be assessed against the woman upon whom the abortion is performed or induced or attempted to be performed or induced.

(4) Civil remedies. (a) Any of the following individuals may bring a claim for damages, including damages for personal injury and emotional and psychological distress, against a person who performs, or attempts to perform, an abortion in violation of this section:

1. A woman on whom an abortion is performed or attempted.

2. The father of the aborted unborn child or the unborn child that is attempted to be aborted.

3. Any grandparent of the aborted unborn child or the child that is attempted to be aborted.

(b) A person who has been awarded damages under par. (a) shall, in addition to any damages awarded under par. (a), be entitled to not less than $1,000 nor more than $10,000 in punitive damages for a violation that satisfies a standard under s. 2895.043 (3).

(c) A conviction under sub. (3) is not a condition precedent to bringing an action, obtaining a judgment, or collecting the judgment under this subsection.

(d) Notwithstanding s. 814.04 (1), a person who recovers damages under par. (a) or (b) may also recover reasonable attorney fees incurred in connection with the action.

(e) A contract is not a defense to an action under this subsection.

(f) Nothing in this subsection limits the common law rights of a person that are not in conflict with sub. (2).

The Act was introduced into legislation on June 4, 2013, and signed by the Governor on July 5, 2013. The Act went into effect today, July 8, 2013.

4

**III. Current Landscape of Abortion Providers in Wisconsin**

Plaintiff Planned Parenthood of Wisconsin ("PPW") provides comprehensive, outpatient health care services to thousands of women in Wisconsin. PPW currently operates 24 health centers throughout Wisconsin and provides abortion services at three of those centers: (1) Appleton North (where it performs surgical abortions to 13.6 weeks of pregnancy); (2) Milwaukee-Jackson (where it performs surgical abortions to 17 weeks and medication abortions to nine weeks); and (3) Madison East (where it performs surgical abortions until 18.6 weeks).[2] None of PPW's physicians who provide abortions in Appleton have admitting privileges at hospitals within thirty miles of the health center. Two of PPW's physicians who perform approximately half of the abortions in Milwaukee (one of whom is plaintiff Dr. Pfleger) also do not have local hospital admitting privileges.

Plaintiff Milwaukee Women's Medical Services d/b/a Affiliated Medical Services ("AMS") provides comprehensive, outpatient health care services, including abortion services, at its clinic in Milwaukee. AMS provides medication abortions to 9 weeks and surgical abortions to 22 weeks (and, infrequently, beyond that time period). AMS provides approximately 3,000 abortions per year. AMS's physicians do not have admitting privileges within 30 miles of its clinic to satisfy the Act's requirements.[3]

---

[2] All measurements are from the woman's last menstrual period ("LMP").

[3] As of the date of this opinion, there are five clinics in Wisconsin where women can obtain abortions -- the four described above and a fifth in Green Bay. That clinic, however, will cease to provide abortion services on August 1, 2013, for reasons unrelated to the Act.

In support of plaintiffs' motion for a temporary restraining order, physicians filed affidavits stating that they have patients scheduled for abortions tomorrow, Tuesday, July 9, 2013, with physicians who lack admitting privileges to satisfy the Act. (Declaration of Teresa A. Huyck ("Huyck Decl.") (dkt. #5) ¶ 5); Declaration of Dennis Christensen M.D. ("Christensen Decl.") (dkt. #6) ¶ 7.)

### IV. Impact of Admitting Privileges' Requirement

Plaintiffs represent that they have worked diligently since learning of the Act to attempt to obtain applications from all potentially relevant hospitals, but have only begun the process of seeking admission at the time the Act went into effect.  Plaintiffs further represent that the process of applying for privileges and receiving a decision typically takes months.  Plaintiffs contend, that even if time were not of issue, it is at best uncertain whether the physicians providing abortion services in Appleton and Milwaukee will be able to actually obtain admitting privileges.  Plaintiffs posit numerous barriers to granting of such privileges, including the common practice to grant privileges only to physicians who can guarantee a minimum number of hospital admissions each year, residency requirements, requirements that physicians be members of physician practices, and political, ideological or religious impediments. (*See* Declaration of Douglas Laube, M.D. ("Laube Decl.") (dkt. #4) ¶¶ 26-33.)

In support of the motion, plaintiffs also submitted a declaration of Dennis Christensen, M.D.  Dr. Christensen is a board-certified obstetrician-gynecologist, with nearly forty years of experience performing abortions, and is the co-owner of plaintiff

AMS.  Dr. Christensen avers that AMS currently has two active physicians, with Dr. Christensen providing occasional medical care when those two physicians are not available.  Neither of AMS's two active physicians nor Dr. Christensen has admitting privileges within 30 miles of AMS's Milwaukee clinic.  Dr. Christensen further represents that if the Act is "not immediately blocked, AMS will have no choice but to discontinue providing abortion care and shut down immediately."  (Declaration of Dennis Christensen, M.D. ("Christensen Decl.") (dkt. #6) ¶ 6.)  In addition to the injury to AMS's staff and owners, Dr. Christensen avers that many women seeking abortions will face significant burdens and delay and some may be precluded from obtaining abortions altogether, including women who are more than 19 weeks pregnant and for whom AMS provides the only in-state option.

PPW's President and Chief Executive Officer Teresa A. Huyck represents that all of the doctors providing abortion services in Appleton North and two of its physicians providing services in Milwaukee do not have the necessary admitting privileges under the Act.  Huyck further represents that because of the difficulty in obtaining such privileges and/or in recruiting physicians with the necessary privileges, the Act will force PPW to close its health center in Appleton North and drastically reduce abortions at its health center in Milwaukee-Jackson.

In light of plaintiffs' representations, if the Act's admitting privileges requirement is enforced, there will be no abortion providers in the State of Wisconsin north of Madison and Milwaukee.  Huyck represents that 60% of PPW's abortion patients are at

7

or below the federal poverty line.[4]  The cost and difficulty associated with travel for the two visits to health centers required under current Wisconsin law will be amplified with the closure of the Appleton clinic.  Moreover, Huyck avers that the abortion providers in its Milwaukee-Jackson and Madison health centers are already overburdened and do not have the ability to provide abortions on additional days, thus resulting in wait times exceeding the current two to three week wait for the initial counseling appointment and another one to two weeks for the abortion appointment.  Any increase in the wait times poses increased medical risks, including losing the medication abortion option for women seeking abortions early in the first trimester or losing the pre-viability abortion option altogether.  Because of the increased travel burdens and delays, Huyck represents that she believes women will either be forced to carry pregnancies to term or will resort to unsafe options.

**V. Risks Associated with Abortions and the Need for Hospital Care**

In support of their motion for preliminary relief, plaintiffs also submit a declaration of Douglas Laube, M.D, based on his expertise in obstetrics and gynecology and the provision of abortions services.  Dr. Laube has been board-certified in obstetrics and gynecology since 1976 and has been licensed to practice medicine in Wisconsin since 1993.  From 1993 to 2006, Dr. Laube served as the Chairman of the Department of Obstetrics and Gynecology at the University of Wisconsin.  He has served as an officer of

---

[4] For a family of four, the federal poverty line is set at an annual income of $23,550. 2013 Poverty Guidelines, *available at* http://aspe.hhs.gov/poverty/13poverty.cfm#guidelines.

8

the American College of Obstetricians and Gynecologists ("ACOG"), including as its President in 2006-2007. Dr. Laube concludes that the admitting privileges "requirement is medically unjustified and will have serious consequences for women's health in Wisconsin." (Declaration of Douglas Laube, M.D. ("Laube Decl.") (dkt. #4) ¶ 7.)

In support of his conclusion, Dr. Laube cites studies demonstrating that legal abortion is one of the safest medical procedures in the United States. The risk of death associated with childbirth is 14 times higher than that associated with abortion. (Laube Decl. (dkt. #4) ¶ 8.) The risk of death related to abortion overall is less than 0.7 deaths per 100,000 procedures. (*Id.*) (As a point of comparison, Dr. Laube states that the risk of death from fatal anaphylactic shock following use of penicillin in the United States is 2.0 deaths per 100,000 uses. (*Id.*)) Less than 0.3% of women experiencing a complication from an abortion require hospitalization. Because of the low risk of complications, Dr. Laube represents that abortions can be performed safely in an outpatient setting: indeed, 90% of abortions in the United States are performed on an outpatient basis. (*Id.* at ¶ 9.)[5]

In situations requiring hospitalization, Dr. Laube further avers that "whether the abortion provider has admitting privileges at that hospital is completely irrelevant to providing optimal care." (Laube Decl. (dkt. #4) ¶ 17.) As Dr. Laube explains, the abortion provider can contact the ob/gyn at that hospital, who can admit the patient if necessary. As a practical matter, if the patient is transported via ambulance, the EMT

---

[5] Dr. Laube also provides detailed descriptions of abortion services at various stages in pregnancy and compares them to common outpatient gynecological procedures. (Laube Decl. (dkt. #4) ¶¶ 12-15.)

9

will make the decision as to which hospital to transport the patient, regardless of whether the abortion provider has admitting privileges at a hospital.[6] Similarly, if the patient experiences complications at her home, she most likely will be transported to the hospital closest to her, which typically is some distance from the abortion clinic and, in-turn, some distance from the hospital for which the abortion provider would necessarily have admitting privileges under the Act. Dr. Laube also points to ACOG guidelines, which recognize that clinics performing abortions should have arrangements in place for transferring patients who require emergency treatment, but explicitly reject the notion that the physicians performing abortions should have admitting privileges at a hospital. (*Id.* at ¶ 25.)

Dr. Laube further avers that this requirement is counter to the current hospital care model, which increasingly relies on dedicated staff physicians or hospitalists, rather than a model relying on physicians who provide only outpatient care with hospital privileges. (*Id.* at ¶ 26.) Under this model, "more and more highly qualified and proficient outpatient providers must hand off the care of their patients experiencing complications at the hospital door. This is not patient abandonment, but the way that good medicine is practiced today." (Laube Decl. (dkt. #4) ¶ 33.)

---

[6] The State posited a hypothetical where the physician might direct the EMT to the hospital at which she has admitting privileges. There are at least two problems with this hypothetical. First, it is just a hypothetical, especially given substantial testimony that physicians would not give that direction because it could run counter to the interest of the patient. Second, it seems just as likely to the court that the EMT will choose to follow the protocols of the company or admitting hospital.

OPINION

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. If the moving party makes this threshold showing, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011) (internal quotations omitted)). Consistent with the Seventh Circuit's approach, this court applies a sliding scale in weighing whether preliminary relief is warranted. *See, e.g.*, *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) ("[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008) ("The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor.").

While defendants have not yet had an opportunity to respond in writing, defendants are on notice of the plaintiffs' motion for temporary restraining order and had an opportunity to respond orally to plaintiffs' submission at the July 8, 2013, hearing. When an opposing party receives notice of an application for a TRO, the court treats the motion as a request for a preliminary injunction. *See, e.g., Levas & Levas v. Antioch*, 684

F.2d 446, 448 (7th Cir. 1982) (affirming the district court's treatment of the TRO -- of which the defendants had notice and contested at hearing -- as a preliminary injunction and affirming the district judge's decision to forego a second evidentiary hearing to decide the preliminary injunction issue). Regardless of the title, the same showing is required to obtain either. *Winning v. Sellen*, 731 F. Supp. 2d 855, 857 (W.D. Wis. 2010). Moreover, while plaintiffs may be faulted for waiting until the eleventh hour to bring suit, they did make efforts to give defendants immediate notice of this motion. Finally, given ample, advance press coverage of plaintiffs' intent to file suit, defendants were surely aware that this lawsuit and a motion for temporary restraining order would immediately follow enactment of the Act.

### A. Likelihood of Success on the Merits

Plaintiffs raise three constitutional challenges to the Act. Two of the challenges involve the plaintiffs' own due process rights. First, plaintiffs argue that the Act violates the nondelegation doctrine because "the state has failed to provide any standards to govern whether admitting privileges should be granted," and "had also empowered the hospitals with the final authority to deny the Plaintiffs the ability to pursue their chosen businesses and occupations." (Pls.' Br. (dkt. #3) 19.) Second, plaintiffs argue that the Act violates plaintiffs' procedural due process rights by preventing abortion provider physicians from pursuing their profession. (*Id.* at 37.) While these arguments may have

merit, the court opts to focus on the challenge to the Act based on the Fourteenth Amendment rights of the *patients* of plaintiffs.[7]

This court is guided by the United States Supreme Court's analysis in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). In *Casey*, the Court considered challenges to a myriad of requirements, including a 24-hour waiting period, informed consent, and parent and spousal notifications, and adopted a two-part inquiry to determine whether an abortion regulation poses an "undue burden" on a woman's right to privacy under the Fourteenth Amendment of the United States Constitution. Under this analysis, the court considers: "(1) whether the . . . requirement is reasonably related to a legitimate state interest and (2) whether the [requirement] had the practical effect of imposing an undue burden." *Karlin v. Foust*, 188 F.3d 446, 481 (7th Cir. 1999).

1. **State Interest**

In the first prong of the analysis, the State must demonstrate that the regulation is reasonably related to "the preservation and protection of maternal health." *City of Akron*, 462 U.S. at 430-31; *Casey*, 505 U.S. at 900-01 (finding recordkeeping and recording requirements "reasonably directed to the preservation of maternal health"); *see also Doe v.*

---

[7] Based on the record before it, the court is convinced that plaintiffs have standing to assert the claims of their patients. *See, e.g.*, *Singleton Wulff*, 428 U.S. 106, 112-16 (1976) (plurality opinion) (describing three factors to consider in determining whether abortion providers have standing to sue of their patients and finding those factors met); *Stenberg v. Carhart*, 530 U.S. 914 (2000) (deciding challenge to abortion statute brought by abortion provider on behalf of his patients); *see generally Planned Parenthood Se., Inc. v. Bentley*, No. 13cv405-MHT, 2013 WL 3287109, at *2-3 (M.D. Ala. June 28, 2013).

*Bolton*, 410 U.S. 179, 195 (1973) (describing the burden as that of the state).[8] In response to substantial evidence that the admitting privileges restriction serves no purpose in advancing maternal health, the State argues that, though admittedly rare, there are situations where serious complications can result from a pre-viability abortion. In those circumstances, the Attorney General believes it will be able to offer testimony showing that the requirement for admitting privileges at a hospital within 30 miles of the location of the abortion would reduce risks to the patient. Aside from the claimed need for "continuity of care," counsel was unable to offer any support for this position, which does not bear even superficial scrutiny on the current record.[9]

For a variety of reasons laid out in the plaintiffs' submissions and set forth above, there is little likelihood that a doctor's admitting privileges to a hospital located within 30 miles of the clinic where an abortion is performed will have any substantial impact on that doctor's ability to effect the patient's treatment once admitted to a treating hospital. Whether or not the abortion provider has admitting privileges *and* at which hospital will likely play little or no role in terms of which hospital may be best suited to care for the patient. As Dr. Laube explains, requiring admitting privileges by a clinician runs counter to current, typical hospital practices, which seek dedicated staff physicians or hospitalists

---

[8] The court reads *Casey* to require that where a challenged regulation is "designed to foster the health of a woman seeking an abortion," the state's reason for adopting the regulations must similarly be health-related, as compared to regulations that are "designed to persuade the woman to choose childbirth over abortion." *Casey*, 505 U.S. at 878.

[9] The State also argued that ob/gyns are best trained to perform abortions and deal with complications. As plaintiffs point out, there is no requirement in the Act, however, that abortions be performed by an ob/gyn.

provide inpatient care. ACOG not only agreed, but expressly opposed such a requirement. Finally, there appears no need for the requirement given evidence that the current system already handles efficiently the very low percentage of women seeking abortions with serious complications.

Moreover, this court's review of the limited legislative history of the Act does not reveal any medical expert speaking in favor of the Act or otherwise articulating a legitimate medical reason for the admitting privileges requirement. On the contrary, plaintiffs have submitted compelling evidence, again mostly in the form of Dr. Laube's declaration, that the requirement provides no medical benefit. There is no barrier to hospital care for an abortion patient who experiences complications based on whether or not the abortion provider has admitting privileges.

Based on this record, the court finds that State is unlikely to meet its burden of demonstrating that the admitting privileges requirement is reasonably related to promoting the health of women seeking abortions.[10]

---

[10] The State cites to two decisions challenging admission requirements based on the nondelegation doctrine. *Greenville Women's Clinic v. Comm'r, S. Car. Dep't of Health & Envtl. Control*, 317 F.3d 357 (4th Cir. 2002); *Women's Health Ctr. of W. County, Inc.*, 871 F/2d 1377 (8th Cir. 1989). Neither case considered whether the requirement constituted an undue burden under *Casey*. Whether or not these courts would reach the same results on this issue is purely speculative, particularly in light of (1) current hospital admission practices and models of care and (2) the absence of any discussion in these cases as to the benefits of admissions requirements on "maternal health."

## 2. Substantial Obstacle

Even if this regulation provided some marginal benefit to maternal health, the court further finds that plaintiffs are likely to succeed in demonstrating that the regulation poses an undue burden on women seeking abortions in Wisconsin because it will have the effect (if not also the purpose) of presenting a "substantial obstacle." *Casey*, 505 U.S. at 878 (holding that a state may only regulate pre-viability abortion on the basis of maternal health if those regulations do not "have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion"). Plaintiffs identify four substantial obstacles to abortion services in Wisconsin based on the Act: (1) the elimination of abortion services after 19 weeks (pre-viability); (2) the closure of half of the clinics in the state; (3) geographical limitation of abortion clinics in the state; and (4) significant reduction in access to abortions even at those clinics that remain open.

At the hearing, the State focused on the continued availability of abortion services in Madison, Milwaukee and clinics in other states. Appleton is the closest facility for a patient traveling from Northeast and North-Central Wisconsin, which itself could entail a 100 miles or more trip.[11] Adding *another* 100 miles to Madison or Milwaukee may well be prohibitive for some patients. These distances are amplified where the majority of patients are at or below the federal poverty line. "[T]hat a woman has some conceivable opportunity to exercise her right does not meant that a substantial obstacle to the exercise of that right is not imposed; nor can a serious burden be ignored because some

---

[11] The impact of closing the Appleton clinic is not on patients in Northeast and North-Central Wisconsin alone. Patients in most of the Upper Peninsula of Michigan would also be affected, requiring even longer driving distances to Appleton.

women of means may be able to surmount this obstacle while poorer women . . . cannot." *Bentley*, 2013 WL 3287109, at *4.

Even if women in more remote areas of Wisconsin are able to travel to Madison, Milwaukee or an out-of-state clinic, the closings and reduction in services overall will likely result in significantly longer wait periods for women seeking abortions -- pushing women past the nine week period allowed for medication abortions or pushing women out of the pre-viability zone. Other courts – including other federal district courts reviewing identical admitting privileges requirements -- have found that the elimination of a substantial portion of abortion providers in a state constitutes a substantial obstacle to a woman's right to seek an abortion. *See, e.g.*, *Okpalobi v. Foster*, 190 F.3d 337, 357 (5th Cir. 1999) (affirming district court's finding that regulation's effect of closing clinics which provided approximately 80% of all abortions in the state constituted an undue burden); *Planned Parenthood Se., Inc. v. Bentley*, No. 2:13cv405-MHT, 2013 WL 3287109, at *7 (M.D. Ala. June 28, 2013) (granting temporary restraining order where admitting privileges requirement would close three of five clinics in the State of Alabama; *Jackson Womens' Health Org. v. Currier*, No. 3:12cv436–DPJ–FKB, 2013 WL 1624365, at *5 (S.D. Miss. Apr. 15, 2013) (granting preliminary injunction after finding an undue burden where state admitting privileges requirement would close the only known abortion provider in Mississippi to close).

Moreover, the closure of AMS's Milwaukee clinic will mean that there will be *no* clinics in the State providing abortion services to women past 19 weeks. As Dr. Christensen explained in his declaration, "many fetal abnormalities are not diagnosed

17

until 20 weeks LMP or later" and, therefore, women seeking abortion care based on these diagnoses will not have access to an in-state provider if AMS closes. (Christensen Decl. (dkt. #6) ¶ 12.)[12]

### B. Irreparable Injury, Balance of Harms and Public Interest

As reflected in the immediate section above, there will almost certainly be irreparable harm to those women who will be foreclosed from having an abortion in the next week either because of the undue burden of travel or the late stage of pregnancy, as well as facing increasing health risks caused by delay. Since the State has failed to date to demonstrate any benefit to maternal health of imposing this restriction, there is no meaningful counterweight recognized by the United States Supreme Court to justify the Act's immediate enforcement. Given the substantial likelihood of success on the merits and of irreparable harm, the public's interest is best served by imposing a temporary restraining order on enforcement of the admitting privileges requirement until this court can address its merits on a more complete record.

### ORDER

IT IS ORDERED that:

1) plaintiffs' motion for temporary restraining order (dkt. #2) is GRANTED; and

---

[12] This would result in a "patchwork system where constitutional rights are available in some states but not others." *Jackson Women's Health Org.,* 2013 WL 1624365 at *5.

2) defendants are enjoined from enforcing the hospital admitting privileges requirement for abortions performed at PPW's Appleton-North and Milwaukee-Jackson centers and AMS's centers until July 18, 2013.

Entered this 8th day of July, 2013.

>BY THE COURT:
>
>/s/
>_____
>WILLIAM M. CONLEY
>District Judge