IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PLANNED PARENTHOOD OF
WISCONSIN, INC., SUSAN PFLEGER,
M.D., FREDRIK BROEKHUIZEN, M.D., and
MILWAUKEE WOMEN'S MEDICAL
SERVICES d/b/a AFFILIATED MEDICAL
SERVICES,

                    Plaintiffs,                          OPINION & ORDER

        v.                                                 13-cv-465-wmc

J.B. VAN HOLLEN, ISMAEL OZANNE,
JAMES BARR, MARY JO CAPODICE, D.O.,
GREG COLLINS, RODNEY A. ERICKSON,
M.D., JUDE GENEREAUX, SURESH K.
MISRA, M.D., GENE MUSSER, M.D.,
KENNETH.B. SIMONS, M.D., TIMOTHY
SWAN, M.D., SRIDHAR VASUDEVAN, M.D.,
OGLAND VUCKICH, M.D., TIMOTHY W.
WESTLAKE, M.D., RUSSELL YALE, M.D., and
DAVE ROSS,

                    Defendants.

On June 14, 2013, the Wisconsin Legislature passed Section 1 of 2013 Wisconsin Act 37 ("the Act"), which among other things requires physicians providing abortion services in Wisconsin to have admitting privileges at a hospital within 30 miles of their clinic.  Plaintiffs are all providers of abortion services in Wisconsin, who assert that requiring admitting privileges at a local hospital violates the Fourteenth Amendment of the United States Constitution.[1]   The court previously issued an order temporarily

---

[1] Although not the focus of this opinion, plaintiffs assert two other causes of action. First, plaintiffs claim that the Act violates the nondelegation doctrine because "the state has failed to provide any standards to govern whether admitting privileges should be granted," and "had also empowered the hospitals with the final authority to deny the

restraining defendants from enforcing this provision of the Act on July 8, 2013, and after briefing and oral argument, extended that restraining order by way of an interim preliminary injunction on July 17, 2013.  (Dkt. ##21, 61, 80.)

With the benefit of additional time to consider the parties' factual submissions and law, the court remains convinced that preliminary relief is warranted.  More specifically, applying the two-part test articulated by the United States in *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846 (1992), the court concludes that (1) defendants are not likely to succeed in demonstrating that the admitting privileges requirement is reasonably related to maternal health; and (2) plaintiffs are likely to succeed in demonstrating that the admitting privileges requirement will unduly burden women's access to abortion services in Wisconsin, at least in the near term.  Accordingly, the court will grant plaintiffs' motion for preliminary injunction prohibiting defendants' enforcement of the Act's admitting privileges requirement pending a decision on the merits or proof of a material change in circumstances.

FACTS

In its previous order, the court recited plaintiffs' alleged facts and addressed defendants' brief oral responses during the court's hearing on July 8th.  After careful consideration of plaintiffs' proposed findings of facts, defendants' written responses,

---

Plaintiffs the ability to pursue their chosen businesses and occupations."  (Pls.' Br. (dkt. #3) 19.)  Second, plaintiffs argue that the Act violates plaintiffs' procedural due process rights by preventing physicians and clinics providing abortion services from pursuing their professions and businesses respectively.  (*Id.* at 36-37.)

supporting affidavits and other evidence, as well as the parties' representations and concessions at the July 17th preliminary injunction hearing, the following summarizes the factual record as it stands today.

### A.  The Parties

Plaintiffs consist of two health care clinics -- Planned Parenthood of Wisconsin ("PPW") and Milwaukee Women's Medical Services d/b/a Affiliated Medical Services ("AMS") -- and two physicians who are affiliated with these clinics.  Plaintiff Susan Pfleger, M.D., is a licensed Wisconsin physician, board-certified ob-gyn with over twenty years of experience.  She performs abortions at PPW's Milwaukee-Jackson center and was scheduled to provide abortions at Appleton North beginning in July.  She does not have admitting privileges at a hospital located within 30 miles of either the Appleton North or Milwaukee-Jackson clinic.  Plaintiff Fredrik Broekhuizen, M.D., is the Medical Director of PPW.  All plaintiffs sue on their own behalf, as well as on behalf of their patients.

PPW provides comprehensive, outpatient health care services to thousands of women in Wisconsin.  PPW currently operates 24 health centers throughout Wisconsin and provides abortion services at three of those centers:  (1) Appleton North (where it performs surgical abortions to 13.6 weeks of pregnancy); (2) Milwaukee-Jackson (where it performs surgical abortions to 17 weeks and medication abortions to 9 weeks); and (3) Madison East (where it performs surgical abortions until 18.6 weeks).[2]  Last year PPW provided approximately 4,000 abortions.  (7/17/13 Hearing Tr. (dkt. #73) 66.)  None of

---

[2] All measurements are from the woman's last menstrual period ("LMP").

PPW's physicians who provide abortions in Appleton currently have admitting privileges at a hospital within thirty miles of the health center.[3]  Two of PPW's physicians who perform approximately half of the abortions in Milwaukee (one of whom is Dr. Pfleger) also do not have local hospital admitting privileges.

AMS provides comprehensive, outpatient health care services, including abortion services, at its clinic in Milwaukee.[4]  AMS provides medication abortions to 9 weeks and surgical abortions to 22 weeks (and, infrequently, beyond that time period).  AMS provides approximately 3,000 abortions per year.  AMS's physicians do not have admitting privileges within 30 miles of its clinic to satisfy the Act's requirements. PPW and AMS provide almost 97% of all abortions in Wisconsin on an annual basis out of their combined four clinics.[5]

---

[3] Defendants contend that two unnamed Appleton-based physicians may have admitting privileges, but do not provide evidence in support.  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 14.)  Instead, defendants cite to declarations stating that Dr. Pfelger had privileges at Aurora Sinai Medical Center in Milwaukee as recently as the end of 2011.  While Dr. Pfelger now plans to provide abortions at PPW's Appleton clinic, any past admission to a Milwaukee hospital obviously does not satisfy the Act's 30 mile radius requirement for that clinic.  Plaintiffs did acknowledge at the PI hearing that the "majority" of their physicians had admitting privileges at hospitals, just not within a 30-mile radius of a clinic where they are providing abortions.  (7/17/13 Hearing Tr. (dkt. #73) 29.)

[4] Until very recently, there were five clinics in Wisconsin where women can obtain abortions -- the four described above and a fifth in Green Bay.  That clinic, however, ceased providing abortion services as of August 1, 2013, for reasons unrelated to the Act.  (Declaration of Robert K. DeMott, M.D. (dkt. #56).)

[5] Based on aggregate 2011 figures reporting 7,249 abortions, these two entities account for roughly 96.57% performed in state.  (Declaration of Laura Ninneman ("Ninneman Decl."), Ex. A (dkt. #47-1) 11, *also available at* http://www.dhs.wisconsin.gov/publications/P4/P45360-11.pdf.)

Defendants consist of the Attorney General J.B. Van Hollen, the Dane County District Attorney Ismael Ozanne, the Department of Safety and Professional Services Secretary Dave Ross, and the thirteen members of the Wisconsin Medical Board.  The court previously granted plaintiffs' unopposed motion to certify a class of 71 elected district attorneys representing each of Wisconsin's counties, with District Attorney Ozanne as the class representative.[6]  All defendants are sued in their official capacity.

### B.  Recent Abortion Statistics in Wisconsin

In 2011, the most recent calendar year for which statistics are available, there were 7,249 reported abortions in Wisconsin, of which Wisconsin residents accounted for 7,019 or 97% and Michigan residents accounts for 144 or roughly 2%.  (Ninneman Decl., Ex. A (dkt. #47-1) 11.)[7]  The other surrounding states of Iowa, Illinois and Minnesota, account for another 75 combined or roughly 1%.  (*Id.*)  In 2011, 2,763 abortions were performed on women residing in Milwaukee County and 937 on women

---

[6] To clarify the record, the court finds that certification of the defendant class is appropriate pursuant to Fed. R. Civ. P. 23(b)(2).  All four of the requirements of subsection (a) are met and that the class has "acted or refused to act on grounds that apply generally to the class, so that injunctive relief or corresponding declaratory relief is appropriate."  *See* 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4.46 (9th ed. 2012) ("The decisions allowing certification of a defendant class under Rule 23(b)(2) generally involve actions to enjoin a group of local public officials from enforcing a locally administered state statute of similar administrative policies.") (citing cases).

[7] In addition to the abortions performed in-state, Minnesota reports that in 2012, 742 Wisconsin residents obtained abortions in Minnesota.  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 59 (citing to "Induced Abortions in Minnesota-January-December 2013: Report to the Legislature" (July 2013), *available at* http:www.health.state.mn.us/divs/chs/abrpt/2012abrpt.pdf).)

residing in Dane County (where Madison is located), which together represents approximately half of the abortions performed in the State. (*Id.* at 23-24.) Nearly 40% of patients at PPW's Milwaukee-Jackson clinic come from counties outside of the Milwaukee area. More than 80% of the patients who obtain abortions in PPW's Appleton health center come from outside Outagamie County, where the health center is located. In 2011, 251 abortions were performed on women residing in Outagamie County, while 373 and 206 were performed on women in surrounding counties Brown and Winnebago respectively. (*Id.* at 23-24.)[8]

### C. The Act

Codified at Wis. Stat. § 253.095, the Act provides in pertinent part:

> SECTION 1. 253.095 of the statutes is created to read:
>
> 2253.095 Requirements to perform abortions. (1) Definition. In this section, "abortion" has the meaning given in s. 253.10 (2) (a).[9]
>
> (2) Admitting privileges required. **No physician may perform an abortion, as defined in s. 253.10 (2) (a), unless he or she has admitting privileges in a hospital within 30 miles of the location where the abortion is to be performed.**
>
> (3) Penalty. Any person who violates this section shall be required to forfeit not less than $1,000 nor more than

---

[8] Exhibit B to Ninneman's declaration is a map showing the three-year annual average number of reported induced abortions by County of Residence, for Wisconsin Residents, from 2009-2011. (Ninneman Decl., Ex. B (dkt. #47-2).)

[9] Abortion is defined as "the use of an instrument, medicine, drug or other substance or device with intent to terminate the pregnancy of a woman known to be pregnant." Wis. Stat. § 253.10(2)(a). The definition encompasses the abortions performed by plaintiffs.

$10,000. No penalty may be assessed against the woman upon whom the abortion is performed or induced or attempted to be performed or induced.

(4) Civil remedies. (a) Any of the following individuals may bring a claim for damages, including damages for personal injury and emotional and psychological distress, against a person who performs, or attempts to perform, an abortion in violation of this section:

1. A woman on whom an abortion is performed or attempted.

2. The father of the aborted unborn child or the unborn child that is attempted to be aborted.

3. Any grandparent of the aborted unborn child or the child that is attempted to be aborted.

(b) A person who has been awarded damages under par. (a) shall, in addition to any damages awarded under par. (a), be entitled to not less than $1,000 nor more than $10,000 in punitive damages for a violation that satisfies a standard under s. 2895.043 (3).

(c) A conviction under sub. (3) is not a condition precedent to bringing an action, obtaining a judgment, or collecting the judgment under this subsection.

(d) Notwithstanding s. 814.04 (1), a person who recovers damages under par. (a) or (b) may also recover reasonable attorney fees incurred in connection with the action.

(e) A contract is not a defense to an action under this subsection.

(f) Nothing in this subsection limits the common law rights of a person that are not in conflict with sub. (2).

(Emphasis added.)  Physicians also face investigation and professional discipline, up to and including potential license revocation, by the Medical Examining Board if they perform an abortion in violation of the Act.  Wis. Stat. § 448.02(3); Wis. Admin. Code § MED 10.02(2)(z).

7

The Act was introduced in the Wisconsin Legislature on June 4, 2013, and opposed by the State's leading medical associations, including the Wisconsin Medical Society, Wisconsin Association of Local Health Departments and Boards, Wisconsin Academy of Family Physicians, Wisconsin Hospital Association, and the Wisconsin Public Health Association.[10]  Devoid of any documentation of a medical need or purpose in Wisconsin, the Governor nevertheless signed the Act on July 5, 2013.  The Act took effect on July 7, 2013, but was enjoined by this court the following day on July 8, 2013.

Until the passage of the Act, the State of Wisconsin has not required hospital admitting privileges for any group of physicians performing an outpatient procedure.[11]

---

[10] Without record support, defendants question whether these medical organizations are "neutral."  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 9.)  Defendants also challenge the independence of a national medical society, the American College of Obstetricians and Gynecologists, based on Dr. Matthew Lee's assertion that ACOG "has become an advocate of unrestricted abortion and its opinions on abortion must be viewed through this lens."  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 9 (citing Declaration of Matthew Lee, M.D. (dkt. #42) ¶ 16.)   Dr. Lee, however, provides no support for his characterization.  Defendants also point to Dr. Thorp's declaration, in which he cites to a 1993 statement of the Executive Board of ACOG, reaffirmed in 2011, that "[t]he College continues to affirm the legal right of a woman to obtain an abortion prior to fetal viability" as proof of ACOG's bias.  (Declaration of John Thorp, Jr., M.D., M.H.S. (dkt. #50) ¶ 39.)  In a supplemental declaration, Dr. Laube, a former President of ACOG, stated that "ACOG has never taken the position that all regulation of abortion is inappropriate, in contrast to the American Association of Pro-Life Obstetricians & Gynecologists, of which Dr. Lee is a member, which asserts that women should not be allowed to voluntarily terminate a pregnancy under any circumstance."  (Supplemental Declaration of Dr. Laube ("Laube Suppl. Decl.") (dkt. #59) ¶ 8.)

[11] Defendants purport to dispute this finding of fact, but as support merely direct the court to Wis. Stat. § 50.36(3g)(c), which provides:

> (c) If a hospital grants a psychologist hospital staff privileges or limited hospital staff privileges under par. (b), the psychologist or the hospital shall, prior to or at the time of hospital admission of a patient, identify an appropriate

Surgical abortion is analogous to other gynecological and non-gynecological outpatient surgical procedures.[12]  (Declaration of Douglas Laube, M.D. ("Laube Decl.") (dkt. #4) ¶¶ 14-15.)  Specifically, a first-trimester surgical abortion is nearly identical to a diagnostic dilation and curettage (or D&C) or surgical completion of miscarriage, and a second-trimester abortion is similar to a hysteroscopy, which is a gynecological procedure that uses endocscopy for diagnostic and operative purposes.  Both of these procedures can be performed in an outpatient setting by gynecologists without hospital admitting privileges.

### D. Barriers in Timely Obtaining Admitting Privileges

There are eight hospitals within 30 miles of the Appleton North clinic and 16 hospitals within 30 miles of the abortion clinics in Milwaukee.  By virtue of membership

---

> physician with admitting privileges at the hospital who shall be responsible for the medical evaluation and medical management of the patient for the duration of his or her hospitalization.

If anything, this provision cuts against defendants, since it really is requiring that psychologists with staff privileges hand off their patient to hospital medical staff upon admission to be "responsible for the medical evaluation and medical management" of the patient.  Indeed, this provision is not unlike a similar provision for nurse midwives.  *See* Wis. Admin. Code § SPS 182.03.  Regardless, the plain language of the statute does not *require* a psychologist, psychiatrist or other physician to have admitting privileges at a hospital, much less at one within a certain distance of a clinic where an outpatient procedure is performed.  In any event, at the July 17, 2013, hearing, defendants effectively conceded that there are no comparable admitting privileges requirements in Wisconsin.  (7/17/13 Hearing Tr. (dkt. #73) 54.)

[12] Defendants dispute this fact, pointing to Dr. Anderson's challenge to Dr. Laube's comparison of surgical abortion to a vasectomy, since a vasectomy is performed outside of the abdominal cavity.  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 78.)  Still, defendants do not dispute -- and cannot dispute -- that virtually identical gynecological procedures are performed in an outpatient setting without any admitting privileges requirement.

in a hospital's medical staff, admitting privileges allow physicians to admit patients for care in that hospital.  In written affidavits, plaintiffs represent that they are working diligently since learning of the Act to review admitting requirements and obtain applications from all potentially relevant hospitals, but are still only in the early stages of what will likely be a months-long application process.  During the July 17th PI hearing, plaintiffs represented that at least some of their physicians have already submitted applications for privileges with local hospitals.  (7/17/13 Hearing Tr. (dkt. #73) 19.)

Plaintiffs represent, and defendants' declarants generally agree, that the process of applying for privileges and receiving a decision typically takes months.  (Declaration of James Anderson, M.D. ("Anderson Decl.") (dkt. #39) ¶ 11 (describing admitting privileges process as "rigorous," requiring "2-3 months of information gathering and review").)   Nevertheless, defendants raise the possibility of "emergency" admitting privileges as an option.  (*See* Declaration of Matthew Lee, M.D. ("Lee Decl.") (dkt. #42) ¶ 10.).)[13]  Plaintiffs respond credibly that such privileges involve emergencies from the hospital's perspective, not from the physician's.  (7/17/13 Hearing Tr. (dkt. #73) 20.)[14] Even if a possibility, the Act provides no grace period to allow physicians or clinics

---

[13] Defendants also cite to a provision of the administrative code in support allowing for "temporary" admitting privileges.  (*See* Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 32 (citing Wis. Admin. Code § DHS 124.12 ("Temporary staff privileges may be granted for a limited period if the individual is otherwise properly qualified for membership on the medical staff.").)  Unfortunately, there is no indication when these privileges would be granted or under what circumstances.

[14] This understanding appears consistent with state law, which refers to "emergency" staff privileges "during a period of a state of emergency related to public health declared by the governor."  Wis. Stat. § 50.36(3d)(a).

providing abortion services reasonable time to obtain the necessary admitting privileges for so-called "emergency" or other reasons, including the health of the patient.

Even if timing were not an issue, plaintiffs further contend that it is (at best) uncertain whether the physicians providing abortion services in Appleton and Milwaukee will be able to obtain the required admitting privileges. Plaintiffs note numerous barriers that typically militate against their being granted such privileges, including (1) the "common practice" of extending privileges only to physicians who can guarantee a minimum number of hospital admissions each year, (2) residency requirements, (3) requirements that physicians be members of approved practice groups and (4) political, ideological or religious impediments. (*See* Laube Decl. (dkt. #4) ¶¶ 26-33; Christensen Decl. (dkt. #6) ¶ 22; Declaration of Fredrik Broekhuizen, M.D. ("Broekhuizen Decl.") (dkt. #7) ¶ 22).)  Specific to a residency requirement, plaintiffs represent that PPW is unable to satisfy *any* residency requirement for its Appleton Clinic because the majority of its physicians travel from elsewhere in Wisconsin to provide care. (Declaration of Teresa A. Huyck ("Huyck Decl.") (dkt. #5) ¶ 21.)[15]

Defendants challenge each of these claimed barriers to obtaining admitting privileges, pointing to declarations of physicians submitted in opposition to plaintiffs' motion for preliminary injunction, largely describing personal experiences at their

---

[15] Whether this barrier is short term (*i.e.*, the clinic is not currently staffed by local physicians) or long term (*i.e.*, the clinic has been unable, despite concerted effort, to find physicians who are willing to reside locally and provide these services) is unclear on the current record.

respective hospitals.[16]   As for the minimum admissions requirement, Dr. Merrill represents that despite "not admitt[ing] a single patient over the past 2-1/2 years" at the four hospitals for which he has privileges, his "privileges are still active and there has been no question of my status at these hospitals."  (Declaration of David C. Merrill, M.D., Ph.D. ("Merrill Decl.") (dkt. #46) ¶ 20.)  Dr. Lee further averred that at his hospital, Wheaton Franciscan -- St.  Joseph, "courtesy" staff appointments may be available for physicians that have "low inpatient usage."   (Lee Decl. (dkt. #42) ¶ 11; *see also* Declaration of James G. Linn, M.D. ("Linn Decl.") (dkt. #43) ¶ 12.)  Drs. Merrill and Lee also aver that their respective hospitals do not have residency requirements, nor is Dr. Merrill aware of such a requirement at other hospitals.  (Merrill Decl. (dkt. #40) at ¶¶ 20, 22; Lee Decl. (dkt. #42) ¶ 11.)

As for the ideological, religious or political barriers, defendants point to the so-called "Church Amendments," 42 U.S.C. §300a-7, which in pertinent part prohibits "discriminat[ion] in the extension of staff or other privileges to any physician or other health care personnel, because he performed or assisted in the performance of a lawful sterilization procedure or abortion."  Defendants also point out that one of the plaintiffs, Dr. Broekhuizen, actually has admitting privileges at Columbia -- St. Mary's Hospital, a

---

[16] Both sides criticize the neutrality of the other sides' respective experts before this court.  Purely on a paper record, without the benefit of live testimony, the court is not in a position to determine whether these alleged biases undermine the credibility of any expert's testimony, although based on disinterest, qualifications and familiarity with abortion services and hospital care specific to Wisconsin, plaintiffs' experts -- who include representatives of nationally-recognized, credential-issuing medical societies and chairs of relevant practice areas at the state's two medical schools -- would appear to have the upper hand.

Catholic institution.  (Linn Decl. (dkt. #43) ¶ 13.)  Drs. Lee and Merrill both also aver that they are unaware of any "absolute bar at religiously affiliated Wisconsin hospitals against competent abortion providers seeking or receiving admitting privileges."  (Lee Decl. (dkt. #42) ¶ 13; Merrill Decl. (dkt. #46) ¶ 22.)[17]

### E.  Impact of Act's Admitting Privileges Requirement on Abortion Services in Wisconsin

Dr. Christensen, a board-certified obstetrician-gynecologist, with nearly forty years of experience performing abortions, and the co-owner of plaintiff AMS, avers that AMS currently has two active physicians, with Dr. Christensen providing occasional medical care when those two physicians are not available.  Neither of AMS's two active physicians, nor Dr. Christensen, has admitting privileges within 30 miles of its Milwaukee clinic.  Dr. Christensen further represents that if the Act is "not immediately blocked, AMS will have no choice but to discontinue providing abortion care and shut down immediately."  (Declaration of Dennis Christensen, M.D. ("Christensen Decl.") (dkt. #6) ¶ 6.)  In addition to this direct injury to AMS's staff and owners, Dr. Christensen avers that many women seeking abortions in Wisconsin will face significant burdens and delay, while some may be precluded from obtaining abortions altogether,

---

[17] Recently, plaintiffs submitted a motion for leave to file a supplemental declaration, in which plaintiffs' counsel attaches a news article which purports to challenge Dr. Lee's representation that his hospital would not reject a physician's application for admitting privileges solely on the basis that the physician performs abortions.  (Suppl. Decl. of Lester Pines, Ex. A (dkt. #78-2).)  Defendants oppose the court's consideration of this declaration on hearsay and timeliness grounds.  (Defs.' Opp'n (dkt. #79).)  The court agrees and does not consider it for purposes of the preliminary injunction motion.

including women who are more than 18.6 weeks pregnant and for whom AMS provides the only outpatient option in Wisconsin.

PPW's President and Chief Executive Officer Teresa A. Huyck represents that all of the doctors providing abortion services in Appleton North and two of its physicians providing services in Milwaukee do not have the necessary admitting privileges under the Act. Huyck further represents that because of the difficulty in obtaining such privileges and/or in recruiting physicians with the necessary privileges, the Act will force PPW to close its Appleton North health center and reduce by roughly one-half abortions performed at its health center in Milwaukee-Jackson.

In response to these proposed facts, defendants purport to "put[] Plaintiffs to their proof," but do not challenge the substance of plaintiffs' assertion that the Act will cause two of four clinics to close and cut the capacity of a third clinic by fifty percent. During the preliminary injunction hearing, defendants similarly did not dispute plaintiffs' assertion that the Act would close down two clinics at least in the short-term, choosing to focus instead on whether these closures and diminished access would constitute an undue burden on women seeking abortions in Wisconsin. (7/17/13 Hearing Tr. (dkt. #73) 58-60.) Defendants also assert that women seeking abortions post-18.6 weeks would still have inpatient options for obtaining an abortion, albeit only for a "severe or lethal fetal anomaly." (Defs.' Resp. to Pls.' PFOFs (dkt. #90) (citing Declaration of John Thorp, Jr., M.D., M.H.S. ("Thorp Decl.") (dkt. #50) ¶ 42).)

14

Plaintiffs represent that 60% of PPW's abortion patients are at or below the federal poverty line. (Huyck Decl. (dkt. #5), ¶ 32.)[18]  Moreover, the cost and difficulty associated with travel for the two visits to health centers required under current Wisconsin law will be amplified with the closure of the Appleton clinic, given its relative proximity to Northeast Wisconsin and the Upper Peninsula of Michigan.  The abortion providers in its Milwaukee-Jackson and Madison health centers are already overburdened and do not have the ability to provide abortions on additional days, thus resulting in wait times, again at least in the near term, that exceed the current two to three weeks for the initial counseling appointment and another one to two weeks for the abortion appointment.  Any increase in the wait times poses increased medical risks for women seeking abortions, including losing the medication abortion option for those occurring early in the first trimester or losing the abortion option altogether for those approaching viability.[19]

Defendants also challenge whether the increased travel distance to Madison or Milwaukee will create a substantial burden on women residing in Northern Wisconsin or the Upper Peninsula.  With the closure of the Appleton clinic, however, defendants acknowledge that certain patients will be required to travel up to an additional 100 miles one way to either Madison or Milwaukee.  Keeping in mind that women are required to travel for at least two appointments, defendants calculate that the additional 400 miles

---

[18] For a family of four, the federal poverty line is set at an annual income of $23,550. Poverty Guidelines, *available at* http://aspe.hhs.gov/poverty/13poverty.cfm#guidelines.

[19] Because of the increased travel burdens and delays, Huyck represents that some women will either be forced to carry pregnancies to term or will resort to unsafe options.

translates to an additional 16 gallons of gasoline at an approximate cost of $56.  (Defs.' Resp. to Pls.' PFOFS (dkt. #51) ¶ 86.)  With certain non-profit organizations providing funding for Wisconsin women seeking abortions, defendants contend that the $56 cost of closure of the Appleton clinic will not substantially burden even poorer women for whom that clinic would have been their closest option.  Defendants contend that, at most, the closures will constitute a "severe inconvenience," which is not enough to satisfy *Casey*'s "undue burden" test.  (7/17/13 Hearing Tr. (dkt. #73) 59.)

### F.  Health Risks Associated with Abortions

Among other evidence, plaintiffs offer the declaration of Douglas Laube, M.D, to address the health risks associated with abortion procedures, based on his expertise in obstetrics and gynecology and the provision of abortions services.  Dr. Laube has been board-certified in obstetrics and gynecology since 1976 and licensed to practice medicine in Wisconsin since 1993.  From 1993 to 2006, Dr. Laube served as the Chairman of the Department of Obstetrics and Gynecology at the University of Wisconsin.  He has also served as an officer of the American College of Obstetricians and Gynecologists ("ACOG"), including as its President for 2006-2007.  Dr. Laube opines that the admitting privileges "requirement is medically unjustified and will have serious consequences for women's health in Wisconsin."  (Laube Decl. (dkt. #4) ¶ 7.)

In support of this conclusion, Dr. Laube cites studies demonstrating that legal abortion is one of the safest medical procedures in the United States, while the risk of death associated with childbirth is 14 times higher.  (Laube Decl. (dkt. #4) ¶ 8.)  The

16

risk of death related to abortion overall is less than 0.7 deaths per 100,000 procedures or 0.000007%.  (*Id.*)  (As a point of comparison, Dr. Laube states that the risk of death from fatal anaphylactic shock following use of penicillin in the United States is 2.0 deaths per 100,000 uses or 0.00002%.  (*Id.*))  Nationally, less than 0.3% of women even require hospitalization because of an abortion complication.  Because of this low risk, Dr. Laube represents that abortions are regularly performed safely in outpatient settings; indeed, 90% of abortions in the United States are performed on an outpatient basis.  (*Id.* at ¶ 9.)

Defendants challenge these statistics, asserting that "[t]he data associated with medical reports regarding abortions is imprecise and incomplete."  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 43 (citing Thorp Decl. (dkt. #50) ¶¶ 14-19).)  Dr. Thorp posits that the complication rates range from 2-10%, but fails to cite to *any* studies in support of his estimate.  (Thorp Decl. (dkt. #50) ¶ 20.)  Dr. Merrill similarly fails to site to any studies, but estimates that the risk of a woman experiencing complications from an abortion that requires hospitalization to be 0.3 to 0.5%.  (Merrill Decl. (dkt. #46) ¶ 13.)[20]

---

[20] While Merrill's estimate is in line with Laube's, both the declarations of Dr. Thorp and Dr. Merrill stand in stark contrast to the detailed statistics referenced in Dr. Laube's declaration.  (Laube Decl. (dkt. #4) nn.1, 3 & 4).)  Even crediting defendants' general assertion that abortion complications are "underreported" (*see* Anderson Decl. (dkt. #39) ¶ 25; Merrill Decl. (dkt. #46) ¶ 13), defendants offer no evidence suggesting that hospitalization as a result of abortion complications substantially exceeds the 0.3% cited in Dr. Laube's declaration.  Likely for this reason, defendants rely on the 0.3% to 0.5% range for hospitalization rates in calculating their estimate that a woman is hospitalized for abortion complications every 16 to 21 days in Wisconsin.  (Defs.' Opp'n  (dkt. #38) 4.)

State reporting records suggest that the risks are even lower. In 2011, there were 25 complications out of the 7,250 abortions completed in Wisconsin, which represents a total 0.35% complication rate, without any information as to what portion of those reported 25 complications actually required hospitalizations. (Ninneman Decl., Ex. A (dkt. #47-1) 15.) Plaintiffs' own hospitalization rates are also lower than those cited by Dr. Laube. (Pls.' PFOFs (dkt. #17) ¶ 49 (citing Broekhuizen Decl. (dkt. #7) ¶ 11 (describing PPW's Milwaukee-Jackson hospitalization rate over the last two calendar years at 0.22% and reporting no hospitalizations at Appleton North over the same period); Christiansen Decl. (dkt. #14) ¶ 14 (stating that AMS has transferred two patients per year on average for the last eight years, which represents a hospitalization rate of less than 0.1% in 2012 based on 3,000 patients).)

### G. Role of Admitting Privileges

In the rare situations requiring hospitalization, Dr. Laube further avers that "whether the abortion provider has admitting privileges at that hospital is completely irrelevant to providing optimal care." (Laube Decl. (dkt. #4) ¶ 17.) As Dr. Laube explains, the abortion provider can contact the ob/gyn at that hospital, who can admit the patient if necessary. To ensure continuity of care, Drs. Broekhuizen and Christiansen both stated in their respective declarations that plaintiffs' physicians would alert the ER and provide as much information as necessary to the on-call physicians.

ACOG guidelines recognize that clinics performing abortions should have arrangements in place for transferring patients who require emergency treatment, but

explicitly reject the notion that physicians performing abortions need to have admitting privileges at a hospital.  (Laube Decl. (dkt. #4) at ¶ 25.)  Such a requirement also runs counter to the current hospital care model, which increasingly relies on dedicated staff physicians or "hospitalists," including an on-call ob-gyn, rather than the outdated model that relies on physicians who provide outpatient care with hospital privileges.  (*Id.* at ¶ 26.)  Dr. Laube explains that under the modern model, "more and more highly qualified and proficient outpatient providers must hand off the care of their patients experiencing complications at the hospital door.  This is not patient abandonment, but the way that good medicine is practiced today."  (*Id.* at ¶ 33.) [21]

Dr. Laube's view is consistent with that of Dr. Stephen W. Hargarten, who is board certified in emergency medicine and Chairman of the Department of Emergency Medicine College of Wisconsin in Milwaukee since 199.  Dr. Hargarten provided a rebuttal declaration in which he describes emergency medicine in Wisconsin, and specifically describes the routine "hand off" of patient care from other physicians who do not have admitting privileges at his hospital and the routine involvement of an on-call

---

[21] In his supplemental declaration, Dr. Laube also points out that

> [a]bandoning a patient would violate MEB 10.02(2)(j) because it would be a "practice or conduct which tends to constitute a danger to the health, welfare, or safety of patient or public." If those physicians who perform abortions were 'abandoning' their patients, with the scrutiny under which abortion clinics operate in this state, surely there would have been a substantiated finding by the Medical Examining Board ("MEB") regarding such conduct. I am unaware that there has ever been such a finding by the MEB.

(Laube Suppl. Decl. (dkt. #59) ¶ 12.)

19

ob-gyn if the circumstances require.  (Declaration of Stephen W. Hargarten, MD, MPH ("Hargarten Decl.") (dkt. #54) ¶¶ 2, 8, 10-11.)

In response, defendants now posit several reasons for the requirement, which fall into three broad categories: (1) credentialing, (2) continuity of care, and (3) accountability / peer review.  *First*, defendants contend that admitting privileges serve a "regulatory" or "credentialing" function.  (Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 40 (noting Dr. Linn's statement that privileges perform a "regulatory function and ensure high standards" and Dr. Anderson's statement that "credentialing is a 'time-proven method to ensure that those doing life-impacting surgical procedures are qualified to do so").)   Any interest in ensuring the quality of physicians performing abortions is not furthered by the Act's requirement that admitting privileges be at a hospital within a 30-mile radius of where the abortion is performed.[22]  Indeed, defendants acknowledge that the majority of physician providers of abortions have privileges at *some* hospital within Wisconsin, just not within the required 30-mile radius.

If the Act's real purpose was to improve the quality of physicians providing abortion services, it could have been addressed directly through board certification, training, and licensing requirements, not indirectly through an admitting privileges

---

[22] Defendants cite to the Eighth Circuit's decision in *Women's Health Ctr. of W. County, Inc. v. Webster*, 871 F.2d 1377 (8th Cir. 1989), in support for their argument that the admitting privileges requirement advances maternal health.  In that case, however, the admitting privileges requirement had *no* geographical restriction, making the link between the requirement and credentialing was more tenable.

requirement, especially where there is a demonstrated, substantial variation in the requirements necessary for such privileges among hospitals across the state.[23]

*Second*, defendants argue that admitting privileges will further continuity of care between the physician and hospital, which is critical in managing complications. However, defendants have so far failed to establish any credible link between admitting privileges at a nearby hospital and furthering continuity of care because of obvious, practical limitations on the likely impact of this requirement, undisputed trends in hospital care away from participation by outside physicians in hospitals, and the utter lack of a similar requirement for *any* other (including substantially more dangerous) outpatient medical procedures advocated by a hospital, medical group or medical society, much less adopted by the Wisconsin Legislature.  (7/17/13 Hearing Tr. (dkt. #73) 69-70.)

As an initial matter, the rate of complications is very low and the rate of those complications requiring hospitalization is even lower.  (*See* discussion *infra* Facts Part F.) The record in this case to date establishes extremely low hospitalization rates arising out of abortion procedures, especially when considered relative to other outpatient

---

[23] By this observation, the court does not mean to suggest the State must adopt the least restrictive or even the most direct means to a legitimate end, but rather that the Legislature's roundabout approach makes the defendants' articulated rationale more suspect.  To the extent the Legislature actually intended to delegate quality control of abortion providers to the varied, changing standards at hundreds of hospitals around the state, plaintiffs' challenge to the Act based on the nondelegation doctrine would also gain substantial traction.

procedures, whether gynecological or unrelated procedures like colonoscopy.[24]  Of those requiring hospitalization after an abortion, up to half of the complications will not present themselves until after the patient is home given the number of complications arising from early-term abortions induced by medication which occur after the patient has left the clinic (Laube Decl. (dkt. #4) ¶ 12) and some portion of the surgical ones which can also present after the procedure.  For those patients -- a substantial portion of whom travel out of their home county to obtain abortion services -- it is unlikely that the appropriate location for hospitalization will be anywhere near the clinic where the abortion was performed.

Even for those patients whose complications present at the clinic or who are likely to be within its thirty-mile radius when complications present, it is uncertain at best that the most appropriate hospital will be the one for which an abortion provider has admitting privileges, even taking into consideration that an EMT may consider the physician's or patient's preference for treating hospital in making a decision as to where to take the patient.  (*See* Defs.' Resp. to Pls.' PFOFs (dkt. #51) ¶ 56.)  If, for example, a physician providing abortion services obtained admitting privileges at a hospital 29 miles from the abortion clinic, it is unlikely that the EMT would send a patient requiring emergency treatment to *that* hospital if another, suitable hospital was available nearby.

---

[24] Like abortion procedures, serious complications from a colonoscopy "are uncommon," but roughly on par with abortion. American Society for Gastrointestinal Endoscopy Standards of Practice Committee, *Guideline: Complications of colonoscopy*, 74 GASTROINTESTINAL ENDOSCOPY 745-46 (2011) (overall serious adverse rate was 0.28%, typically due to related polypectomy or use of anesthesia).

In discussing continuity of care, defendants' experts also express concern about an abortion providers' inability to properly manage emergencies in the absence of an admitting privileges requirement.   As defendants point out, Wisconsin law already requires abortion providers to

> [h]ave arrangements with a hospital approved under subch. II of ch. 50, Stats., for admission of patients needing hospital care. Such hospital shall be located sufficiently near the facility used so that the patient could be transferred to and arrive at the hospital within 30 minutes of the time when hospitalization appears necessary.

Wis. Admin. Code § MED 11.04(g).  Indeed, this requirement is consistent with ACOG's recommendation that physicians providing abortion services should have arrangements in place for transferring patients who require emergency treatment.[25]

Telling, the Act in question does not require that the physician who provided abortion services actually accompany his or her patient to the hospital, provide treatment of the patient at the hospital, or in any way facilitate the hand-off of the patient to emergency doctors or other specialists.  On the other hand, without admitting privileges, abortion providers in Wisconsin are free to accompany patients to the hospital,

---

[25] Defendants cite to two Fourth Circuit cases, *Greenville Women's Clinic v. Bryant*, 222 F.3d 157 (4th Cir. 2000), and *Greenville Women's Clinic v. Comm'r, S. Car. Dep't of Health & Envtl. Control*, 317 F.3d 357 (4th Cir. 2002), in support of their argument that the admitting privileges requirement furthers maternal health.  The pertinent regulation at issue in those cases required that "[s]taff at abortion clinics must have admitting privileges at a local hospital *or* have documented arrangements for emergency transfer to a hospital," 222 F.3d at 161 (emphasis added).  The South Carolina regulation ultimately upheld by the Fourth Circuit is, therefore, not only substantially in line with ACOG's standards, but also more clearly tied to the purpose of insuring emergency care for women seeking abortion services while leaving more flexibility for those providing services to comply.

communicate with the emergency physicians, and ensure that the patient is properly handed-off.  Indeed, as previously discussed, taking steps to ensure continuity of care between clinicians and hospitals is already the expected practice in Wisconsin generally.

In addition to these practical limitations, the admitting privileges requirement also runs counter to current hospital practices in Wisconsin, which seek dedicated staff physicians or hospitalists to provide inpatient care.  Defendants' declarants mention the importance of communication between the abortion provider, emergency room physicians and specialists treating patients with complications, but fail to explain adequately how admitting privileges will aid in communication or the effective hand-off of patients dealing with complications.  As explained in Dr. Hargarten's declaration in support of plaintiffs' motion for preliminary injunction, emergency room physicians are trained to address complications arising from an abortion and will involve on-call specialists when needed.  Moreover, while other states may have a shortage of ob-gyns at hospitals, Dr. Hargarten is not aware of any shortage of this specialty in Wisconsin.

Most telling of all is defendants' inability -- despite repeated opportunities and prompting by this court -- to provide a single example of the recognized importance of local admitting privileges for *any* other clinical or outpatient procedure than abortion anywhere in Wisconsin, and not just by a governmental entity, but by any medical group or society.  (7/17/13 Hearing Tr. (dkt. #73) 69-70.)  The reason for this would appear obvious:  were a procedure sufficiently dangerous as to require, or even have a substantial risk of, hospitalization, it would likely be performed in a hospital.  The fact that procedures demonstrably more dangerous (by a factor of ten or more), including

procedures requiring general anesthesia, are performed in outpatient facilities underscores defendants' present failure, and likely inability, to meet their burden of proof that a reasonable relationship exists between admitting privileges and continuity of care.[26]

*Third*, defendants argue that the admitting privileges requirement will ensure accountability through subsequent peer review in cases of mismanaged health care or patient abandonment.  The court cannot discount the possibility that if there were a rare, tragic circumstance where a woman's complications from an abortion procedure were not adequately addressed at a hospital, it may be subject to peer review.  Still, the hospital would almost certainly review its procedure regardless of the abortion provider's admitting privileges, and while the hospital would not have the sanction of denying continued admitting privileges available to someone lacking them in the first place, should blame be ultimately placed on the provider, the hospital is not without far more effective means to affect a physician's or clinic's ability to conduct a medical practice, including recommending that the State revoke a license to practice medicine.


OPINION

## I.  Standing

Defendants devote much of their opposition brief challenging plaintiffs' standing to assert the Fourteenth Amendment rights of their patients, whether as physicians who

---

[26] The court will await trial on the issue, but the complete absence of an admitting privileges requirement for clinical procedures including for those with greater risk is certainly evidence that Wisconsin Legislature's only *purpose* in its enactment was to restrict the availability of safe, legal abortion in this State, particularly given the lack of any demonstrable medical benefit for its requirement either presented to the Legislature or this court.

provide women abortions or as organizations that operate facilities where abortion services are provided.  The Seventh Circuit has repeatedly ruled otherwise:  the standing of physicians and clinics to assert the rights of their patients in the abortion context "is not open to question."  *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998); *see also Karlin v. Foust*, 188 F.3d 446, 456-57 (7th Cir. 1999) (both citing *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 62 (1976)).  Whether, as defendants argue, *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), or some other development in the law may alter the Seventh Circuit's definitive holdings in *Doyle* and *Karlin* is not for this court to say, but rather for the Seventh Circuit.  As explained in the court's TRO opinion and order and the subsequent PI hearing, the court remains satisfied in the meantime that plaintiffs have standing to pursue the constitutional claims of their abortion patients under current law and, in turn, that this court has subject matter jurisdiction over those claims.

## II. Motion for Preliminary Injunction

As directed by the Seventh Circuit, this court applies a sliding scale in weighing whether preliminary relief is warranted.  *See, e.g., Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) ("[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008) ("The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its

favor.").  To win a preliminary injunction, therefore, "a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.  If the moving party makes this threshold showing, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011) (internal quotations omitted)).  Here, the balance weighs heavily in plaintiffs' favor.

### A. Likelihood of Success on the Merits

Plaintiffs raise three constitutional challenges to the Act.  In line with its opinion granting plaintiffs' motion for temporary restraining order, the court will focus on plaintiffs' challenge to the Act based on the Fourteenth Amendment rights of the plaintiffs' *patients*, which (in this court's view at least) is the strongest of their claims and justifies a continuing injunction pending a definitive ruling on the merits.

### 1. Standard of Review

Women have a fundamental liberty interest, protected by the due process clause of the Fourteenth Amendment of the United States Constitution, in obtaining an abortion. *Roe v. Wade*, 410 U.S. 113, 154 (1973); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846 (1992) (reaffirming the central holding in *Roe v. Wade*).  As the

United States Supreme Court has repeatedly explained, this right is not absolute. *Roe*, 410 U.S. at 154; *Casey*, 505 U.S. at 877-78. State interests in maternal health and the protection of fetal life can justify regulations. *Id.* In this lawsuit, the State maintains that the requirement for admitting privileges is "reasonably directed to the preservation of maternal health." (Defs.' Opp'n (dkt. #38) 36-37 (quoting *Casey*, 505 U.S. at 900-01).) *See City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 430-31 (1983), *reversed on other grounds Casey*, 505 U.S. at 870; *Doe v. Bolton*, 410 U.S. 179, 195 (1973) (describing the burden as that of the state).[27]

Plaintiffs argue for a heightened standard of review, since the state regulation implicates a fundamental right (Pls.' Br. (dkt. #3) 26 & n.10), but the court finds no basis for applying this standard of review, except perhaps to the extent that the burden falls on the State to demonstrate that the regulation is "reasonably related" to a legitimate state interest. Contrary to defendants' reading of the *Casey* and *Gonzales* decisions, this still makes the court something more than a rubber stamp of any rationale defendants now articulate to explain the Wisconsin Legislature's requirement of admitting privileges at a hospital within 30 miles of outpatient abortions.

---

[27] The court reads *Casey* to require that where a challenged regulation is "designed to foster the health of a woman seeking an abortion," the state's reason for adopting the regulations must similarly be health-related, as compared to regulations that are "designed to persuade the woman to choose childbirth over abortion." *Casey*, 505 U.S. at 878. In briefing and at the preliminary injunction hearing, defendants' counsel conceded that (1) the only state interest at issue here is the health of women seeking abortions in Wisconsin, and (2) it is defendants' burden to prove the admitting privileges requirement is reasonably related to that interest. (7/17/13 Hearing Tr. (dkt. #73) 45, 52, 54.)

Certainly, the Supreme Court appears to have stepped back from requiring a "compelling state interest" to justify any limitation on access to abortion articulated some forty years ago in *Roe v. Wade*, 410 U.S. at 149, 156.  How far back remains open to debate.  *Roe* itself acknowledged that the government could impose basic health safeguards -- such as requiring that a procedure be performed by a qualified health professional -- as long as no limit is placed on a woman's access to abortion itself.  *Id*. at 154.  In *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989), Justice O'Connor provided the fifth vote for affirmance of a Missouri statute that, among other things, directed physicians to perform fetal viability tests at 20 weeks, concluding in her concurrence that this testing requirement did not impose an "undue burden" on a woman considering an abortion.  *Id.* at 530 (O'Connor, J., concurring).  With *Casey*, the Supreme Court expressly adopted this new, arguably less rigorous "undue burden" standard, acknowledging the government's latitude to regulate abortion even during the first trimester for reasons of maternal health or fetal viability.  505 U.S. at 875-76.  Still, as in *Webster*, the Court declined to overrule *Roe v. Wade*.

In two, more recent 5-4 decisions considering an intact D&E abortion (sometimes referred to as a "partial birth abortion") -- the first striking down a Nebraska law prohibiting the procedure in *Sternberg v. Carhart*, 530 U.S. 914 (2000), in which Justice Kennedy vigorously dissented, and the second upholding a federal ban adopted after extensive testimony and congressional findings in *Gonzales v. Carhart*, 550 U.S. 124 (2007), in which Justice Kennedy wrote for the majority -- the Court still did not overrule *Roe* (or *Casey* or even *Sternberg*).  *Gonzales*, 550 U.S. at 145-46, 157-58.  As to

the procedure itself, Justice Kennedy noted that prohibited intact D&E abortions "occur in the second trimester" and, in graphic detail, were found by Congress to be "a brutal and inhumane procedure." *Id*. at 134-40, 157. Ultimately, Justice Kennedy found that the question of constitutionality came down to whether the government's unquestioned interest in "potential life" and "protecting the integrity and ethics of the medical profession," *id.* at 157 (quoting *Casey*, 505 U.S. at 873, and *Washington v. Glucksperg*, 521 U.S. 702, 731 (1997), respectively), outweighed any health risks to women by the prohibition of this procedure. *Id*. at 159.

As Justice Kennedy explained, where the government "has a rational basis to act" and the restriction "does not impose an undue burden," the government "may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interest in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales*, 550 U.S. at 158. The Court in *Gonzales* deferred to Congress's findings that (1) the prohibited method of abortion had a "disturbing similarity to the killing of a newborn infant," and (2) the prohibition would not "impose significant health risks on women" despite the existence of conflicting medical evidence. *Id.* at 158, 162. Accordingly, the burden of the prohibition was held not to be "undue," at least where alternatives are "available to the prohibited procedure that have extremely low rates of medical complications" and are "generally the safest method of abortion during the second trimester." *Id.* at 164.

In reaching this result, the *Gonzales* Court emphasized that it did "not in circumstances here, place dispositive weight on Congress' findings." *Id*. at 165. "The

30

Court retains an independent constitutional duty to review factual findings where constitution rights are at stake." *Id*.  As the Seventh Circuit had previously explained, this requires "lower courts to undertake an individualized inquiry into the effects of the regulations challenged . . . , even if those regulations are virtually identical to those upheld in *Casey*." *Karlin v. Foust*, 188 F.3d 446, 484 (7th Cir. 1999).  In the end, under the Supreme Court's jurisprudence, a woman's right to an abortion remains fundamental to the point of the fetus's viability, but may be regulated through means related to legitimate state interests, including maternal health, fetal viability and medical integrity and ethics, unless the regulation is unduly burdensome.   Accordingly, it remains incumbent on district courts to consider: "(1) whether the . . . requirement was reasonably related to a legitimate state interest and (2) whether the [requirement] had the practical effect of imposing an undue burden." *Karlin*, 188 F.3d at 481.

### 2.  Reasonable Relationship of Admitting Privileges to Maternal Health

In considering whether defendants are likely to succeed in demonstrating a reasonable link between the admitting privileges requirement at issue here and maternal health, this court is bound "to review factual findings where constitutional rights are at stake." *Gonzales*, 550 U.S. at 165.  "Uncritical deference" to legislative fact findings is "inappropriate." *Id.* at 166.  On the other hand, "[c]onsiderations of marginal safety, including the balance of risks, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends." *Id.*

31

Here, there are *no* legislative findings.  Indeed, while defendants submitted the legislative record in support of their opposition to plaintiffs' motion, the record contains no testimony from a physician or other medical expert about whether, how, or why the admitting privileges requirement would further women's health.  (7/17/13 Hearing Tr. (dkt. #73) 42.)  On the contrary, the record contains only physicians and medical organizations speaking against the bill.  (*See* Affidavit of Jeffrey R. Renk, Ex. A (dkt. #48-1) 1 (noting Appearance against Senate Bill 206 by Dr. Tosha Wetterneck of the Wisconsin Medical Society).)

Defendants are, therefore, left to submit after-the-fact declarations by individual physicians purporting to provide a medical justification for this requirement in the Act. While the court considers this evidence in determining whether the State is likely to succeed in proving that an absolute requirement of local admitting privileges is reasonably related to maternal health, it obviously falls well short of the detailed record and formal factfinding considered by the Supreme Court in *Gonzales*.

For reasons previously discussed, defendants are unlikely to establish as a matter of fact that there is a reasonable relationship between the admitting privileges requirement and maternal health.  Defendants' position may have some merit if they could articulate a *single, actual* instance where a provider's lack of admitting privileges had been a factor in an abortion patient's negative outcome or the ability to properly consider or sanction a responsible provider for such an outcome in Wisconsin.  When pressed at the hearing, defendants were unable to even provide an example where an abortion provider's refusal to assist with continuity of care led to further complications.  (7/17/13

32

Hearing Tr. (dkt. #73) 48-49.)[28]  All defendants have presented to date are conclusory statements about patient "abandonment" on the part of defendants' experts.  As Dr. Laube points out if abandonment were an issue, surely there would be documented findings by the State of Wisconsin Medical Examining Board.  (Suppl. Laube Decl. (dkt. #59) ¶ 12.)  At this stage, defendants have failed to present *any* evidence that patient abandonment post-abortion is even a legitimate concern in Wisconsin.  On this record, the admitting privileges requirement remains a solution in search of a problem.

Defendants' principal response to this lack of evidence is to point to language in *Gonzales* that state legislatures have "wide discretion in areas where there is medical and scientific uncertainty."  (Defs.' Opp'n (dkt. #38) 65 (citing *Gonzales*, 550 U.S. at 163-64); *see also* Defs.' Sur-Reply (dkt. #65) 5-6.)  This assumes there is, in fact, a "documented medical disagreement."  *Gonzales*, 550 U.S. at 162.  The State's submissions to date fail to establish a credible, medical disagreement about the benefit of requiring admitting privileges at a hospital within 30-miles of an abortion procedure, especially in light of the unanimous criticism of this requirement by medical associations, including the American College of Obstetricians and Gynecologists.  *See City of Akron*, 462 U.S. at 431 (considering whether the regulation "departs from accepted medical practice").  Moreover, *Gonzales* involved the weighing of medical uncertainty with respect to the potential negative impact on women's health by prohibiting the intact D&E

---

[28] Defendants offered Dr. Linn's examples.  (Linn's Decl. (dkt. #43) ¶ 9.)  In the first case, the abortion provider failed to take steps to insure a proper transfer of the patient to the hospital's care.  In the second case, the provider stayed with the patient through admitting and surgery at the hospital.  But in neither case does Dr. Linn opine that the patient's need for hysterectomy was necessarily affected.

procedure against the state's compelling interests in respecting the life of the unborn and in the integrity and ethics of the medical community.  Here, there is no other legitimate state interest or interests at play which would counter-balance any arguable uncertainty in the medical community as to the medical rationale underlying this regulation.[29]

The Supreme Court's caution that abortion providers should be treated the same as other members of the medical community cuts both ways.  *Gonzales*, 550 U.S. at 163

_____

[29]  In their sur-reply brief, defendants also cite to *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 693 (7th Cir. 2002), for the proposition that "it is an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate."  (Defs.' Sur-Reply (dkt. #65) 5.)  This case is distinguishable from *A Woman's Choice* for at least two reasons.  First, the informed consent provision, including a two-visit requirement, at issue in that case posed certain difficulties in understanding and measuring its impact on women's access to abortion that are not present here.  As the Ninth Circuit explained in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004),

> [i]n the context of a law purporting to promote fetal life, whatever obstacles that law places in the way of women seeking abortions logically serve the interest the law purports to promote -- fetal life -- because they will prevent some women from obtaining abortions.  By contrast, in the context of a law purporting to promote maternal health, a law that is poorly drafted or which is a pretext for anti-abortion regulation can both place obstacles in the way of women seeking abortions *and* fail to serve the purported interest very closely, or at all.

*Id.* at 540.  In other words, in a case challenging a "persuasion" regulation, the plaintiff would need to prove an undue burden separate from the intended effect to decrease the number of women opting for abortions.  Such a challenge is not present here.  Second, the procedural posture of *A Woman's Choice-East Side Women's Clinic* also distinguishes that case from the present action.  In that case, the majority concluded that the district court had erred in finding plaintiff's evidence sufficient to establish undue burden.  Here, at this stage in the proceeding, the court need only conclude either that (1) defendants are not likely to succeed in demonstrating the requirement is reasonably related to maternal health *or* (2) plaintiffs are likely to succeed in demonstrating that the regulation poses an undue burden to find preliminary relief appropriate.

("The law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community.")  While abortion providers are singled out in certain ways (*e.g.*, reporting and informed consent requirements) *because* of the State's interest in persuading women to carry pregnancies to term or for some other reason unrelated to women's health, where, as here, the only interest at stake is maternal health, the exclusive application of the admitting privileges requirement to abortion providers borders on the irrational. Indeed, as discussed, the claimed connection between the admitting privileges requirement and maternal health is stretched to breaking when one considers other outpatient procedures, both gynecological and nongynecological in nature, that carry the same or even more serious risks and have no admitting privileges requirement.

No one disputes that credentialing of physicians, continuity of care and accountability and peer review of abortion procedures all may further women's health, just as they would for other medical procedures, making them proper areas of regulation by the State.  Specifically, each component may better equip physicians to handle complications.  But defendants have failed to meet their burden of proof by connecting the dots between these components of quality patient care and the admitting privileges requirement.  Even under a more lenient standard of review, the "reasonably related" requirement -- that a regulation must be reasonably related to the State's legitimate interest in maternal health -- still has significance particularly in light of the *Gonzales* Court's description of the lower court's role in reviewing factual findings that underlay a regulation impinging on a fundamental constitutional right.  Based on the record before

35

the court to date, the court concludes that the State is not likely to succeed in demonstrating that the admitting privileges requirement is reasonably related to maternal health.

### 3. Undue Burden

Even if defendants could meet their burden of establishing a reasonable relationship between the admitting privilege restriction and maternal health, the court further finds that plaintiffs are likely to succeed in demonstrating that the regulation poses an "undue burden" on women seeking abortion services in Wisconsin because it will have the effect (if not also the purpose) of presenting a "substantial obstacle" to the provision of those services, at least in the near term. *Casey*, 505 U.S. at 878.

As previously discussed, the protection of a woman's fundamental right to an abortion from *undue* burden comes directly from the Supreme Court's decision in *Casey*:

> The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Casey*, 505 U.S. at 874.[30]

---

[30] *Casey* also delineated the proper focus of an undue burden challenge. In finding a spousal notification provision unconstitutional, the Court explained that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894; *see also Gonzales*, 550 U.S. at 167-68 (plaintiffs must demonstrate that the regulation "would be unconstitutional in a large fraction of *relevant* cases" (emphasis added) (citing *Casey*)); *Karlin*, 188 F.3d at 481 (explaining that the court should focus on the "practical impact of the challenged

In order to demonstrate that the admitting privileges requirement creates a substantial obstacle to a woman seeking an abortion in Wisconsin, plaintiffs initially must demonstrate that the Act threatens closure of their respective clinics. As described above in the fact section, plaintiffs have submitted sufficient evidence to demonstrate that at least in the short-term, enforcement of the admitting privileges requirement will close PPW's Appleton clinic and AMS's clinic and will reduce PPW's Milwaukee clinic by half. In light of the record to date, the court finds that if the Act's admitting privileges requirement is enforced, there will be no abortion providers in the State of Wisconsin north of Madison and Milwaukee, at least in the near term, and likely through the expedited trial of this case in November. Plaintiffs have also put forth sufficient evidence to demonstrate that there are longer-term barriers to admitting privileges. Only time will tell whether these barriers are surmountable.

Plaintiffs identify three substantial obstacles to abortion services in Wisconsin imposed by the Act's admitting privilege requirement: (1) geographical limitation on the

---

regulation and whether it will have the likely effect of preventing a significant number of women for whom the regulation is relevant from obtaining abortions"). In so holding, the Court rejected the state's argument that the spousal notification provision at issue could not constitute an undue burden because the statute affects fewer than one percent of women seeking abortions. Here, defendants make a similar argument in asserting that the focus of plaintiffs' challenge should be on all Wisconsin women seeking abortions, since the admitting privileges requirement applies to all abortion providers in the state. *Casey*, however, instructs that the Act "must be judged by reference to those for whom it is an actual rather than irrelevant restriction." 505 U.S. at 895. Here, that would seem to be women seeking abortions who are impacted by the closure of PPW's Appleton clinic and the AMS clinic, and the reduction of capacity of the PPW Milwaukee clinic. The question is what percentage of those women will be *substantially* impacted. Even if the defendants are right that the relevant question is the impact on all women seeking abortions in Wisconsin, plaintiffs have offered sufficient proof to conclude that the impacts on a still significant minority of that population are also likely to be substantial in the near term for reasons explained elsewhere in this opinion.

location of abortion clinics in the state; (2) significant reduction in access to abortions across the state; and (3) the elimination of abortion services after 19 weeks (but still before viability).  In response, the State points to the continued availability of abortion services in Madison, Milwaukee and clinics in other states.  Appleton is the closest facility for a patient traveling from Northeast and North-Central Wisconsin and the Upper Peninsula of Michigan, which itself could entail a trip of 100 miles or more. While some patients in these areas may find travel to Madison or Milwaukee to be easier and faster than to Appleton (depending on their proximity to major highways and road conditions), adding *another* 100 miles or more to Madison or Milwaukee may well be prohibitive for a substantial fraction of patients currently served by the Appleton location.  While defendants focus solely on the additional cost of gasoline associated with up to an *additional* 400 miles of travel (assuming the required minimum of two round-trips before an abortion may be performed in Wisconsin), this math ignores other significant costs -- both tangible and intangible -- associated with this additional distance. Along with gas, there are certainly other tangible costs to consider in reducing geographical access to a substantial portion of Northern Wisconsin and the Upper Peninsula of Michigan including payment for childcare and overnight accommodations and lost earnings.  These costs are amplified given that the majority of patients are at or below the federal poverty line.

Then there are the less tangible, increased costs measured by the stress and worry attendant with prolonged trips (and additional delays due to car trouble or weather issues) for women attempting to obtain an abortion without a parent, spouse, or

employer finding out.  As District Judge Thompson recently explained in a decision enjoining a similar admitting privileges requirement in Alabama, "that a woman has some conceivable opportunity to exercise her right does not mean that a substantial obstacle to the exercise of that right is not imposed; nor can a serious burden be ignored because some women of means may be able to surmount this obstacle while poorer women . . . cannot."  *Planned Parenthood Se., Inc. v. Bentley*, No. 2:13cv405-MHT, 2013 WL 3287109, at *4 (M.D. Ala. June 28, 2013).

Even if women in more remote areas of Wisconsin are able to travel to Madison, Milwaukee or to an out-of-state clinic, the closings and reduction in services overall will likely result in significantly longer wait periods for women throughout the state seeking abortions for some time to come -- pushing women past the nine week period allowed for medication abortions or pushing women completely out of the pre-viability window. Other courts -- including other federal district courts reviewing identical admitting privileges requirements -- have found that the elimination of a substantial portion of abortion providers in a state constitutes a substantial obstacle to a woman's right to seek an abortion.  *See, e.g., Okpalobi v. Foster*, 190 F.3d 337, 357 (5th Cir. 1999) (affirming district court's finding that regulation's effect of closing clinics that provided approximately 80% of all abortions in the state constituted an undue burden); *Bentley*, 2013 WL 3287109, at *7 (granting temporary restraining order where admitting privileges requirement would close three of five clinics in the State of Alabama); *Jackson Womens' Health Org. v. Currier*, No. 3:12cv436–DPJ–FKB, 2013 WL 1624365, at *5 (S.D. Miss. Apr. 15, 2013) (granting preliminary injunction after finding an undue

burden where state admitting privileges requirement would close the only known abortion provider in Mississippi); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 541 (9th Cir. 2004) ("A significant increase in the cost of abortion or [decrease in] the supply of abortion providers and clinics can, at some point, constitute a substantial obstacle to a significant number of women choosing an abortion.").[31]

Here, based on the most recent annual statistics, it appears that AMS alone accounts for approximately 41% of abortions performed in Wisconsin.[32] Assuming the number of abortions performed in PPW facilities is evenly split between Madison, Appleton and Milwaukee, the closure of the Appleton facility and the reduction of services at the Milwaukee facility, could further reduce the availability of abortion services in Wisconsin by an additional 28%.[33] At least in the near term, this would have the effect of reducing the availability of in-state abortion services by 69%.

Defendants point to cases where courts have found that the closure of an abortion clinic was not an undue burden. (*See* Defs.' Opp'n (dkt. #38) 47-49.) All involve instances where (1) the clinic or an individual doctor affected by the regulation was one

---

[31] While the *Casey* Court affirmed the 24-hour waiting period provision in that case, the Court nonetheless noted that it was a "closer question" than the informed consent provision and labeled the district court findings as to the practical effect of at least two visits to a doctor "troubling in some respects." *Casey*, 505 U.S. at 885-86. This language would suggest that at some point delays and increased travel, along with the practical difficulties of increased travel, could cross the line and become an undue burden.

[32] AMS performs approximately 3000 abortions per year; in 2011, there were 7249 abortions reported in Wisconsin.

[33] PPW performs approximately 4000 abortions per year. This percentage assumes services will be cut by half based on a complete closure of the Appleton clinic and 50% decrease in the capacity of PPW's Milwaukee clinic.

among many, and/or (2) alternative clinics were within a relatively close distance. As a result, these closures represented a relatively small or even no decrease in the availability of abortion services. *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 598 (6th Cir. 2006) (finding closure of one clinic did not impose an undue burden where other clinics located within 45 to 55 miles); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 161 (4th Cir. 2000) (threatening closure of a single provider where other providers located approximately 70 miles away).

Nor is this case like those where courts have simply noted the existence of significant travel distances because of the remote location of a clinic. *See Planned Parenthood, Sioux Falls v. Miller*, 860 F. Supp. 1409, 1414 (D.S.D. 1994) (finding undisputed that "[a]pproximately 17 percent of the total South Dakota women receiving abortions travel 300 miles or more each way"); *Utah Women's Clinic, Inc. v. Leavitt*, 844 F. Supp. 1482, 1491 (D. Utah 1994), *rev'd on other grounds*, 75 F.3d 564 (10th Cir. 1995) (noting that women in Alaska have to travel 800 miles to access a clinic). Plaintiffs here are not demanding that a state be compelled to "provide abortion clinics in close proximity to every woman's home." *Leavitt*, 844 F. Supp. at 1491. Rather, plaintiffs have evidence that the state adopted a regulation having the immediate effect of *substantially decreasing* access to abortion services to a significant percentage of women in Wisconsin and the Upper Peninsula of Michigan.

Moreover, the closure of AMS's Milwaukee clinic will mean *no* clinics in Wisconsin providing abortion services to women, at least on an outpatient basis, for still non-viable fetuses past 18.6 weeks LMP. As Dr. Christensen explained in his

41

declaration, "many fetal abnormalities are not diagnosed until 20 weeks LMP or later" and, therefore, women seeking abortion care based on these diagnoses will not have access to an in-state provider if AMS closes.  (Christensen Decl. (dkt. #6) ¶ 12.)  This would result in a "patchwork system where constitutional rights are available in some states but not others."  *Jackson Women's Health Org.,* 2013 WL 1624365 at *5.  While defendants would challenge this impact, suggesting that ob/gyns could step in and provide late term, pre-viability coverage in hospitals, the State's own reporting data demonstrates that the provision of abortion services is largely only available from the named plaintiffs in this lawsuit.[34]  At least based on the current record, plaintiffs have established that the closure of AMS's clinic will effectively foreclose abortion services past 18.6 weeks LMP in Wisconsin.

Defendants rightly point out that most, if not all of these impacts, might be avoided if defendants can obtain admitting privileges from a hospital within 30 miles each of the locations where abortions are performed before these closures are required or sufficiently soon to make their reopening a realistic possibility.  But there is no dispute that plaintiffs are *not* in compliance with the admitting privileges now.  Moreover, the evidence to date makes it seem likely that they will not be for months, if at all, despite efforts to expedite these privileges.  In the meantime, it would seem inevitable that there

---

[34] Indeed, attempts at increased access to late-term abortion services have met substantial opposition.  *See* Judith Davidoff, *Madison Surgery Center will not offer second-trimester abortions*, The Capital Times, Dec. 14, 2010, *available at* http://host.madison.com/news/local/health_med_fit/madison-surgery-center-will-not-offer-second-trimester-abortions/article_8a1e5d32-070c-11e0-be05-001cc4c03286.html (last visited July 30, 2013).

will be a substantial disruption in the timely and orderly provision of abortion services to women in Wisconsin and the Upper Peninsula of Michigan.

At least at the preliminary injunction stage, the court considers these obstacles in access to abortion services and undue burden in light of the dubious benefits to women's health of the admitting privileges restriction in Wisconsin. Even if there were some evidence that the admitting privileges requirement would actually further women's health, any benefit is greatly outweighed by the burdens caused by increased travel, decreased access and, at least for some women, the denial of an in-state option for abortion services.

## III.  Irreparable Injury, Balance of Harms and Public Interest

As reflected in the immediate section above, there will almost certainly be irreparable harm to those women who will be foreclosed from having an abortion in the near term, either because of the undue burden of additional travel or the late stage of pregnancy, as well as facing *increasing* health risks caused by delay in difficult pregnancies, being forced to consider an unregulated, illegal abortion as an option. Since defendants to date have failed to demonstrate any reasonable relationship between maternal health and imposing this restriction, there is no meaningful counterweight recognized by the United States Supreme Court to justify the Act's immediate enforcement. Given the substantial likelihood of success on the merits and of irreparable harm, the public's interest is best served by imposing a preliminary injunction on enforcement of the admitting privileges requirement until this court can address its merits after trial.

ORDER

IT IS ORDERED that:

1) Plaintiffs' motion for leave to file supplemental declaration (dkt. #78) is DENIED;

2) plaintiffs' motion for preliminary injunction (dkt. #2) is GRANTED; and

3) defendants are enjoined from enforcing the hospital admitting privileges requirement in Section 1 of 2013 Wisconsin Act 37 pending a trial to be held in November 2013.

Entered this 2nd day of August, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge