IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PLANNED PARENTHOOD OF
WISCONSIN, INC., SUSAN PFLEGER,
M.D., KATHY KING, M.D., and
MILWAUKEE WOMEN'S MEDICAL
SERVICES d/b/a AFFILIATED MEDICAL
SERVICES,

                    Plaintiffs,

      v.

J.B. VAN HOLLEN, ISMAEL OZANNE,
JAMES BARR, MARY JO CAPODICE, D.O.,
GREG COLLINS, RODNEY A. ERICKSON,
M.D., JUDE GENEREAUX, SURESH K.
MISRA, M.D., GENE MUSSER, M.D.,
KENNETH. B. SIMONS, M.D., TIMOTHY
SWAN, M.D., SRIDHAR VASUDEVAN, M.D.,
OGLAND VUCKICH, M.D., TIMOTHY W.
WESTLAKE, M.D., RUSSELL YALE, M.D., and
DAVE ROSS,

                    Defendants.

OPINION AND ORDER

13-cv-465-wmc

In this action, plaintiffs Planned Parenthood of Wisconsin, Inc.; Susan Pfleger, M.D., a Planned Parenthood physician; Kathy King, M.D., Planned Parenthood's Medical Director; and Milwaukee Women's Medical Services d/b/a Affiliated Medical Services assert various constitutional challenges to Section 1 of 2013 Wisconsin Act 37 ("the Act") against defendants, the Attorney General of the State of Wisconsin, the Dane County District Attorney, the Secretary of the Department of Safety and Professional Services and members of the Medical Examining Board. This section of the Act requires every physician who provides abortions in Wisconsin to have admitting privileges at a hospital within thirty miles of the health center where the abortion is performed. The

court previously granted plaintiffs a temporary restraining order and a preliminary injunction based in part on its conclusion that plaintiffs were likely to succeed on their claim that the Act violates their patients' rights to liberty and privacy. (Dkt. ##21, 81.) Before the court is plaintiffs' motion for summary judgment on a separate claim -- namely, that the Act violates the nondelegation doctrine. (Dkt. #113.) Plaintiffs assert that their motion raises a facial challenge to Section 1 of the Act, but the numerous disputed facts, even as to the operation of the statutory and regulatory framework itself, much less its implications, suggest otherwise. In any event, because a genuine issue of material fact exists as to whether admitting privileges are being denied arbitrarily or for improper reasons by hospitals without an adequate opportunity for review by a governmental entity, the court will deny plaintiffs' motion.

## UNDISPUTED FACTS[1]

### A. The Challenged Act

Plaintiffs challenge Section 1 of 2013 Wisconsin Act 37, to be codified at Wis. Stat. § 253.095 (the "Act"), which provides in pertinent part:

> **SECTION 1.** 253.095 of the statutes is created to read:
>
> **253.095 Requirements to perform abortions.** (1) Definition. In this section, "abortion" has the meaning given in s. 253.10 (2) (a).
>
> (2) Admitting privileges required. No physician may perform an abortion, as defined in s. 253.10 (2) (a), unless he or she

---

[1] Except as specifically noted, the court finds the following facts taken from the parties' proposed findings of fact to be material and undisputed.

> has admitting privileges in a hospital within 30 miles of the location where the abortion is to be performed.

Because hospitals have discretion to grant or deny admitting privileges to physicians, the Act makes plaintiffs' ability to provide abortions contingent on the decisions of the hospitals. The Act neither contains requirements or procedures hospitals have to follow in determining whether to grant or deny physicians admitting privileges; nor retains any authority by the State to waive the privilege requirement for certain physicians.

## B. Statutory and Regulatory Scheme for Grant of Admitting Privileges

Plaintiffs contend that the State also retains no authority to review the hospitals' decisions regarding privileges. Defendants acknowledge that there is no procedure to review every decision a hospital makes on each individual doctor's application for admitting privileges, but contend that the State can conduct inspections and investigations against a hospital thought to be in violation of the Hospital Regulation and Approval Act, Wis. Stat. § 50.32 *et seq.*, and administrative rules promulgated under that act, including Wis. Admin. Code §§ DHS 124.05 and 124.12. The parties dispute whether this statutory and regulatory scheme sets sufficient boundaries on hospitals' discretion in granting or denying admitting privileges so as to protect abortion providers' due process rights.

Section 50.36(4) describes the mechanism by which the Department of Health Services may enforce its rules and standards.

(4) The department shall make or cause to be made such inspections and investigation, as are reasonably deemed necessary to obtain compliance with the rules and standards. It shall afford an opportunity for representatives of the hospitals to consult with members of the staff of the department concerning compliance and noncompliance with rules and standards. If the department takes enforcement action against a hospital for a violation of ss. 50.32 to 50.39, or rules promulgated or standards adopted under ss. 50.32 to 50.39, and the department subsequently conducts an on-site inspection of the hospital to review the hospital's action to correct the violation, the department may, unless the hospital is operated by the state, impose a $200 inspection fee on the hospital.

Wis. Stat. § 50.36(4)

Section 124.05 of the DHS Administrative Code describes a hospital's requirement of a governing body and certain responsibilities of the governing body, including medical staff appointments.

(e) *Medical staff appointments.* The governing body shall appoint members of the medical staff in accordance with s. 50.36 (3), Stats., as follows:

1. A formal procedure shall be established, governed by written rules covering application for medical staff membership and the method of processing applications;

2. The procedure related to the submission and processing of applications shall involve the administrator, the credentials committee of the medical staff or its counterpart, and the governing body;

3. The selection of physicians, dentists and podiatrists and definition of their medical, dental or podiatric privileges, both for new appointments and reappointments, shall be based on written criteria;

4. Action taken by the governing body on applications for medical staff appointments shall be in writing;

4

> 5. Written notification of applicants shall be made by either the governing body or its designated representative;
>
> 6. Applicants selected for medical staff appointment shall sign an agreement to abide by the medical staff by-laws and rules; and
>
> 7. The governing body shall establish a procedure for appeal and hearing by the governing body or a committee designated by the governing body if the applicant or the medical staff wishes to contest the decision on an application for medical staff appointment.

Wis. Admin. Code § DHS 124.05(2)(e).

Finally, § DHS 124.12 describes the process for selecting members of the medical staff and provides in pertinent part that "the hospital medical staff shall have a system, based on definite workable standards, for evaluation of each applicant by a credentials committee which makes recommendations to the medical staff and to the governing body." Wis. Admin. Code § DHS 124.12(4)(b)(1). The regulation also provides that the hospital's criteria for granting admitting privileges "shall include individual character, competence, training, experience and judgment" and that "[a]ll qualified candidates shall be considered by the credentials committee." *Id.* at § DHS 124.12(4)(c). Hospitals are also required to have a "mechanism for appeal of decisions regarding medical staff membership and privileges." *Id.* at § DHS 124.12(5)(b)4.

Even so, on the current record, the court cannot find with any degree of certainty that the statute and regulations encourage or prevent arbitrary or inappropriate denial of privileges. In addition, there is a dispute between the parties on whether there is any role for oversight by the State.

### C.  Hospital's Bylaws Governing Admitting Privileges

During discovery in this action, plaintiffs sought bylaws from an unknown number of hospitals and received responses from approximately 25 hospitals.  (Amended Decl. of Lester A. Pines ("Am. Pines Decl."), Exs. B-1 through B-19 (dkt. ##134-2 through 134-20); *see also* Declaration of Brian P. Keenan ("Keenan Decl."), Exs. 102-121 (dkt. ##152-2 to 152-21).)  These bylaws generally contain written policies governing the procedures and standards for granting admitting privileges to physicians.  The policies inform physicians of the information they need to provide to hospitals in their applications for admitting privileges, though plaintiffs point to some examples where additional information, not described in the policies, is also requested.  (Pls.' Resp. to Defs.' PFOFs (dkt. #156) ¶ 2.)  The policies also inform physicians of the hospital's process of reviewing and approving or denying an application, which involves review by one or more committees, with final approval by the board of directors or another governing body.  In addition, the policies describe the criteria one must meet to gain privileges, though plaintiffs contend that not *all* of the criteria are set out in these policies.  The hospitals judge applicants, at least in part, based on whether they have provided sufficient evidence regarding their background, experience, training and current competence.  Finally, the hospitals generally have adopted internal procedures outlining in writing how a physician might appeal a denial of an application for admitting privileges.

By way of example, defendants identify "threshold criteria" for appointment to the medical staff at a few hospitals in Wisconsin.  Bellin Hospital in Green Bay, Wisconsin,

lists the following "specific qualifications" (among others) in its bylaws to be eligible for appointment:

- have a current, unrestricted license to practice in the State of Wisconsin;

- possess current, valid professional liability insurance coverage;

- have not been convicted of Medicare, Medicaid or other governmental or private third-party payer fraud or program abuse;

- have not been convicted of . . . any felony . . . or [] any misdemeanor (during the previous 10 year period) relating to controlled substances, illegal drugs, insurance or health care fraud or abuse, or violence; and

- have never had Medical Staff appointment or clinical privileges denied, revoked, resigned, relinquished or terminated by any health care facility or health plan for reasons related to clinical competence or professional conduct.

(Keenan Decl., Ex. 108 (dkt. #152-8) pp.30-31.)[2]  Bellin Hospital's bylaws also provide that "[a]ny individual who does not satisfy a criterion may request that it be waived," though that individual "bears the burden of demonstrating that his or her qualifications are equivalent to, or exceed, the criterion in question." (*Id.* at p.32.)[3]

The actual bylaws provided to the court also show that specific hospital procedures and standards for determining whether to grant admitting privileges vary widely.  For example, some hospitals will not provide a hearing for applicants who do not appear to meet the threshold criteria for appointment to the medical staff.  (Pls.' 2nd

---

[2] Plaintiffs do not dispute that Bellin relies on this list of criteria, but -- as discussed below -- they contend that the listed criteria are not the exclusive criteria used by hospitals in granting privileges.

[3] Defendants also cite to similar "threshold criteria" at Columbia Medical Center, Waukesha Memorial Hospital and Community Memorial Hospital.  (Defs.' PFOFs (dkt. #151) ¶¶ 8-10.)

Am. PFOFs (dkt. #145-1) ¶ 6 (citing bylaws of Bellin Hospital, Columbia Center, Waukesha Memorial Hospital, Community Memorial Hospital).)

Plaintiffs represent that almost every hospital also requires that a doctor either treat a minimum number of admitted patients, regularly use the hospital's facilities, or have active membership at another hospital, which would effectively require patient contacts or active use of *some* hospital in order to gain privileges. In support plaintiffs cite to and describe the bylaws of 24 Wisconsin hospitals. (Pls.' Reply to Pls.' PFOFs (dkt. #154) ¶ 7.) By way of example, Appleton Medical Center offers two categories of regular permanent staff who can admit patients: active and courtesy. Active staff must regularly admit or provide services at the hospital, while courtesy staff must be on active staff of another hospital. (Keenan Decl., Ex. 103 (dkt. #152-3) pp.9-10.)[4] Saint Elizabeth Hospital, also located in Appleton, Wisconsin, likewise offers two categories of regular permanent staff who can admit patients: active and courtesy. Active staff must have twenty patient contacts or more over two years. (Keenan Decl., Ex. 102 (dkt. #152-2) pp.17-18.) Courtesy staff must have at least one patient contact in two years. (*Id.* at p.18.)[5]

In addition, under the bylaws, hospitals may reserve the right to assess an application for privileges based on the hospital's own needs and financial resources, and can therefore deny privileges to physicians who are otherwise qualified. (Pls.' 2nd Am.

---

[4] The bylaws also provide for a one-year "associate medical staff" role. (Keenan Decl., Ex. 103 (dkt. #152-3) p.10.)

[5] Plaintiffs characterize a patient contact requirement as "unrelated to the provision of quality medical care," which defendants dispute.

PFOFs (dkt. #145-1) ¶ 8 (citing several hospitals' bylaws that allow that applicants may be denied privileges on the basis of "the purposes, needs and capabilities" of the hospital and "community need").)

Finally, a number of hospitals in Wisconsin have religious affiliations that may impact application decisions.  For example, of the 25 hospitals who responded to plaintiffs' discovery requests, twelve have a Catholic affiliation, and all twelve of those hospitals require compliance with the Ethical and Religious Directives for Catholic Health Care Services promulgated by the National Conference of Bishops.  These Directives prohibit abortions and include the following statement:  "In this context, Catholic health care institutions need to be concerned about the danger of scandal in association with abortion providers."  United States Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Services Part IV, ¶ 45 (5th ed. 2009), *available at* http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf (last visited May 22, 2014).  This Directive, however, stops short of prohibiting admitting privileges to physicians who perform abortions at other facilities.  Defendants also point to federal law, which purports to prohibit hospitals from "discriminat[ing] in the extension of staff or other privileges to any physician or other health care personnel because he performed or assisted in the performance of a lawful sterilization procedure or abortion[.]"  42 U.S.C. § 300a-7(c)(1).

In an email to a news reporter, the Medical Director of Wheaton Franciscan Healthcare, which operates numerous hospitals in Wisconsin, stated that admitting

privileges will not be granted to abortion providers by the hospital because abortion is against the religious principles by which the hospital abides and that there is no appeal from the decision of the hospital board of directors.  (Pls.' 2nd Am. PFOFs (dkt. #145-1) ¶ 11.)   In her deposition, however, she testified that Wheaton Franciscan Healthcare does "not categorically deny privileges for that reason.  We evaluate all applications on their merits."  (Defs.' Resp. to Pls.' PFOFs (dkt. #150) ¶ 11 (citing Deposition of Rita M. Hanson, M.D. (dkt. #118) 53-54).)[6]  Defendants also point out that plaintiff Kathy King, M.D., the Medical Director of Planned Parenthood of Wisconsin, Inc., is on the staff at Froedtert Memorial Lutheran Hospital -- a religiously-affiliated hospital.

## OPINION

### I.  Overview of the Nondelegation Doctrine

The nondelegation doctrine is principally known for its application to cases involving delegation of legislative authority to the executive branch and "is rooted in the principle of separation of powers that underlies our tripartite system of Government." *See, e.g., Mistretta v. United States*, 488 U.S. 361, 371 (1989). "An offshoot of the constitutional nondelegation doctrine that is applicable to the states forbids them to authorize private persons to deprive other private persons of life, liberty, or property without due process of law." *Beary Landscaping, Inc. v. Costigan*, 667 F.3d 947, 950 (7th Cir. 2012).

---

[6] The most recent time an abortion provider applied for privileges at Wheaton Franciscan Healthcare was apparently in the mid-1980s.  At that time, the hospital denied privileges because the doctor performed abortions.

The doctrine is rooted in a handful of Supreme Court cases from the 1920s and 1930s.  In *Washington ex rel. Seattle Title Trust Company v. Roberge*, 278 U.S. 116 (1928), the Supreme Court considered whether a zoning ordinance that permitted the building of a home for the elderly in a certain neighborhood upon approval of two-thirds of the neighbors violated the due process clause of the Fourteenth Amendment because the neighbors "were free to withhold consent for selfish reasons or arbitrarily."  *Id.* at 122. Likewise, in *Carter v. Carter Coal Company*, 298 U.S. 238 (1936), the Supreme Court held that a consortium of major cola producers may not dictate legally binding employment regulations for small producers.  In so holding, the Court explained, "[t]his is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business."  *Id.* at 311.

While *Roberge* and *Carter Coal* involved situations in which private citizens were delegated regulatory powers over others with adverse interests in their same neighborhood or marketplace, the doctrine has not been limited to those situations, but applied more broadly to situations where the government placed discretion in the hands of an entity that is not bound by any public duty or set of standards.  *See, e.g.*, *Ass'n Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 675 (D.C. Cir. 2013) (explaining that the doctrine "ensures that regulations are not dictated by those who 'are not bound by any official duty' but may instead act 'for selfish reasons or arbitrarily.'" (quoting *Roberge*, 278 U.S. at 122); *see also Beary Landscaping*, 667 F.3d at 950 (describing delegation to private

parties generally without regard to whether the private party is a competitor or otherwise has adverse interests).

## II. Application of Nondelegation Doctrine in Abortion Context

Plaintiffs argue generally -- and defendants do not challenge -- that they "have protected liberty and property interests in their continued operation of their businesses and in pursuit of their chosen profession."  (Pls.' Br. (dkt. #114) 3 (citing *Purvis v. Oest*, 614 F.3d 713, 718 (7th Cir. 2010) ("It is well established . . . that a person has a liberty interest to pursue employment in her chosen field . . . .")).)  As such, the Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits a state from depriving plaintiffs of those interests without due process.  Part of this protection is insuring that any delegation to a private, non-state actor "sets clear boundaries" on the exercise of discretion by "contain[ing] detailed directives."  *United States v. Goodwin*, 717 F.3d 511, 517 (7th Cir. 2013).[7]

Plaintiffs further assert -- and defendants dispute -- that the Act "delegates total discretion over who may provide abortions in Wisconsin to hospitals, but does so without imposing sufficient standards to guide the exercise of that discretion."  (Pls.' Br. (dkt. #114) 3.)  As such, plaintiffs argue that the Act's delegation of discretion violates both their substantive and procedural due process rights.  (*Id.*)

---

[7] In *Goodwin*, the Seventh Circuit appeared to rely on these directives in denying a nondelegation challenge even though the state legislature delegated powers to another governmental body -- that state's attorney general as an executive branch official -- rather than as here to a private entity.  717 F.3d at 517.

This is not the first time a due process challenge has been brought against an abortion regulation requiring hospital involvement.  Plaintiffs rely on two relatively dated district court cases invalidating similar abortion regulations on the basis of their impermissible delegation to hospitals.    First, in *Hallmark Clinic v. North Carolina Department of Human Services*, 380 F. Supp. 1153, 1158 (E.D.N.C. 1974), a specially-constituted, three-judge panel held unconstitutional a state regulation requiring abortion clinics either to have written agreements with a hospital within 15 minutes of the clinic relating to access of abortion clinic's patients to the hospital or for the providers to have admitting privileges at the hospital, because the regulation "placed no limits on the hospital's decision to grant or withhold a transfer agreement, or even to ignore the request for one."  As for the alternative method of securing admitting privileges, the court specifically held that "[s]taff privileges, like transfer agreements, depend on the whim or good will of a hospital."  *Id.* at 1159.  While the court acknowledged that the State imposed "some restrictions to deny or revoke staff privileges, the limitations are mostly procedural.  Selection of standards is generally left to the hospital."  *Id.*

Similarly, in *Birth Control Centers, Inc. v. Reizen*, 508 F. Supp. 1366, 1374 (E.D. Mich. 1981), the district court held that a regulation requiring freestanding surgical outpatient facilities "to secure a written agreement with a physician having staff privileges at a local hospital, who agrees to act as admitting and attending physician for all patients" violated "due process concepts because [it] delegate[d] a licensing function

to private entities without standards to guide their discretion."[8]  In so holding, the court explained, "The power to prohibit licensure may not constitutionally be placed in the hands of hospitals.  Such an impermissible delegation without standards or safeguards to protect against unfairness, arbitrariness, or favoritism is void for lack of due process."  *Id.* at 1375.

More recently, however, three courts of appeals have rejected similar challenges.  In *Greenville Women's Clinic v. Commissioner, South Carolina Department of Health & Environmental Control*, 317 F.3d 357 (4th Cir. 2002), the court rejected a constitutional challenge to a regulation requiring as a "condition of licensure, that clinic doctors maintain certain admitting rights with local hospitals and referral arrangements with other relevant experts."  *Id.* at 362.  In so holding, the court explained that "[t]here is nothing in the record or, indeed, in the general experience in South Carolina that suggests that the requirements to have admitting arrangements with local hospitals and referral arrangements with local experts in various related fields present a substantial impediment to obtaining or retaining a license."  *Id*.  On that record, the court found that "the possibility that the requirements will amount to a third-party veto power is so remote that, on a facial challenge, we cannot conclude that the statute denies the abortion clinics due process."  *Id.* at 363.  Moreover, the court specifically noted that the clinic's ability to seek a waiver or exception further belied any claim of a due process violation.  *Id.*

---

[8] On appeal, the Sixth Circuit affirmed in part and vacated in part the district court's decision.  743 F.2d 352 (6th Cir. 1984).  The State did not appeal the district court's decision as to the particular regulation requiring a transfer agreement.  *Id.* at 356 n.2.

14

In *Women's Medical Professional Corporation v. Baird*, 438 F.3d 595 (6th Cir. 2006), the Sixth Circuit similarly held that a state licensing scheme for abortion clinics did not constitute an impermissible delegation of authority to a third party.  *Id*. at 610.  The court, however, distinguished *Hallmark Clinic* and *Reizen* on the basis that the regulation at issue in *Women's Medical* "contains an important feature that the laws at issue in those cases did not:  [the state] retains authority to grant a waiver of the transfer agreement requirement."  *Id.*  As such, the court explained the "ability to grant a waiver of this requirement means that the area hospitals do not necessarily have the final veto on whether an abortion clinic is licensed."  *Id.*  Based on this, the court concluded that "because the waiver procedure allows the state to make the final decision about whether [an abortion provider] obtains a license, there was no impermissible delegation of authority to a third party."  *Id.*

Finally, in *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), the Ninth Circuit rejected the plaintiff's nondelegation claim based on an Arizona regulation requiring a physician with admitting privileges at a hospital in Arizona be present at an abortion clinic until a patient is stable and ready to leave the recovery room.  In rejecting the challenge, the court noted that Arizona law "requires hospitals to refrain from arbitrary provision of admitting privileges and requires them to exercise their discretion based on reasons related to the hospital's interests."  *Id.* at 555.  While there is no mention that the State of Arizona retained the ability to grant a waiver of this requirement, the court cited to state law allowing for judicial review, albeit narrow, of hospital procedures to ensure that they "comport with due process."  *Id.* at 555-56.

15

### III.  Challenge to Wisconsin's Admitting Privilege Requirement

Plaintiffs contend that the Act violates both their procedural and substantive due process rights.  Before finding a procedural due process violation, a court must engage in a two-step inquiry:  (1) whether plaintiff was deprived of a protected interest in life, liberty, or property; and (2) what process is constitutionally required with respect to that deprivation.  *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996).  Plaintiffs acknowledge the statutory and regulatory scheme described in the facts above requires hospitals "to establish procedures," but leaves hospitals "on their own to develop them." (Pls.' Br. (dkt. #114) 7.)  *See also Hallmark Clinic*, 380 F. Supp. at 1159 ("Although the law imposes some restrictions on decisions to deny or revoke staff privileges, the limitations are mostly procedural.  Selection of standards is generally left to the hospital[.]").  More specifically, plaintiffs take issue with the lack of any appeal process within some hospitals for applicants who do not meet the threshold criteria requirements, while also arguing that any appeal would not address the concerns raised as part of their substantive due process challenge (that a hospital may act in its own business interest in rejecting otherwise qualified applicants).  Plaintiffs also argue that the lack of a final check by the State -- either by retaining the right to waive the privilege requirement or through judicial review -- violates their procedural due process rights.  Since these arguments largely overlap with plaintiffs' substantive due process challenge, the court will turn its attention to that claim.

A state cannot exclude a person from practicing her profession absent "a rational connection" between the required qualification and the applicant's "fitness or capacity"

to fulfill the profession, nor can it prevent a person from practicing her profession for arbitrary reasons. *See Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 239 (1957); *see also Douglas v. Noble*, 261 U.S. 165, 168 (1923) (describing same test with respect to dentistry license). Plaintiffs contend that the Act violates their substantive due process rights because hospitals can deny privileges for reasons "unrelated to the provision of quality outpatient care, such as consideration of the needs and capacities of the hospitals." (Pls.' Br. (dkt. #114) 10.) Similarly, plaintiffs contend that conditioning the ability to provide abortion services in Wisconsin on a physician's ability to send a minimum, annual number of patients to a hospital (and/or the number of physician contacts with a patient at the hospital) does not advance a legitimate state interest, especially in light of the low complication rate of abortions. (*Id.* at 11 & 11 n.2.)

While it is certainly rational for a *hospital* to consider its business needs in granting or denying admitting privileges, those requirements do not appear to further any legitimate *state* interest, at least with respect to the providing of constitutionally protected abortion services.[9] *See, e.g., Doe v. City of Lafayette, Ind.*, 377 F.3d 757, 773 (7th Cir. 2004) (explaining that the requirement that a regulation be "rationally related

---

[9] Even if a hospital's denial of admitting privileges to abortion providers purely for its own business reasons could tangentially advance a legitimate state interest, a denial based on an objection to abortion or concern for adverse publicity or attention, certainly would not. *See* 42 U.S.C. § 300a-7(c)(1) (prohibiting discrimination against abortion providers in the decision whether the grant admitting privileges); *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846 (1992) (reaffirming the central holding in *Roe v. Wade* that women have a fundamental liberty interest, protected by the due process clause of the Fourteenth Amendment of the United States Constitution, in obtaining an abortion). Since a dispute exists over whether this occurs in fact, a trial is required on this issue as well.

to a legitimate government interest" poses the same question as whether the regulation is "arbitrary" or "irrational").   Stated another way, a state cannot impose requirements on the practice of a profession through third parties, like hospitals, that it could not impose directly.  *See Tucson Woman's Clinic*, 379 F.3d at 556 ("The state cannot grant hospitals power it does not have itself.") (quoting *Hallmark Clinic*, 380 F. Supp. at 1158-59).

In response, defendants argue that plaintiffs' claim requires a showing that they have actually been denied privileges arbitrarily and, as such, plaintiffs cannot prevail at summary judgment without such evidence.  Plaintiffs counter that "[i]t is the *delegation* itself and the resulting compulsion to submit to the hospitals' requirements as a condition of continuing to perform abortions that makes the claim ripe."  (Pls.' Reply (dkt. #157) 4 (emphasis in original).)   In support, plaintiffs point to the two district court cases striking down similar regulations requiring some approval from a hospital on nondelegation grounds.  (*Id.* at 4 n.1.)

Unfortunately for purposes of reaching a decision on the merits of plaintiffs' delegation claim, the actual records in *Hallmark Clinic* and *Reizen* are more developed than what plaintiffs have put forth at summary judgment.  In *Hallmark Clinic*, there was a record of the plaintiffs' or other abortion providers' attempts to comply with the new regulation and those efforts being thwarted by hospitals within the necessary proximity to the abortion clinics.  *See Hallmark Clinic*, 380 F. Supp. at 1155-56 (detailing plaintiff Dr. Hoke's efforts to obtain transfer agreement or maintain admitting privileges with hospital within 15 minute travel time of abortion clinic).  The record does not appear to be as developed in *Reizen*, but even in that case the court still noted that "the State

18

acknowledged that some abortion clinics had experienced difficulty in securing written agreements with hospitals." *See Reizen*, 508 F. Supp. at 1374.  Even if these two district court cases taken in a vacuum supported a finding of unconstitutionality on the face of the statute or regulatory scheme outlined above, plaintiffs rely on individual hospital's admitting privileges policies and practices to advance their claim, and there are both disputed and undeveloped issues of facts as to both the nature and application of those policies and practices.

In light of the three court of appeals decisions discussed above, defendants also counter that application of the delegation doctrine here would be a "stretch" beyond a "narrow set of circumstances" where it has been applied.  (Defs.' Opp'n (dkt. #149) 14.) Defendants more specifically argue that "Act 37's admitting-privileges requirement no more 'delegates' the continued operation of abortion clinics to a third party than any other health and safety regulation."  (*Id.*)  As an example, defendants point to the federal law requirement that businesses over a certain size be handicap accessible.  (*Id.* (citing Americans with Disabilities Act of 1990).)   Defendants reason that the ADA regulation similarly requires action by a non-state third party:  "in order to comply, a business owner must find a landlord willing to rent space to him (or a property owner willing to sell him land for a building) that will accommodate a handicap-accessible ramp.  The owner must also find a contractor willing to build the ramp.  Those contractors must find suppliers willing to sell him the necessary materials.  The list goes on." (*Id.* at 14-15.)

A comparison with the ADA seems wholly inapt.  Compliance with the ADA does not require a business owner to secure a license or permit from a particular third party, or

one of a small group of particular third parties.  If a building is not handicap accessible, a business owner could purchase another building, work with a contractor to ensure that the current building is up to code, or lease another building, among other possible options.  The panoply of third parties described in defendants' hypothetical in no way mirrors the power of a hospital or small number of hospitals within the relevant geographical scope to deny privileges and thereby bar providers from performing abortions.  Even if this analogy proved a useful fit, the requirement in the ADA -- unlike the requirement at stake here -- contains a waiver.  *See* 42 U.S.C. § 12183(a) (requiring public access buildings to be handicap-accessible "except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter").

In any event, all three of the federal court of appeals cases previously discussed have upheld similar abortion regulations, at least in part, on the basis that the regulation either contained a waiver of a hospital's denial (*Greenville Women's Clinic*, 317 F.3d at 363; *Women's Med. Prof. Corp.*, 438 F.3d at 610) or permitted judicial review of that denial (*Tucson Woman's Clinic*, 379 F.3d at 555-56).  Admittedly, the Fifth Circuit recently rejected a nondelegation doctrine challenge to a similar admitting privileges in Texas without finding a right to seek a waiver or judicial review, instead finding that the admitting privileges requirement "poses no more significant threat to plaintiffs' due process rights than the requirement that those performing abortions be licensed physicians, which involves the independent action of a medical licensing board." *Planned*

*Parenthood of Greater Tx. Surgical Health Servs. v. Abbott*, No. 13-51008, 2014 WL 1257965, at *13 (5th Cir. Mar. 27, 2014) (quoting *Women's Health Ctr. of W. Cnty., Inc. v. Webster*, 871 F.2d 1377, 1382 (8th Cir. 1989)).  This comparison also appears inapt at least in Wisconsin, however, since the State of Wisconsin has delegated the licensing of physicians to the Wisconsin Medical Examining Board, a *state* entity, and as such in requiring a physician to be licensed to perform abortions, there is no delegation of *any* function to a private entity.  *See* Wis. Stat. § 15.08 ("All members of examining boards shall be residents of this state and shall, unless otherwise provided by law, be nominated by the governor, and with the advice and consent of the senate appointed."); *Salvi v. Med. Examining Bd.*, 2011 WI App 143, ¶ 12, 337 Wis. 2d 556, 806 N.W.2d 268 (describing the Medical Examining Board as a "state agency") (unpublished).[10]

Because Section 1 of the Act contains no express right to obtain a waiver or judicial review of a private entity's effective denial of plaintiffs' protected liberty and property interests in conducting their business of providing abortions, it is arguably vulnerable to a facial challenge under a fair reading of existing case law.  As already discussed, however, the record here leaves the court uncertain at best whether the broader state statutory and regulatory scheme under which Section 1 operates and the hospital policies under which it is implemented are inadequate to prevent arbitrary or inappropriate denials of privileges.  In any event, defendants maintain that denials are

---

[10] Curiously, the medical licensing board in Texas also appears to be "an agency of the executive branch of state government."  Tex. Occupations Code Ann. § 152.001.  The Fifth Circuit panel apparently did not appreciate this fact or found the distinction unimportant.

subject to "review of hospitals' decisions regarding privileges" by the Department of Health Services, at least as a matter of general policy.  (Defs.' Resp. to Pls.' PFOFS (dkt. #150) ¶ 4.)

In short, while plaintiffs label their challenge as a facial one, they rely on hospital policies as evidence that arbitrary criteria are (or, at the very least, may be) applied in denying privileges.  Absent some showing of hospitals actually exercising their discretion to deny privileges for reasons unrelated to a legitimate state interest, however, the "possibility that the requirement will amount to a third-party veto power" is simply too "remote" to grant judgment to plaintiffs at this time.  *Greenville Women's Clinic*, 317 F.3d at 363.  Coupled with the possibility that Wis. Stat. § 50.36(4) may provide an avenue for State oversight, this issue forecloses summary judgment.  Since the trial scheduled for next week will necessarily touch on plaintiffs' efforts to secure admitting privileges and grounds for any denials, the court will be better equipped to take up plaintiffs' nondelegation claim on the merits.

ORDER

IT IS ORDERED that:

1) plaintiffs' unopposed motion for leave to file second amended proposed findings of fact (dkt. #145) is GRANTED; and

2) plaintiffs' motion for summary judgment (dkt. #113) is DENIED.

Entered this 23rd day of May, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge