IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PLANNED PARENTHOOD OF
WISCONSIN, INC., SUSAN PFLEGER,
M.D., KATHY KING, M.D., and
MILWAUKEE WOMEN'S MEDICAL
SERVICES d/b/a AFFILIATED MEDICAL
SERVICES,

                    Plaintiffs,

    v.

J.B. VAN HOLLEN, ISMAEL OZANNE,
JAMES BARR, MARY JO CAPODICE, D.O.,
GREG COLLINS, RODNEY A. ERICKSON,
M.D., JUDE GENEREAUX, SURESH K.
MISRA, M.D., GENE MUSSER, M.D.,
KENNETH. B. SIMONS, M.D., TIMOTHY
SWAN, M.D., SRIDHAR VASUDEVAN, M.D.,
OGLAND VUCKICH, M.D., TIMOTHY W.
WESTLAKE, M.D., RUSSELL YALE, M.D., and
DAVE ROSS,

                  Defendants.

OPINION AND ORDER

13-cv-465-wmc

TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

BACKGROUND FACTS .................................................................................... 3

   I.  The Lawsuit ............................................................................................ 3

   II. Act 37 ..................................................................................................... 5

       A.   Overview of Key Provisions ......................................................... 5

       B.   Legislative History ....................................................................... 6

       C.   Timing ........................................................................................... 7

   III. Overview of Abortion Services ............................................................. 8

   IV. Current Availability of Abortion Services in Wisconsin ....................... 9

       A.   State Statistics ............................................................................... 9

       B.   Plaintiffs' Abortion Services ..................................................... 10

       C.   Location of Out-of-State Abortions Clinics ............................. 14

   V.  Overview of Admitting Privileges ....................................................... 15

       A.   Types ............................................................................................ 15

       B.   Typical Application Process and Timing .................................. 15

   VI. Status of Plaintiffs' Admitting Privileges ........................................... 16

OPINION ......................................................................................................... 17

   I.  Preliminary Matters ............................................................................. 17

       A.   Plaintiffs' Motion to Seal Certain Trial Exhibits ..................... 17

       B.   Plaintiffs' Motions to Supplement Record .............................. 17

   II. Fourteenth Amendment Liberty and Privacy Claim ........................... 20

       A.   Legal Standard ........................................................................... 20

       B.   State Interest / Medical Rationale ............................................ 24

       C.   Burdens ...................................................................................... 55

       D.   Balancing Benefits with Burdens ............................................. 80

   III. Improper Purpose Claim .................................................................... 83

   IV. Nondelegation Doctrine Claim ........................................................... 86

   V.  Equal Protection / Substantive Due Process Claims ........................... 88

ORDER ............................................................................................................ 90

INTRODUCTION

For reasons left largely unexplained at the time of its enactment, the Wisconsin Legislature passed and Governor Walker signed, Section 1 of 2013 Wisconsin Act 37 ("the Act"), requiring every physician who provides abortions in Wisconsin to have admitting privileges at a hospital within thirty miles of the health center where the abortion is performed. After finding that this requirement likely violated the liberty and privacy rights of plaintiffs' patients under the Fourteenth Amendment of the United States Constitution, this court entered a preliminary injunction on August 2, 2013, enjoining its enforcement. After affirming the entry of that injunction, the Seventh Circuit remanded this case for an adjudication of the merits of plaintiffs' claims.

In light of the evidence presented by both sides at trial, the court now finds that the marginal benefit to women's health of requiring hospital admitting privileges, if any, is substantially outweighed by the burden this requirement will have on women's health outcomes due to restricted access to abortions in Wisconsin. While the court agrees with the State that sometimes it is necessary to reduce access to insure safety, this is decidedly *not* one of those instances. On the robust trial record, the court is, if anything, more convinced that the admitting privileges requirement in Act 37 "remains a solution in search of a problem," *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-cv-465-wmc, 2013 WL 3989238, *14 (W.D. Wis. Aug. 2, 2013), unless that problem is access to abortion itself. In particular, the State has failed to meet its burden of demonstrating through credible evidence a link between the admitting privileges requirement and a legitimate health interest.

1

For the reasons explained in this opinion below, therefore, the court finds Section 1 of Act 37 violates liberty and privacy rights of plaintiffs' patients under the Fourteenth Amendment of the United States Constitution.  The court further finds that the sudden adoption of a requirement for admitting privileges without a time period allowed to achieve compliance compels a finding that its purpose was to impose a substantial obstacle on women's right to abortions in Wisconsin, also in violation of their Fourteenth Amendment rights.  As for those claims directed at plaintiffs' own rights under the Fourteenth Amendment, the court finds no rational reason to treat physicians who perform abortions differently from those who regularly perform equally or more risky outpatient procedures.  Finally, the court finds that the Act violates the non-delegation doctrine by leaving to private hospitals the authority to deny admitting privileges for reasons other than a physician's competence without any means for appeal.

Accordingly, the court declares Section 1 of Act 37 unconstitutional and will enter an order permanently enjoining the enforcement of the Act.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional "freedoms . . . unquestionably constitutes irreparable injury"); *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

BACKGROUND FACTS[1]

## I.    The Lawsuit

In this lawsuit, plaintiffs Planned Parenthood of Wisconsin, Inc. ("PPW"); Susan Pfleger, M.D., a PPW physician; Kathy King, M.D., PPW's Medical Director; and Milwaukee Women's Medical Services d/b/a Affiliated Medical Services ("AMS") assert various constitutional challenges to the Act against defendants, the Attorney General of the State of Wisconsin, the Dane County District Attorney (as a representative of a class of DAs), the Secretary of the Department of Safety and Professional Services and members of the Medical Examining Board.   At times, the court refers collectively to defendants as "the State."

The court previously granted plaintiffs a temporary restraining order, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 963 F. Supp. 2d 858 (W.D. Wis. 2013) ("*Van Hollen I*"), and a preliminary injunction, *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-cv-465-wmc, 2013 WL 3989238 (W.D. Wis. Aug. 2, 2013) ("*Van Hollen II*"), based on its conclusion that plaintiffs were likely to succeed on their claim that the Act violates their patients' rights to liberty and privacy under the Fourteenth Amendment of the United States Constitution.  (Dkt. ##21, 81.)  The Seventh Circuit affirmed the court's entry of a preliminary injunction.  *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 807 (7th Cir. 2013) ("*Van Hollen III*").

---

[1] The following facts are provided as background, while the court's key factual findings after trial are set forth in the opinion in context of plaintiffs' various constitutional claims.

3

On remand from the Seventh Circuit, the court held a bench trial, which included a neutral expert, Dr. Serdar Bulun, Chair of the Department of Obstetrics and Gynecology at Northwestern University Feinberg School of Medicine, appointed by the court on the recommendation of the Seventh Circuit.  On the third day of trial, the court held a colloquy between Dr. Bulun, plaintiffs' expert Dr. Douglas Laube, and defendants' expert Dr. John Thorp, Jr.  The primary focus of the colloquy was on complications arising from abortion, the relative safety of abortion, and the role admitting privileges might play in furthering care of women during and after abortions.  Following this colloquy, the court gave the parties an opportunity to cross-examine Dr. Bulun on any matter, including the concise written responses to questions posed by the court previously provided to the parties and made a part of the trial record.  (Tr. Ex. 500.)  The court then heard testimony from the parties' principal experts, as well as from named individual plaintiffs Drs. King and Pfleger, PPW's CEO Teri Huyck, AMS's two owners, Drs. Christiansen and Smith (through his deposition), several additional experts and other witnesses on the same subjects.

The primary focus of the trial and of the parties' efforts to date has been on patients' Fourteenth Amendment liberty and privacy claim.[2]  Plaintiffs also assert the

---

[2]  Defendants maintain their objection to the standing of plaintiffs, as clinics and physicians, to bring Fourteenth Amendment claims on behalf of their patients.  (Defs.' Post-Trial Br. (dkt. #255) 79.)  In its TRO opinion, this court rejected that challenge, relying on earlier Seventh Circuit decisions finding clinics and physicians had standing to pursue the claims of their patients, and left it up to the Seventh Circuit to determine whether intervening Supreme Court case law somehow changed this holding.  *Van Hollen II*, 2013 WL 3989328, at *11.  On appeal of the preliminary injunction, the Seventh Circuit again reiterated the standing of physicians and clinics to pursue the legal claims of their patients in the abortion context.  *Van Hollen III*, 738 F.3d at 794-95.

following claims under the Fourteenth Amendment: (1) undue burden claim on behalf of their patients based on an impermissible *purpose*; (2) equal protection and substantive due process claims based on the Act singling out physicians providing abortion services without a rational basis; and (3) a due process claim based on the State delegating decisionmaking over the plaintiffs' rights to practice their chosen profession to private entities, namely hospitals, without adequate oversight or a mechanism to waive or appeal the hospitals' denial of admitting privileges (a so-called "non-delegation doctrine" claim).[3]

## II.  Act 37

### A.  Overview of Key Provisions

Section 1 of 2013 Wisconsin Act 37, codified at Wis. Stat. § 253.095, provides in pertinent part:

> SECTION 1. 253.095 of the statutes is created to read:
>
> **253.095   Requirements   to   perform   abortions.**   (1) Definition. In this section, "abortion" has the meaning given in s. 253.10 (2) (a).
>
> (2) Admitting privileges required. No physician may perform an abortion, as defined in s. 253.10 (2) (a), unless he or she has admitting privileges in a hospital within 30 miles of the location where the abortion is to be performed.

---

[3] Before trial, the court also denied plaintiff's motion for summary judgment on the non-delegation doctrine claim, finding an issue of fact as to whether the state permitted appeal or waiver of hospital's determination. *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 23 F. Supp. 3d 956 (W.D. Wis. 2014) ("*Van Hollen IV*").

"Abortion" is defined as "the use of an instrument, medicine, drug or other substance or devise with intent to terminate the pregnancy of a woman known to be pregnant." Wis. Stat. § 253.10(2)(a). This definition encompasses the abortions provided by plaintiffs.

Any person who violates the Act is subject to civil forfeiture penalties of between $1,000 and $10,000. Wis. Stat. § 253.095(3). The Act also provides that any physician performing or attempting to perform an abortion without admitting privileges (or otherwise in violation of the Act) could be subject to civil suits for damages for "personal injury and emotional and psychological distress." Wis. Stat. § 253.095(4). Such suits may not only be brought by a "woman on whom an abortion is performed or attempted," but by the "father of the aborted unborn child or the unborn child that is attempted to be aborted," or any "grandparent of the aborted unborn child or the child that is attempted to be aborted." *Id.* Finally, physicians violating the Act may face investigation and professional discipline up to and including license revocation. Wis. Stat. § 448.02(3); Wis. Admin. Code MED § 10.02(2)(z).

### B. Legislative History

The Act was proposed to its legislative sponsor Senator Mary Lazich by representatives of Wisconsin Right to Life. (Joint Stip. (dkt. #200) ¶¶ 21, 35; Affidavit of Laura D. Rose ("Rose Aff."), Ex. A (dkt. #49-1) 1; 5/28/14 Trial Tr. (dkt. #233) 124-25 (Merrill testifying that he proposed the admitting privileges requirement to Wisconsin Right to Life, who then forwarded his email to Senator Lazich who sponsored the bill).)

The Act was opposed by the state's leading medical and public health associations, including the Wisconsin Medical Society, the Wisconsin Section of the American

Congress of Obstetricians and Gynecologists, the Wisconsin Association of Local Health Departments and Boards, the Wisconsin Academy of Family Physicians, the Wisconsin Hospital Association, and the Wisconsin Public Health Association.  (5/29/14 Trial Tr. (dkt. #244) 139 (Laube); Joint Stip. (dkt. #200) ¶ 23; Rose Aff., Ex. A (dkt. #49-1) 11.) The Medical Examining Board did not propose, recommend, support or advocate for the legislation, and no member of the Wisconsin legislature or legislative aide consulted with or sought the advice of the Medical Examining Board as to any medical need or benefit of requiring physicians performing abortions to have admitting privileges at a hospital.  (Ex. 22 at Nos. 4-6.)  There was also no documented medical need or purpose for the Act when presented to the legislature, and the only physician who provided testimony regarding the Act testified against it.  (Joint Stip. (dkt. #200) ¶ 18; Affidavit of Jeffrey R. Renk ("Renk Aff."), Ex. A (dkt. ##48-1) (listing Dr. Tosha Weterneck of the Wisconsin Medical Society as against the bill).)

### C. Timing

Not unlike some other controversial legislation in Wisconsin of late, the Act was passed precipitously.  First introduced as 2013 Senate Bill 206 in the legislature on June 4, 2013, a hearing was held on the Act in front of the Committee of Health and Human Services the next day.  The Bill was then passed by the Senate on June 12, and by the Assembly on June 13, presented to the Governor on July 3, signed by him into law on Friday, July 5, and would have taken effect three days later on Monday, July 8, 2013, but for this court's injunction.  (Joint Stip. (dkt. #200) ¶ 18; Renk Aff., Exs. A, B (dkt. ##48-1, 48-2).)

### III.   Overview of Abortion Services

Nationally, over 90% of abortions are performed in an outpatient setting. (5/27/14 Trial Tr. (dkt. #243) 104 (King); Ex. 27 at ¶ 8.)   There are two types of abortions:   medication (or medical) abortions and surgical abortions.   The former involves administration of two medications, Mifepristone and Misoprostol, to induce an abortion.   (Ex. 50 (Expert Report of Douglas Laube, M.D. ("Laube Rept.")) ¶ 3.)   The patient takes Mifepristone in the clinic, which terminates the pregnancy, and takes Misoprostol at home approximately 24 to 48 hours after the visit in the clinic, which causes her uterine to contract and expel its contents.   (5/27/14 Trial Tr. (dkt. #243) 105 (King); Ex. 50 (Laube Rept.) ¶ 3.)

Surgical abortion involves the use of instruments to evacuate the contents of the uterus.   (5/27/14 Trial Tr. (dkt. #243) 105 (King).)   There are two kinds of surgical abortion:   aspiration or surgical suctioning abortion and dilation and evacuation abortion.   (5/27/14 Trial Tr. (dkt. #243) 26 (Ashlock).)   The procedure is short in duration, lasting five to eight minutes in the first trimester, but up to 20 minutes for a late second-trimester procedure.   (5/27/14 Trial Tr. (dkt. #243) 160-61 (King).)   A surgical abortion involves no incision into the woman's skin or other bodily membrane. (*Id.* at 105.)   First trimester surgical abortions are nearly identical to diagnostic dilation, curettage and surgical completion of miscarriage.   (Ex. 50 (Laube Rept.) ¶ 5.)   Second-trimester abortions are similar to hysteroscopies, a gynecological procedure that assesses "the cavity of the uterus through a small, pencil-sized endoscope so that one can visualize

8

the inside of the uterine cavity."  (5/29/14 Trial Tr. (dkt. #244) 132-33 (Laube); Ex. 50 (Laube Rept.) ¶ 6.)

## IV.   Current Availability of Abortion Services in Wisconsin

### A.  State Statistics

Pursuant to state statute, "each hospital, clinic or other facility in which an induced abortion is performed" must report selected information on every patient who has obtained an induced abortion in Wisconsin.  Wis. Stat. § 69.186(1).  (Joint Stip. (dkt. #200) ¶ 7.)  By statute, the Wisconsin Department of Health Services ("DHS") is also required to publish annual demographic summaries of the information reported. Wis. Stat. § 69.186(2).  The parties have provided reports for 2009 through 2012.  (*See* Joint Stip. (dkt. #200) ¶¶ 8-12; Exs. 1088-91.)[4]

According to these reports, the vast majority of abortions occur in the first trimester.  In Wisconsin in 2012, 83% of abortions occurred at or before 12 weeks of pregnancy, as measured from the first day of a woman's last menstrual period ("LMP"), and 96% at or before 15 weeks LMP.  (Joint Stip. (dkt. #200) ¶ 9; Ex. 1088.)[5]

---

[4]     The reports are also available electronically at http://www.dhs.wisconsin.gov/stats/prevyrsreportsitop.htm.

[5] The 2013 Report was not available at the time of trial but has since been issued. According to that report, in 2013, 84% of abortions occurred at or before 12 weeks LMP, and 93% at or before 15 weeks LMP.  Wis. Dep't of Health Services, "Reported Induced Abortions     in     Wisconsin,     2013"     (Aug.     2014),     *available     at* http://www.dhs.wisconsin.gov/publications/P4/p45360-13.pdf   (last   visited   Mar.   16, 2015).

### B. Plaintiffs' Abortion Services

There are currently four clinics in Wisconsin where women can obtain abortions.[6] PPW operates three of the clinics:  Madison East, Appleton North, and Milwaukee-Jackson.  AMS operates the fourth clinic, also in Milwaukee.

### 1. AMS

AMS provides medication abortions to ten weeks LMP, and surgical abortions to 22 weeks LMP, and infrequently beyond 22 weeks on a limited case-by-case basis. (5/27/14 Trial Tr. (dkt. #243) 27 (Ashlock); 5/29/14 Trial Tr. (dkt. #244) 221 (Christiansen testifying that AMS provides surgical abortions up to 24 weeks).)[7]  AMS provided approximately 2,100 abortions annually in 2011, 2,300 in 2012, and 2,500 in 2013.  (5/27/14 Trial Tr. (dkt. #243) 28 (Ashlock); Ex. 2.)  The vast majority of abortions were performed in the first trimester, and approximately one-quarter of those abortions were medication abortions.  (5/27/14 Trial Tr. (dkt. #243) 30-31 (Ashlock); Ex. 2.)  As for late second-trimester abortions, AMS performed 155 abortions post-20 weeks LMP in 2010, 135 in 2011, and 131 in 2012.  (5/27/14 Trial Tr. (dkt. #243) 29-

---

[6] Abortion services appear limited to these stand-alone clinics and are not part of a typical OB-GYN's practice.  (Ex. 27 (Stulberg Rept.) ¶ 8 (noting that in the Midwest, only 8.8% of OB-GYN's perform abortions).)   In August 2013, a fifth outpatient abortion provider in Wisconsin stopped providing abortion services.  (5/27/14 Trial Tr. (dkt. #243) 302 (Huyck testifying to Green Bay provider closing practice); 5/29/14 Trial Tr. (dkt. #244) 251 (Christiansen testifying to closure); Joint Stip. (dkt. #200) ¶ 38.)

[7] AMS's medical director Wendy Ashlock testified that aspiration abortions are performed through 14 weeks LMP and dilation and evacuation abortions from 15 to 22 or 23 weeks LMP on a case by case basis.  (5/27/14 Tr. (dkt. #243) 27 (Ashlock).)

30 (Ashlock); Ex. 2.)  Providing abortion care represents over 90% of the services AMS provides.  (5/27/14 Trial Tr. (dkt. #243) 13 (Ashlock).)

Dr. Dennis Christiansen is 50% owner of AMS and the associated medical director.  (5/29/14 Trial Tr. (dkt. #244) 172 (Christiansen).)  Having retired (or at least attempted to retire), he currently provides abortions at AMS on an occasional basis.  (*Id.*)  He is a board-certified obstetrician and gynecologist, and has been on the clinical faculty at the University of Wisconsin Medical School since 1993, where he taught residents in the ob-gyn and family practice programs to perform abortions.  (*Id.* at 173, 175; Ex. 13.)

Dr. Christiansen has been providing abortions in Wisconsin since 1977.  (*Id.* at 251.)  In 1980, Dr. Christiansen established the Madison Abortion Clinic which he ran until he donated the clinic to Planned Parenthood in 2008.  (*Id.* at 173.)  Dr. Christiansen also operated abortion facilities in Rockford, Illinois and Niles, Michigan.  (*Id.*)  Over the course of his career, he has performed over 85,000 abortions.  (*Id.* at 180.)  During that same period, Dr. Christiansen estimates that he has transferred 50 patients to the hospital for emergency treatment.  (*Id.* at 181.)[8]

Dr. Bernard Smith is the other 50% owner of AMS and is its medical director, serving in this capacity since he joined AMS in 1990.  (Deposition of Bernard Smith, M.D. ("Smith Depo.") (dkt. #211) 19, 23.)   Initially, Dr. Bernard spent two to three days per week at AMS, but now he spends four days per week.  (*Id.* at 19-20.)   Dr. Smith's training and residency is in Emergency Medicine, but he has been principally

---

[8] Of those hospital transfers, Dr. Christiansen further estimates that six patients ended up having hysterectomies but that all recovered completely.  (5/29/14 Trial Tr. (dkt. #244) 181 (Christiansen).)

engaged in providing reproductive health services, primarily abortion services, for 30 years. (5/27/14 Trial Tr. (dkt. #243) 56 (Ashlock); Pls.' PFOFs (dkt. #179) ¶ 23.) Dr. Christiansen trained Dr. Smith to provide second-trimester abortions, gradually increasing the gestational age. (5/29/14 Trial Tr. (dkt. #244) 178-79 (Christiansen).) Dr. Smith resides in Chicago, Illinois. (Smith Depo. (dkt. #211) 39.)

### 2. Planned Parenthood of Wisconsin

Planned Parenthood of Wisconsin provides comprehensive outpatient reproductive health care services, including abortion services, to thousands of women in Wisconsin each year. (5/27/14 Trial Tr. (dkt. #243) 296 (Huyck).) PPW has been providing health care services since 1935, and at the time of trial, provided those services at 23 health centers in Wisconsin. (*Id.*)[9] At three of those centers, PPW offers abortions: Appleton North (where PPW provides abortions to 13.6 weeks LMP);[10] Milwaukee-Jackson (where PPW provides abortions to 17 weeks LMP); and Madison East (where PPW provides abortions to 18.6 weeks LMP). (5/27/14 Trial Tr. (dkt. #243) 97-98 (King).) At all three locations, PPW provides medication abortions up to 9.0 weeks LMP. (*Id.* at 98.) PPW provided approximately 3,300 abortions in 2013 and

---

[9] PPW's Fond du Lac's clinic recently closed (the fifth clinic PPW closed in the past year), reducing the number of PPW clinics to 22. Jessica VanEgergen, *Fifth Planned Parenthood Clinic Closes as Result of Scott Walker Budgets*, The Cap Times (Sept. 25, 2014), *available at* http://host.madison.com/news/local/writers/jessica_vanegeren/fifth-planned-parenthood-clinic-closes-in-wisconsin-as-result-of/article_31f438a6-44d0-11e4-9694-5b395df864ff.html (last visited Mar. 16, 2015).

[10] The number before the decimal refers to the number of weeks and the number after the decimal refers to the number of days. Therefore, "13.6 weeks LMP" means 13 weeks and 6 days pregnant, as measured from the last menstrual period.

over 4,100 in 2012 at its three clinics.  (5/27/14 Trial Tr. (dkt. #243) 297 (Huyck).)
Eighty-four percent of abortions at PPW are done in the first trimester.  (5/27/14 Trial
Tr. (dkt. #243) 98 (King).)   Approximately 10% to 12% of abortions performed at
PPW's clinics are medication abortions, with the remainder being surgical.  (*Id.* at 158.)

Plaintiff Kathy King is the Medical Director of PPW.  (5/27/14 Trial Tr. (dkt.
#243) 90 (King).)  She is a licensed Wisconsin physician and board-certified ob-gyn with
over 10 years of experience.  (*Id.* at 90-91; Ex. 59.)  Dr. King is an Assistant Professor of
Obstetrics & Gynecology at the Medical College of Wisconsin.  (5/27/14 Trial Tr. (dkt.
#243) 90-91 (King); Ex. 59.)   She has admitting privileges at Froedtert Hospital and
Children's Hospital of Wisconsin in Milwaukee, and recently obtained admitting
privileges at a hospital near the Appleton North health center.  (Ex. 59; Joint Stip. (dkt.
#200) ¶ 6.)  Dr. King provides abortion services approximately four days a month at
PPW's Milwaukee-Jackson clinic.  (5/27/14 Trial Tr. (dkt. #243) 102 (King).)  Given her
medical director role at PPW, along with her practice at the Medical College of
Wisconsin and Froedtert, Dr. King does not have the time to provide additional care at
PPW's Milwaukee-Jackson clinic or travel to other centers to provide abortion care.  (*Id.*)
Dr. King has performed at least 2,000 abortions during the course of her career.  (*Id.* at
92.)

Dr. Susan Pfleger is also a board-certified ob-gyn, who works at PPW between one
and three days per week, providing counseling pre-abortion, abortion services and
insertion of contraception devices post abortion.  (5/27/14 Trial Tr. (dkt. #243) 182,
184-85 (Pfleger).)   Dr. Pfleger began working for PPW in 2000 and was its medical

director for approximately five to six years.  (*Id.* at 185.)  Dr. Pfleger currently provides

services at the Milwaukee-Jackson clinic.  (*Id.*)  Over the course of her career, Dr. Pfleger

has performed approximately 15,000 abortions.  (*Id.* at 187.)

In addition to King and her co-plaintiff Pfleger, there are four other physicians

(identified as Dr. P1, Dr. P2, Dr. P3, and Dr. P5) providing abortion services at PPW's

health clinics.  (Joint Stip. (dkt. #200) ¶¶ 2, 3, 5, 6.)[11]  Like Dr. King, the other

physicians providing services at PPW have private practices separate from PPW and only

have a set number of days that they can dedicate to performing abortions.  (5/27/14 Trial

Tr. (dkt. #243) 150 (King).)

### C.  Location of Out-of-State Abortions Clinics

There are abortion clinics in Minnesota, Illinois and Michigan.  (5/27/14 Trial Tr.

(dkt. #243) 170 (King).)  Within legal limits, a clinic in Chicago provides abortions to

the end of the 23rd week.  (*Id.*)[12]

---

[11] Except for named plaintiffs Drs. Pfleger and King and AMS's two owners Drs. Smith and Christiansen, all of the other doctors providing abortion services in Wisconsin are referred to by aliases in order to protect their identity.  The court agrees that this is necessary in light of the extreme harassment and threats physicians providing abortions face.  *See* discussion *infra* Opinion II.C.i.

[12] In a recent decision, the Fifth Circuit held that "the proper formulation of the undue burden analysis focuses solely on the effects *within* the regulating state."  *Jackson Women's Health Org v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014) (emphasis added).  As such, the location of out-of-state clinics may not be relevant, but since the Seventh Circuit has yet to consider this issue, the court will consider the option of out-of-state clinics in reviewing the undue burden claim.

## V.   Overview of Admitting Privileges

### A.  Types

A physician with admitting privileges at a particular hospital may admit patients and direct their care, as would a member of the hospital staff.  Hospital staff membership and privileges, including admitting privileges, are governed by each hospital's bylaws. Most hospitals have different categories of privileges, some of which allow admission of patients, while other categories do not.   For example, while defendant's expert Dr. Geoffrey Keyes described certain strategies for physicians with low or no volume of hospital patients, his suggestion that physicians attempt to obtain "refer and follow privileges" would not satisfy the requirements of Act 37, because those privileges do not allow a physician to admit patients.   (5/27/14 Trial Tr. (dkt. #243) 254 (Keyes); Deposition of Rita M. Hanson, M.D. ("Hanson Depo.") (dkt. #210) 19.)

### B.  Typical Application Process and Timing

Plaintiffs submitted the deposition testimony of Rita Hanson, M.D., Chief Medical Officer for Wheaton Franciscan Healthcare.  (Hanson Depo. (dkt. #210).)  In her deposition, Dr. Hanson described the credentialing process at Wheaton, which appears similar to that required by other hospitals, as well as consistent with plaintiffs' experience in securing or attempting to secure admitting privileges.  Applicants are first given a "pre-application, which is very basic information that the physician completes," to make sure that they "meet our basic qualifications."  (*Id.* at 10.)  If those criteria are met, the physician is asked to complete a full application.  (*Id.* at 10-11.)  Once the full application is completed, the medical office:  (1) verifies the information provided by

15

contacting the institutions listed by the applicant; (2) queries the National Practitioner Data Bank; and (3) performs a background check.  (*Id.* at 11.)  Once those steps are completed, letters of recommendations are reviewed and references are checked.  (*Id.*)

After these verifications are completed, the applicant is typically invited to interview with the chair of the department, although the chair can waive the interview if he or she is already familiar with the applicant.  (*Id.*)  There may also be interviews with the academic chair and with the credentials committee chair.  (*Id.* at 12.)  Should the applicant pass the interview hurdle, the application would then go to the credentials committee, which reviews all of the materials collected by the medical staff office and forms from any interviews in light of the type of privileges requested.  (*Id.* at 13.)  The credentials committee then makes a recommendation to the medical executive committee, which in turn makes a recommendation to what Wheaton refers to as the "Tier 3 Board," consisting of the hospital leadership and members of the community.  (*Id* at 13-14.)  If the Tier 3 Board approves, privileges are granted; however, if denied, there is no appeal process.  (*Id.* at 15.)

## VI.   Status of Plaintiffs' Admitting Privileges

As discussed below in greater detail, PPW physicians were successful in securing admitting privileges in Milwaukee and Appleton.  (Joint Stip. (dkt. #200); ¶¶ 3, 6; Ex. 98.)  AMS's two physicians, Drs. Christiansen and Smith, did not have admitting privileges at a hospital within 30 miles of AMS at the time the Act was passed, nor apparently were they able to obtain such privileges by the time of trial.

16

OPINION

## I.   Preliminary Matters

There are two preliminary set of motions that must be addressed before the court turns to the merits.

### A.  Plaintiffs' Motion to Seal Certain Trial Exhibits

Plaintiffs seek to seal certain documents containing excerpts of PPW manuals outlining its protocols for operation because they contain proprietary and sensitive business information.  (Pls.' Mot. to Seal (dkt. #224).)  The documents were marked as confidential pursuant to the protective order entered in this case, and the protective order further provides that documents designated confidential will be sealed if used at trial.  (Dkt. #105-1.)  While the court questions whether these documents contain the kind of "highly sensitive" competitive information warranting sealing, *see Formax Inc. v. Alkar-Rapidpak-MP Equip., Inc.*, No. 11-C-0298, 2014 WL 792086, at *3 (E.D. Wis. Feb. 25, 2014), the court nonetheless is persuaded that these materials contain trade secrets, as defined under Wisconsin law, Wis. Stat. § 134.90(c).  Accordingly, the court will grant plaintiffs' motion and order that Exhibits 32, 36, 37 and 38 remain under seal.

### B.  Plaintiffs' Motions to Supplement Record

Also before the court are two motions by plaintiffs to supplement the trial record. "[A] motion to reopen to submit additional proof is addressed to [the court's] sound discretion."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971) (citing *Swartz v. N.Y. Central R. Co.*, 323 F.2d 713, 714 (7th Cir. 1963)); *see also* Fed. R. Civ. P. 59(a)(2) (providing that the court may take additional testimony after a nonjury

17

trial).  In the first motion, plaintiffs seek to include three categories of exhibits.  (Dkt. #247.)  First, plaintiffs seek to include additional materials related to hospital staff privileges obtained by subpoena, which are related to other hospital materials already the subject of a stipulation between the parties.  The court will grant this request in light of the parties' stipulation and as unopposed by defendants.  Accordingly, exhibits 1A-1F attached to the declaration of Renée Paradis (dkt. #250-1) are admitted as Exhibit 97.

Second, plaintiffs move to admit discovery responses by defendant Dave Ross, Secretary of the Wisconsin Department of Safety & Professional Services, and defendant Kenneth B. Simons, Chairperson of the Medical Examining Board of the State of Wisconsin, in which they both represent that neither agency nor organization has investigated or, in the case of the Medical Examining Board, taken disciplinary action against, a physician performing abortion services in the last five years.  These discovery responses were identified before trial as Exhibits 21 and 22, and defendants interposed no objection as called for by the court's pretrial procedure.  Plaintiffs explained that they intended to move these exhibits into the record formally during the trial but inadvertently failed to do so.  Although aware of plaintiffs' intent to enter these discovery responses into the record without objection, defendants now oppose plaintiffs' request on the basis that they had ample opportunity to do so at the trial.  While the court agrees that plaintiffs should have formally moved for their admission, plaintiffs' failure to do so here is excusable given the volume of exhibits and the speed with which the trial advanced.  More importantly, defendants are in no way prejudiced by the exhibits admission.  Nor can defendants claim surprise given that the exhibits are discovery

responses *they* provided and not only understood could but would be used against them at trial.  Accordingly, the court will grant plaintiffs' second request as well.  Exhibits 21 and 22 are formally admitted.

Third, plaintiffs seek leave to supplement the record with letters to and from Milwaukee area hospitals concerning Drs. Smith and Christensen's eligibility for privileges, which were only collected after trial.  Defendants object to plaintiffs' request, arguing that:  (1) the evidence is untimely; (2) plaintiffs fail to explain why these documents could not have been obtained before the close of trial; and (3) defendants would be prejudiced by the admission of the evidence because they had no opportunity to challenge the offered document, including hearsay statements by physicians or the hospital credentialing members, to examine its authors, or to present counterevidence.  (Defs.' Opp'n (dkt. #251) 2-3.)  On this, the court agrees with defendants.  Any correspondence of this type could and should have been obtained sooner and moved into evidence during trial.  Accordingly, the court will deny plaintiffs' request to supplement the trial record with correspondence concerning Drs. Smith and Christiansen's eligibility for admitting privileges in Milwaukee-area hospitals.

In the second motion, plaintiffs seek leave to include two categories of exhibits.  (Dkt. #253.)  First, plaintiffs seek to include email correspondence between AMS and Waukesha Memorial Hospital concerning Drs. Christiansen and Smith's eligibility for admitting privileges, which will be denied for the same reasons as explained above.  Second, plaintiffs seek to include two letters, both to plaintiff Dr. Pfleger, one from an Appleton hospital notifying her that she has been granted admitting privileges and the

19

other from Aurora Sinai (a Milwaukee hospital) informing her that she must satisfy certain requirements by November 29, 2014, or risk revocation of her membership. Because this part of the motion is unopposed by defendants, exhibit A to plaintiffs' supplemental motion to include certain documents in the trial record (dkt. #253-1) is admitted as Exhibit 98.

## II.   Fourteenth Amendment Liberty and Privacy Claim

### A.  Legal Standard

In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), the United States Supreme Court observed that a "woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*.  It is a rule of law and a component of liberty we cannot renounce." *Id*. at 871.  In *Casey*, the Court also specifically addressed the source of this liberty interest:

> Though abortion is conduct, it does not follow that the State is entitled to proscribe it in all instances. That is because the liberty of the woman is at stake in a sense unique to the human condition and so unique to the law. The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only she must bear. That these sacrifices have from the beginning of the human race been endured by woman with a pride that ennobles her in the eyes of others and gives to the infant a bond of love cannot alone be grounds for the State to insist she make the sacrifice. Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture. The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society.

*Id.* at 852.   Still, the Supreme Court held in *Casey* and in subsequent cases, this liberty interest is not absolute.

In affirming this court's entry of a preliminary injunction in this case, the Seventh Circuit set forth the applicable test for determining whether a regulation directed at women's health constitutes an undue burden:

> The cases that deal with abortion-related statutes sought to be justified on medical grounds require not only evidence (here lacking as we have seen) that the medical grounds are legitimate but also that the statute not impose an "undue burden" on women seeking abortions.   The feebler the medical grounds, the likelier the burden, even if slight to be "undue" in the sense of disproportionate or gratuitous.

*Van Hollen III*, 738 F.3d at 798 (citing *Casey*, 505 U.S. at 874, 877, 900-01; *Sternberg v. Carhart*, 530 U.S. 914, 930 (2000); *Mazurek v. Armstrong*, 520 U.S. 968, 972-73 (1997) (per curiam)).

In its post-trial brief, the State essentially disregards this test, mentioning it only briefly in a footnote.   (Defs.' Post-Trial Br. (dkt. #255) 61 n.40.)   Instead, the State refers this court either to:   (1) cases outside of the abortion context involving rational basis review, *see, e.g.*, *City of Clerburne v. Clerburne Living Ctr.*, 473 U.S. 432 (1985); *Heller v. Doe*, 509 U.S. 312 (1993); or (2) a pair of decisions from the Fifth Circuit considering a challenge to Texas's admitting privileges requirement, *see Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 407 (5th Cir. 2013) ("*Abbott I*"), and *Planned Parenthood of Greater Tex. Surg. Health Servs. v. Abbott*, 748 F.3d 583 (5th Cir. 2014) ("*Abbott II*").   While this court rejected plaintiffs' invitation to apply strict scrutiny in its preliminary injunction opinion, *Van Hollen II*, 2013 WL 3989238, at *12, neither

is it free to apply a vanilla rational basis test in light of the Seventh Circuit's directive to weigh legitimate health benefits derived from an abortion regulation against the burdens it places on women seeking access to abortion services.

Notably, in *Abbott II*, the Fifth Circuit criticized the Seventh Circuit's directive, rejecting any requirement by the State to prove through evidence that the admitting privileges requirement will make abortions safer.  748 F.3d at 596.[13]  Even if this court found the Fifth Circuit's reasoning consistent with *Casey* and subsequent Supreme Court decisions -- and it does not -- this court, of course, is required to follow the law of the case as articulated by of the Seventh Circuit.[14]

As this court explained in its preliminary injunction opinion, unlike cases where courts have considered a regulation adopted to respect the potential life of the unborn or

_____

[13] The court in *Abbott II* harped on the Seventh Circuit's need for "statistical evidence." 748 F.3d at 596.  This court does not read the Seventh Circuit's opinion as requiring a particular type of evidence from the State, statistical or otherwise, but it is clear that it is the State's burden to put forth evidence demonstrating that the regulation is reasonably related to the health of women seeking abortions.

[14] This balancing of benefits and burdens has since been adopted by the Ninth Circuit and at least one other district court both reviewing similar admitting privileges requirements.  *See Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 912 (9th Cir. 2014) ("[W]e compare the extent of the burden a law imposes on a woman's right to abortion with the strength of the state's justification for the law.  The more substantial the burden, the stronger the state's justification for the law must be to satisfy the undue burden test; conversely, the stronger the state's justification, the greater the burden may be before it becomes 'undue.'"); *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1337 (M.D. Ala. 2014) (explaining the undue burden test as "whether, examining the regulation in its real-world context, the obstacle is more significant than is warranted by the State's justifications for the regulation" (internal citation omitted)).  Indeed, a different panel of the Fifth Circuit in *Jackson Women's Health Organization v. Currier*, 760 F.3d 448 (5th Cir. 2014), seemed to depart from the *Abbott* court's reasoning, recognizing that the undue-burden analysis must consider "the entire record and factual context in which the law operates."  *Id.* at 458.

to further the integrity and ethics of the medical community, *see, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), "there is no other legitimate state interest or interests at play [in this case,] which would counter-balance any arguable uncertainty in the medical community as to the medical rationale underlying this regulation." *Van Hollen II*, 2013 WL 3989328, at *15 & n.29 (discussing *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004)).   Accordingly, the court must balance health interests against health interests:  the health interests of women who may suffer a complication requiring hospitalization because of an abortion procedure performed by a physician without admitting privileges within 30 miles of the procedure against the health interests of women facing obstacles in obtaining an abortion because of this privileges requirement.

Indeed, the Supreme Court appears more willing to treat skeptically and strike down state regulations purportedly aimed at the health of women where the evidence of such a requirement is lacking.  *See, e.g.*, *City of Akron v. Akron Ctr. for Repro. Health, Inc.*, 462 U.S. 416, 434-39 (1983) (holding that requirement that second trimester abortions be performed in a hospital infringed on women's right to abortion because the medical evidence did not support such a requirement and requiring hospitalization places a significant obstacle in the path of women seeking an abortion), *overruled on other grounds by Casey*, 505 U.S. 833; *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 482 (1983) (invalidating a similar hospitalization requirement); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 76-79 (1976) (striking down a state regulation prohibiting the use of saline in abortion procedures because it "fails as a reasonable regulation for the protection of maternal health," rejecting the state's

23

argument that the Court should defer to "substantial supporting medical evidence," finding that the prohibition "comes into focus, instead, as an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks"). Consistent with these Supreme Court holdings and the Seventh Circuit's directive, the court's role in weighing the benefits of a regulation purportedly adopted to further the health of women seeking abortions against the regulation's burden on those same women is more straightforward than trying to weigh that burden against so-called "persuasion" regulations or those directed at protecting the integrity of the medical community.

### B.  State Interest / Medical Rationale

Since the State contends that the admitting privileges requirement at issue is reasonably directed to the health of women seeking abortions, it has the burden of demonstrating this link. *See Akron*, 462 U.S. at 430, *overruled on other grounds by Casey*, 505 U.S. 833 (describing the burden as that of the state); *Doe v. Bolton*, 410 U.S. 179, 195 (1973) (same); *see also Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1340-41 (M.D. Ala. 2014) (describing holding in *Doe* as requiring "more than general statements of concern and claims that the regulations conceivably might, in some cases, lead to better health outcomes; rather the Court required the State to establish, through evidence, that the regulation really was strongly justified"); *Van Hollen III*, 738 F.3d at 798 (requiring evidence that "the medical grounds are legitimate").

Similarly, the *Gonzales* Court emphasized that the Court "did not . . . place dispositive weight on Congress' findings." *Gonzales*, 550 U.S. at 165. Instead, "[t]he

24

Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake." *Id*.  As the Seventh Circuit had previously explained, this requires the district court to "undertake an individualized factual inquiry based on the record before it in determining whether the challenged abortion restriction imposes an undue burden." *Karlin v. Foust*, 188 F.3d 446, 484 (7th Cir. 1999).[15]

In determining whether the admitting privileges regulation is reasonably related to a legitimate medical reason, the court's inquiry at trial principally considered the following questions:  (i) are admitting privileges required for other outpatient procedures; (ii) how safe is abortion, especially as compared to similar outpatient procedures and childbirth; and (iii) would the admitting privileges requirement further women's health?

### i.    Unique Application of this Requirement to Abortion Services

At trial, defendants conceded that an admitting privileges requirement has never been imposed on *any* outpatient procedure other than the provision of abortion services. Indeed, the parties submitted a joint stipulation prior to trial where defendants concede that "[t]he State of Wisconsin does not require physicians who provide surgery at

---

[15] In its post-trial briefing, the State continues to argue that a health benefit from the regulation "may be based on rational speculation unsupported by evidence or empirical data," citing to cases outside of the abortion context.  (Defs.' Post-Trial Br. (dkt. #255) 61 (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *see also id.* at 58 (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993) (the State "has no obligation to sustain the rationality of a statutory classification")).)  Despite its earlier concession that the State bears the burden of demonstrating that the regulation is reasonably related to women's health, *Van Hollen II*, 2013 WL 3989238, at *12 n.27, the State now also argues in its post-trial brief that plaintiffs bear the burden of demonstrating that the Act is "irrational," again citing non-abortion related cases.  (Defs.' Post-Trial Br. (dkt. #255) 63.)  Since this newfound position is contrary to the case law described above, the court will hold defendants to their proof on this part of the balancing analysis.

ambulatory surgery centers or in other outpatient settings to have hospital admitting privileges." (Joint Stip. (dkt. #200) ¶ 14.)

Still, defendants offered the testimony of Dr. Geoffrey Keyes, President of the American Association for the Accreditation of Ambulatory Surgery Facilities, Inc., ("Quad A"), that Act 37 "conforms to existing standards of care for accrediting ambulatory surgical facilities." (Ex. 1075 (Expert Rept. of Geoffrey R. Keyes, M.D. ("Keyes Rept.")) ¶ 1.)   In addition to the most glaring difference -- that this standard applies to all medical procedures (rather than just abortions) -- Quad A's standards concerning admitting privileges requirement in securing accreditation differs from Act 37's requirement in at least three important respects.  (5/27/14 Trial Tr. (dkt. #243) 246 (Keyes).)  *First*, the standards require that physicians hold "or demonstrate that they have held" admitting privileges, allowing at least for the possibility that lapsed admitting privileges could satisfy the requirement.  (5/27/14 Trial Tr. (dkt. #243) 246 (Keyes); Ex. 96 at A116.)  *Second*, the standards provide for an exception or waiver if a physician "can demonstrate the loss or inability to obtain such privileges was not related to lack of clinical competence, ethical issues, or problems other than the economic competition." (*Id.*)  *Third*, the standards allow for a "signed and dated document from a person in the same specialty who has admitting privileges in a hospital within 30 minutes of the facility that indicates their willingness to admit the patient to the hospital" as an alternative. (5/27/14 Trial Tr. (dkt. #243) 248 (Keyes); Ex. 96 at A116.)

Defendants also offered the testimony of Eric Ostermann, Executive Director of the Association of Wisconsin Surgery Centers, Inc. ("WISCA"), a professional

association of surgery centers ("ACSs") in Wisconsin, who similarly testified that Wisconsin law does not require ASCs to have admitting privileges or transfer agreements, but they must have one or the other to be certified for Medicare.  (5/28/14 Trial Tr. (dkt. #233) 91-92, 98 (Ostermann); 5/27/14 Trial Tr. (dkt. #243) 251-52 (Keyes also acknowledging Medicare and Medicaid payment requirement).)  *See also* 42 C.F.R. § 416.41(b)(3) (providing that to be certified for coverage by Medicare or Medicaid, an ambulatory surgery center must either have a written transfer agreement with a hospital *or* ensure that their physicians have admitting privileges).  Regardless, the parties agree that "[a]n ambulatory surgery center can operate in Wisconsin without Medicare certification or accreditation from a national accreditation body."  (Joint Stip. (dkt. #200) ¶ 15.)

Indeed, defendants' evidence is entirely consistent with the medical practice guidelines adopted by both the American College of Obstetricians and Gynecologists ("ACOG") and the National Abortion Federation ("NAF"), requiring physicians who provide abortions in outpatient settings to make arrangements for treatment of those patients experiencing complications.  (Ex. 50 (Laube Rept.) ¶ 18.)  In short, abortion procedures have been quite intentionally singled out for disparate regulation.

### ii.    Safety of Abortions

Since an admitting privileges requirement is unique to abortion, the next logical question is whether there is a reason to treat abortion differently in light of the State's purported justification, namely the health of women seeking this outpatient procedure.

### a.  Expert Testimony

As described above, the court engaged the neutral expert and principal experts for each side in a colloquy on the third day of trial in an attempt to reach a consensus where possible on several pertinent issues, primarily concerning the safety -- relative and otherwise -- of abortion and the role of admitting privileges in furthering the health of women experiencing complications from abortions.   The court-appointed expert, Dr. Serdar E. Bulun, John J. Sciarra Professor and Chair of the Department of Obstetrics and Gynecology, Northwestern University Feinberg School of Medicine, has been board-certified in ob-gyn since 1994, is licensed to practice medicine in Illinois, Texas and New York, and has been on staff at Northwestern Memorial Hospital since 2003.  (Ex. 500.) The court chose Dr. Bulun because of his expertise and qualifications in obstetrics and gynecology, insights into the credentialing process in light of his position as chair of the ob-gyn department at Northwestern, his lack of involvement in this particular lawsuit (or even to Wisconsin), and his general neutrality on issues surrounding abortion rights. Prior to trial, with the input of the parties, the court posed eight questions to Dr. Bulun and requested that he respond in writing after reviewing the parties' principal expert reports.   Those responses were circulated to the parties before trial, admitted into evidence and guided the expert colloquy.  (Ex. 500.)

Plaintiffs designated Dr. Douglas Laube to participate in the colloquy.  Dr. Laube is also a board-certified ob-gyn since 1976 and has been practicing obstetrics and gynecology for 43 years, providing a range of outpatient and hospital services, including in the past abortion services.  (Ex. 50 (Expert Report of Douglas Laube, M.D. ("Laube

Rept.")) ¶ 2.)  Dr. Laube has taught at the University of Wisconsin Medical School for 21 years (including 13 years as the Department's chair), and served as past president of the American College of Obstetricians and Gynecologists.  (*Id*.)

Defendants' designated expert is Dr. John Thorp, Jr., a board-certified ob-gyn since 1991, with a board-certified sub-specialty in maternal-fetal medicine since 1992. (Ex. 1058 (Expert Report of James Thorp, Jr., M.D., M.H.S. ("Thorp Rept.")).)  Dr. Thorp is a Professor in the Department of Maternal and Child Health and in the Department of Epidemiology, both in the School of Public Health at the University of North Carolina School of Medicine and is a Professor in the Department of Epidemiology at the School of Public Health and Tropical Medicine at Tulane University.  (*Id.*)  Dr. Thorp is also the Interim Director of the Center for Women's Health Research at UNC.  (*Id.*)[16]

---

[16] The court has several concerns with Dr. Thorp's credibility.  First, Dr. Thorp has not only been retained in a number of cases to provide testimony supporting abortion regulations, including similar challenges to admitting privileges requirements (5/29/14 Trial Tr. (dkt. #244) 86-88 (Thorp)), but has also submitted amicus curiae briefs *on his own behalf* to the U.S. Supreme Court in support of abortion-related regulations (*id.* at 91).  His extensive involvement in lawsuits supporting abortion regulations calls into question his ability to separate personal beliefs from the medical science surrounding these regulations.  Second, the court's general concern about Dr. Thorp's ability to be objective is supported by certain hyperbolic statements in his report, as well as by the argumentative nature of his contributions during the colloquy with the court.  (*See, e.g.*, Ex. 1058 (Thorp Rept.) ¶ 19 ("After reading Dr. Laube's opinions comparing the relative safety of childbirth to TOP [termination of pregnancy], one could reasonably draw the conclusion that human pregnancy and delivery is a disease state that is unsafe and should be managed by the safer choice of pregnancy termination, notwithstanding common sense and conventional medical science.  Indeed, such a jaundiced view would seemingly question why a woman would ever choose conception and childbirth."); 5/29/14 Trial Tr. (dkt. #235) 25, 35 (colloquy) (exhibiting a general unwillingness to engage with studies that did not support his position); 5/29/14 Trial Tr. (dkt. #235) (Thorp) (flippantly

### b. Complication Rates

The types of complications associated with abortions vary somewhat by the type of procedure used.  For medication abortions, complications may include adverse reaction to one of the medications, bleeding, infection, failed or incomplete abortion, and very rare risk of death.  (Ex. 50 (Laube Rept.) ¶ 3; 5/27/14 Trial Tr. (dkt. #243) 160 (King).)  For surgical abortions, complications include an adverse reaction to one of the sedation medications, bleeding, infection, incomplete abortion, and injury to the cervix or uterus, and a very rare risk of death.  (Ex. 50 (Laube Rept.) ¶ 4; 5/27/14 Trial Tr. (dkt. #243) 159 (King).)

In determining complication rates for abortions, the court primarily relies on two recent, large-scale and peer reviewed studies conducted here in the United States.  The first study reviewed outcomes in 233,805 medication abortions, and found that less than 0.65% of patients experienced a complication and that six out of 10,000 (or 0.06%) experienced a complication requiring hospitalization.  (Ex. 50 (Laube Rept.) ¶ 9 (citing Kelly Cleland et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 Obstetrics & Gynecology 166, 169 (2013)).)  The second study also from 2013 reviewed outcomes in 11,487 first-trimester surgical abortions, and found that 1.27% of patients experienced minor complications requiring outpatient treatment, and six (or 0.052%) experienced a major complication (a category that included hospital admission).  (Ex. 50 (Laube Rept.) ¶ 9 (citing Tracy Weitz et al., *Safety of Aspiration Abortion Performed by Nurse*

---

suggesting that the court "knock a [percentage] point off" to account for any overlap among the studies he cited).)

*Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103 Am. J. Public Health 454-61 (2013)).)

In his report, Dr. Bulun relied on complication rates from older studies. A 1970s multicenter study of 84,000 abortions, reported rates of serious complications comparable to those reported in the more recent studies cited above.[17]   (Ex. 500 at p.1 (listing complication rates by gestation as 0.1 to 0.4% at 7 to 12 weeks gestation; 1.3% at 15-16 weeks, and 1.9% at 17-20 weeks).)   Similarly, a 1990s study cited in Dr. Bulun's report reported a rate of hospitalization for first trimester surgical abortions of 0.071%, and for second trimester abortions of 1-1.5%.  (Ex. 500 at p.2.)

Notably, Dr. Bulun's data demonstrates an increase in complication rates by gestation.  Dr. Laube agreed that "the complication rate from second-trimester abortion, especially late second-trimester abortion, is significantly more than with first trimester." (5/29/14 Trial Tr. (dkt. #244) 46 (Laube).)   For example, the risk of perforating the uterus is higher at 16 weeks or later than it is during a first trimester or an earlier second trimester abortion, because an instrument needs to introduced into the uterus rather than relying on suction to complete the abortion.  (5/27/14 Trial Tr. (dkt. #243) 225-27 (Pfleger).)[18]

---

[17] Serious complications are defined as a fever of 38ºC or higher for 3 or more days, hemorrhage requiring transfusion or unintended surgery.  (Ex. 500 at p.1.)

[18] Arguably if the regulation at issue were applied to dilation and evacuation abortions, typically performed at and after 16 weeks LMP, the question of whether there was a medical reason for the admitting privileges requirement might be closer, but the State did not make this argument.  Even if it had, the evidence demonstrates that the risk of complications is still very low for late-second trimester abortions.

31

By comparison, the risk of death associated with childbirth in the United States is approximately 14 times higher than that associated with abortion, and women are more likely to experience complications from live births than from having abortions.  (Ex. 50 (Laube Rept.) ¶ 7 (citing Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion & Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216 (Feb. 2012)).)  The risk of death related to abortion overall is less than 0.6 deaths per 100,000 procedures, which equates to a mortality rate of 0.0006%. (Ex. 50 (Laube Rept.) ¶ 7 (citing David A. Grimes, *Estimation of Pregnancy-Related Mortality Risk by Pregnancy Outcome, United States*, 194 Am. J. Obstetrics & Gynecology 92, 93 (2006)).)  The comparable risk of death for childbirth is 8.8 out of 100,000 births or a mortality rate of 0.0088%.  Raymond & Grimes, *supra* at 216.

In response, defendants' expert Dr. Thorp asserts in his report that the "[c]omplication rate ranges from 2 to 10%, with most complications being managed without major surgery."  (Ex. 1058 (Thorp Rept.) ¶ 20.)  In his testimony, Dr. Thorp corrected the statement to say that it should be .2% to 10% (emphasis on the decimal before the 2).  (5/29/14 Trial Tr. (dkt. #244) 96 (Thorp).)  While Dr. Thorp failed to cite any support in his report for this extremely broad variation in probable outcomes range, during his testimony he explained that the complication rate range comes from a piece he authored published in *Scientifica*.  (*Id.* at 99-100.)  As with his report in this case, his article also erroneously provided the 2% to 10% range, but Dr. Thorp stated that he submitted an erratum to correct the range to reflect .2% to 10%.  (*Id.* at 99.)  On cross-examination, plaintiffs effectively called into question the scientific rigor and value of

32

*Scientifica*, in light of its extraordinarily high acceptance rate and requirement that authors pay to publish their pieces.  (*Id.* at 101-02.)  Putting aside this general criticism, there also were multiple errors in Dr. Thorp's citations to studies that purportedly supported this range, and his methodology in compiling these statistics lacked analytical rigor.  (*Id.* at 104-110.)   For example, when pressed by the court as to why his complication range did not account for any overlap, Dr. Thorp responded, "[s]o make it to account for overlap and knock a point off and make it 6%."  (*Id.* at 113.)  In light of the deep flaws in his analysis and his testimony, which often came off more as advocacy then expert opinion, the court finds little to credit in Dr. Thorp's opinions of the relative risks of abortions to child birth or comparable invasive procedures.

While the court places no weight on the complication range provided by Dr. Thorp, the court has nonetheless considered the criticisms Dr. Thorp raised about the studies relied on by plaintiffs and the court-appointed expert.   Dr. Thorp's main criticism, consistent with that of defendants' other experts, is that abortion complications are underreported.  (*See also* Ex. 1072 (Expert Report of James G. Linn, M.D. ("Linn Rept.")) ¶ 3.)  *First*, Dr. Thorp takes issue with any statement that abortion is safer than childbirth, because abortion-related deaths, collected by the CDC, are underreported due to poor data collection and a shorter window for reporting such deaths.  (Ex. 1058 (Thorp Rept.) ¶ 14; 5/29/14 Trial Tr. (dkt. #244) 11-13 (colloquy).)  In contrast, Dr. Thorp contends that "[p]regnancy-related deaths are systemically sought and investigated by state government sponsored commissions and the majority of states formally link birth certificates to death certificates."  (Ex. 1058 (Thorp Rept.) ¶ 14.)  As support, Dr.

33

Thorp points to data from Scandinavian countries, where each patient has a unique identifier number and all health events are recorded around that number, showing higher death rates from abortion than studies of the United States.  (5/29/14 Trial Tr. (dkt. #244) 17 (colloquy); Ex. 1058 (Thorp Rept.) ¶¶ 15, nn.20-22.)  From this, Dr. Thorp "estimates" the death rate from abortion to be between "10 to 20" out of 100,000, comparable to childbirth.  (5/29/14 Trial Tr. (dkt. #244) 18-19 (colloquy).)  Both Dr. Laube and Dr. Bulun reject the notion that the United States' data is as underreported as Dr. Thorp claims, relying on the studies cited above which show about 1 death out of 100,000 abortions.  (5/29/14 Trial Tr. (dkt. #244) 30 (colloquy).)  Moreover, both doctors agree that the CDC data is reliable, given the practical constraints for all such studies.  (5/29/14 Trial Tr. (dkt. #244) 15, 34 (colloquy).)  Dr. Henshaw, a former senior fellow with the Guttmacher Institute, similarly testified that the "abortion mortality is very . . . accurately documented by the Centers for Disease Control."  (5/30/14 Trial Tr. (dkt. #234) 11 (Henshaw).)[19]

While the court credits some amount of underreporting, Dr. Thorp's perception that deaths due to abortions are "significantly underreported" lacks any support in reliable studies, and it is further undercut by his unsupported opinion that the CDC's "analyses were being used to deliberately promote an unjustified confidence in abortion

---

[19] Dr. Henshaw also testified about a recent study in California where the authors reviewed records of 55,000 abortions in California and were able to trace complications based on Medicaid records.  (5/30/14 Trial Tr. (dkt. #234) 12-13 (Henshaw).)  In this way, that study mirrored the data collection mechanism in the Scandinavian studies cited by Dr. Thorp, rather than relying on reporting by physicians.  Dr. Henshaw represented that the "rates they came up with were very similar to the rates that have been found in other clinical studies."  (*Id.*)

safety." (5/29/14 Trial Tr. (dkt. #244) 95 (Thorp).)  Dr. Laube concedes that the studies

he relies on -- like all self-reporting studies -- may suffer from underreporting.  (*See, e.g.*,

5/29/14 Trial Tr. (dkt. #244) 120, 128-29 (Laube).)  "[W]e rely on those studies to give

us an idea [] that what we are doing in these various procedures that were reported are

consistent with contemporary standards.  So we have to rely on literature which is extent.

We can't rely on a perfect system which we don't have.  So as professionals, . . . we have

to rely on this peer-reviewed process to enable our practitioners to move forward."

(5/29/14 Trial Tr. (dkt. #244) 141-42 (Laube).)[20]  In the end, as Dr. Bulun testified, the

best data available (data similar to that regularly relied upon by medical experts for many

diagnostic and empirical purposes) supports a finding that abortion procedures as a

whole are safer for a woman's health than childbirth.[21]

 *Second*, Dr. Thorp is critical of other studies concerning complications that derive

their data from the Guttmacher Institute.  In addition to his criticism about the self-

reporting nature of that data, Dr. Thorp criticizes the reliability of the Guttmacher

---

[20] At trial, Dr. Thorp was pressed to engage more with these peer-reviewed studies. Sensing reluctance, I was reminded of a phrase attributed to Mark Twain (and by others to Disraeli), "Lies, damn lies, and statistics," to which Dr. Thorp took some offense. (5/29/14 Trial Tr. (dkt. #244) 31 (colloquy).) It was not my intent to imply that *he* was guilty of lying, but rather that both sides can manipulate data to their own advantage. Nonetheless, I found Dr. Thorp's defensiveness telling.

[21] The disparity in outcomes between abortion and childbirth is hardly surprising in light of the fact that approximately one-third of babies in the United States are delivered by cesarean section (*see* CDC FastStats, *Births - Methods of Delivery*, *available at* http://www.cdc.gov/nchs/fastats/delivery.htm (last visited Mar. 16, 2015)), not to mention the even higher percentage of deliveries for which other interventions, including epidurals, occur, *and* given that childbirth requires women to maintain pregnancies, during which complications can develop, of 2 to 4 times as long as those of women seeking abortions. Thankfully, modern medicine has advanced to the point that a typical birth or abortion are both relatively safe procedures for women's health.

Institute data given its affiliation with Planned Parenthood. (Ex. 1058 (Thorp Rept.) ¶¶ 7, 8.)   As Dr. Henshaw testified, the Guttmacher Institute does not try to collect information on complications, rather the Guttmacher Institute relies on clinical studies focused on tracking complication rates.  (5/30/14 Trial Tr. (dkt. #234) 11 (Henshaw).) Moreover, the court is inclined to credit Dr. Henshaw's testimony that the research department is sufficiently separate from the policy and public affairs departments, not to be swayed as to empirical outcomes of dedicated research studies.  (*Id.* at 43.)  At most, Dr. Thorp's own documented bias cancel's out Dr. Henshaw's testimony, leaving the court with Dr. Bulun's more objective conclusions.

Accordingly, the court finds that while there may be some amount of underreporting, the overwhelming evidence demonstrates that abortion is safe, especially in the first trimester when the vast majority of abortions are performed nationwide and in Wisconsin, the rates of complications are very low, and the morbidity rate is exceedingly low, especially as compared to the risk of death from childbirth.  Even if there is underreporting of complications due to self-reporting by physicians, this would appear to ring true for outpatient procedures generally, not just abortions.  (5/29/14 Trial Tr. (dkt. #244) 25-26, 28-29, 34 (colloquy).)  As such, statistics concerning the *relative* safety of abortion are no more susceptible to objection than other gynecological and nongynecological procedures.   Ultimately, even Dr. Thorp conceded during the expert colloquy that "[a]bortion is a relatively safe procedure."  (5/29/14 Trial Tr. (dkt. #244) 7-8 (colloquy).)

Abortions (both first and second trimester, and even post-16 week second trimester abortions) are safer or comparable in safety to other outpatient procedures. For example, operative colonoscopy has a complication rate of 5%, with major events requiring hospitalization in 2% of procedures. (5/29/14 Trial Tr. (dkt. #244) 35-36 (colloquy); Ex. 500 at p.3.) Egg retrieval for in vitro fertilization carries a severe complication rate of 0.72%. (Ex. 500 at p.3.) Diagnostic or operative hysteroscopy has a hospitalization rate ranging from 0.1 to 0.33%. (*Id.*) Abortion is also comparable in safety or safer to that of a vasectomy, which has a complication rate of 1 to 3%. (5/29/14 Trial Tr. (dkt. #244) 134 (Laube).)

During the colloquy, Drs. Bulun and Laube similarly testified to abortion being as safe as other outpatient gynecological procedures like cervical biopsies, endometrial biopsies, IUD insertions, and LEEP procedures, all of which routinely take place in the outpatient setting.[22] (5/29/14 Trial Tr. (dkt. #244) 34-36, 41, 43-44 (colloquy); *see also* 5/30/14 Trial Tr. (dkt. #233) 49-50 (Linn testifying that LEEP procedure carries a rate of heavy bleeding between 1 to 3%).) While Dr. Thorp contends that abortion is not comparable to hysteroscopies and D&Cs procedures because of women's tendency toward increased blood flow while pregnant, (5/29/14 Trial Tr. (dkt. #244) 42 (colloquy), 85 (Thorp)), Dr. Thorp failed to describe how this fact alone increases complications, much less provide any studies that suggest greater complications. Even as

---

[22] "A LEEP procedure is an operation that's done to treat precancerous conditions of the cervix and it's done under local anesthesia. And basically the tip of the cervix where the precancerous condition is located, that area is removed." (5/28/14 Trial Tr. (dkt. #233) 47 (Linn).)

37

a subjective matter, Dr. Laube pointed out that a "pregnant uterus also responds better to treatments to stop that bleeding, such as a use of uterotonics, making the risk of the procedures [abortion, dilation and curettage, or hysteroscopies] roughly the same."  (Ex. 51 (Expert Rebuttal Report of Douglas Laube, M.D. ("Laube Rebuttal")) ¶ 11; *see also* 5/92/14 Trial Tr. (dkt. #244) 43 (colloquy).)

### c.  Plaintiffs' Complication Rates

Plaintiffs' own data and experience dealing with complications is consistent with the general statistics provided by plaintiffs' experts and the neutral expert.  In particular, the vast majority of complications due to abortions are handled in the clinic setting, and do not require transfer to a hospital.  (5/27/14 Trial Tr. (dkt. #243) 109, 112 (King).)  In reports submitted to the National Abortion Federal, plaintiff AMS reported 39 patients experiencing complications in 2010, representing 1.51% of the total abortions performed; 10 patients in 2011, representing 0.46%; and 8 patients in 2012, representing 0.34%.  (5/27/14 Trial Tr. (dkt. #243) 31-32 (Ashlock); Ex. 2.)  Wendy Ashlock, the Director of AMS, testified that the percentage of complications at AMS has consistently been less than 2%.  (5/27/14 Trial Tr. (dkt. #243) 32 (Ashlock.)  From 2009 to the date of trial, AMS transferred a total of 8 patients directly to a hospital from AMS (2 in 2009, 3 in 2011, 2 in 2012, and 1 in 2013).  (*Id.* at 40; Ex. 4.)

Of the approximately 8,400 abortions PPW has provided at its Milwaukee-Jackson health center in the last five years, PPW has transferred only four patients to the hospital for treatment related to an abortion complication.  (5/27/14 Trial Tr. (dkt. #243) 115-16 (King); Ex. 31.)  Of the approximately 5,000 abortions provided at the

Appleton North clinic in the same period of time, only one patient was transferred to a hospital for treatment.  (5/27/14 Trial Tr. (dkt. #243) 116 (King); Ex. 31.)

According to Wisconsin's own 2012 Reported Induced Abortions figures, there were 13 reported complications out of a total of 6,927 abortions, which represents a complication rate of 0.19%.  (Joint Stip. (dkt. #200) ¶ 9; Ex. 1088.)  The 2013 report reveals 16 reported complications out of 6,463 abortions, resulting in a complication rate of 0.25%.  Wis. Dep't of Health Services, "Reported Induced Abortions in Wisconsin, 2013" (Aug 2014), *available at* http://www.dhs.wisconsin.gov/publications/P4/p45360-13.pdf/.[23]

### iii.    State's Evidence in Support of Admitting Privileges Requirement

Perhaps in response to this court's statement in its preliminary injunction opinion that "[d]efendants' position may have some merit if they could articulate a *single, actual* instance where a provider's lack of admitting privileges had been a factor in an abortion patient's negative outcome," *Van Hollen II*, 2013 WL 3989238, at *14, defendants attempted to produce such evidence at trial.  A woman who had an abortion in 1995 at Appleton's PPW clinic testified to having a high fever about one week after her abortion, eventually being hospitalized for treatment of a major infection.  (5/28/14 Trial Tr. (dkt. #233) 5, 8-11 (Wood).)  Even assuming this woman's infection was a complication caused by her abortion, which was reasonably questioned in light of other reasons offered

---

[23] Admittedly, the complication data collected from the State is of arguable value one way or the other.  (5/30/14 Trial Tr. (dkt. #234) 12 (Henshaw testifying that the state governments do not collect information on complications "in reliable way").)

in her medical record (*id.* at 19; Ex. 1069; 5/28/14 Trial Tr. (dkt. #233) 127 (Merrill)), the infection developed several days after her abortion and she understandably went to a hospital across the street from where she was living at that time, rather than return to a hospital near where the abortion had been performed.  (5/28/14 Trial Tr. (dkt. #233) 9 (Wood).)  Given these circumstances, an admitting privileges requirement would not have altered Wood's treatment, or at least defendants have failed to demonstrate as much.

One of defendants' other experts, Dr. Linn, similarly testified to a case about ten years ago where he cared for a patient who had been brought by ambulance from AMS to the emergency room.  (Ex. 1072 (Linn Rept.) ¶ 6; 5/28/14 Trial Tr. (dkt. #233) 37 (Linn).)  In that case, the woman required a hysterectomy.  Dr. Linn did not know for certain, but believed that the doctor who provided the abortion did not call to transfer the patient; nor did he call the next day to check on her status.  (Ex. 1072 (Linn Rept.) ¶ 6; 5/28/14 Trial Tr. (dkt. #233) 37-39 (Linn).)  Dr. Linn opined that if the doctor "was on the medical staff of the hospital, he could have expedited her care," possibly avoiding a hysterectomy, or "[a]t the very least, if he was on staff at the hospital, there would have been some quality review process initiated to see if the complication could have been avoided and how to do 'hand-off' of care."  (Ex. 1072 (Linn Rept.) ¶ 6.)  On cross-examination, however, Dr. Linn testified that he believed the doctor who had performed

the abortion *was* on staff at another hospital in Milwaukee, thereby apparently satisfying the requirements of Act 37.  (5/28/14 Trial Tr. (dkt. #233) 58-59, 62 (Linn).)[24]

As described above in the court's rulings on plaintiffs' motions to supplement the record, defendant Dave Ross, Secretary of the Wisconsin Department of Safety & Professional Services, and defendant Kenneth B. Simons, Chairperson of the Medical Examining Board of the State of Wisconsin, stated in response to interrogatories that neither the agency nor the board has investigated, or in the case of the Medical Examining Board, taken disciplinary action against, a physician performing abortion services in the last five years.    (Exs. 21, 22.)

While the lack of *any* evidence demonstrating that Act 37 addresses a known problem is telling, defendants correctly point out that there need not be a lengthy record of incidents to warrant legislation.  *See Greenville Women's Clinic v. Bryant*, 222 F.3d 157,

---

[24] The weight to be given to Dr. Linn's testimony was also called into question given that he, like most of defendants' other experts, had been actively recruited by Dr. Vincent Rue, an advocate of abortion regulations who has been discredited by other courts because of his lack of analytical rigor and possible personal biases. (Pls.' Br. (dkt. #248) 13 n.3 (citing cases).)   While the State's reliance on a third-party to assist in locating experts is not in and of itself problematic, Dr. Rue's reputation before other courts raises some concerns.  More importantly, Dr. Rue ghost wrote or substantively edited portions of some of defendants' experts' reports, including that of Dr. Linn's.  As a result, Dr. Linn could not explain at the trial the intended meaning of some parts of his own report. (5/28/14 Trial Tr. (dkt. #233) 60-61 (Linn discussing Exhibit 1072 (Linn Rept.) ¶ 12); *see also* 5/29/14 Trial Tr. (dkt. #244) 241 (Anderson acknowledging that Dr. Rue provided "wordsmithing" of his reports); 5/29/14 Trial Tr. (dkt. #244) 93-94 (Thorp acknowledging that he had spoken with Dr. Rue); 5/30/14 Trial Tr. (dkt. #234) 63 (Uhlenberg testifying that he was recruited by Rue).)   Dr. Linn's testimony is also called into question given his own, admitted interest in reducing access to abortions and in particular, an interest in closing AMS.   (5/28/14 Trial Tr. (dkt. #233) 57 (Linn) (testifying that he supported Act 37 because AMS would have to close); *see also id.* at 56 (Linn testifying that he attended a meeting by the Wisconsin Right to Life about the admitting privileges requirement).)

41

169 (4th Cir. 2000) ("[T]here is no requirement that a state refrain from regulating abortion facilities until a public-health problem manifests itself."). Defendants posit three core reasons for requiring admitting privileges: (a) continuity of care / communication; (b) ensuring quality of physicians providing such care; and (c) peer review / accountability. (Ex. 1058 (Thorp Rept.) ¶ 22; Ex. 1087 (Expert Report of David C. Merrill, M.D., Ph.D ("Merrill Rept.")) ¶¶ 2, 3, 21; 5/28/14 Trial Tr. (dkt. #233) 109, 114 (Merrill); Ex. 1082 (Expert Report of James C. Anderson, M.D. ("Anderson Rept.")); 5/29/14 (dkt. #244) 233 (Anderson).) This opinion will now turn to the court's findings of fact as to each.

### a. Continuity of Care

The parties and their experts agree that continuity of care is paramount in managing complications. While there is agreement on this general proposition, at trial the *evidence* demonstrated that the admitting privileges requirement is unlikely to further continuity of care for several reasons. *First*, for those complications occurring at the clinic, there was a consensus among the parties and their experts that advance transfer agreements and a call to the receiving hospital's emergency department from the physician who performed the abortion are the most important factors in ensuring continuity of care. (5/29/14 Trial Tr. (dkt. #244) 61-62 (colloquy); 5/29/14 Trial Tr. (dkt. #244) 235-36 (Anderson); 5/28/14 Trial Tr. (dkt. #233) 109 (Merrill).) As such, any benefit of admitting privileges in terms of continuity of care is incrementally small, at best when compared to transfer agreements already required by law and in place at each of plaintiffs' clinics.

42

In fact, all of the plaintiffs' clinics comply with Wis. Admin. Code MED § 11.04(1)(g), which requires physicians performing abortions to have made arrangements with a local hospital for admission of patients requiring emergency care.  (Notably, no other provider of outpatient procedures in Wisconsin is required to have such arrangements.)  AMS's arrangement is with Aurora-Sinai Hospital.  (5/27/14 Trial Tr. (dkt. #243) 41 (Ashlock); Smith Depo. (dkt. #211) 69.)  AMS's director testified to the protocol AMS follows in managing complications, including having the doctor contact the emergency room and copying the patient's records for the emergency room staff. (5/27/14 Trial Tr. (dkt. #243) 36 (Ashlock); Smith Depo. (dkt. #211) 69-70, 80-81.) PPW similarly has agreements with hospitals in Madison, Milwaukee and Appleton. (5/27/14 Trial Tr. (dkt. #243) 111, 121 (King); Ex. 37.)  According to PPW's policies, if a patient needs hospital care, the staff will arrange for emergency transport, including completing an emergency transport form and copying her medical chart.  (5/27/14 Trial Tr. (dkt. #243) 113 (King); Exs. 34, 38.)  The physician is also required to contact the receiving hospital and describe the situation in particular, what led up to the emergency, and what interventions were performed.  (*Id.*)

Even one of defendants' own experts, Dr. Anderson, agreed that admitting privileges are not required for a treating physician to call the ER in ensuring continuity of care.  (*See* 5/29/14 Trial Tr. (dkt. #244) 236).)  Moreover, the Act does *not* require the physician who performs the abortion accompany his or her patient to the hospital, treat the patient at the hospital, communicate with the hospital, or facilitate the hand-off of the patient to hospital physicians.  The Act also does not require the physician to admit

or attempt to admit patients who need hospitalization at a hospital where the physician has admitting privileges.

*Second*, the weight of the evidence demonstrates that the image of a treating physician in an outpatient setting accompanying her patient to the hospital, much less continuing treatment in the inpatient setting is increasingly outdated and contrary to modern hospital care.   *See Van Hollen III*, 738 F.3d at 793 ("The trend in the hospital industry is for the hospital to require the treating physician to hand over his patent who requires hospitalization to physicians employed by the hospital, rather than allowing the treating physician to continue participating in the patient's treatment in the hospital."). As explained by the Chief Medical Officer for Wheaton Franciscan Healthcare -- the healthcare system of which six of the 17 hospitals within a 30 mile radius of AMS are affiliated -- "the healthcare landscape has evolved."   (Hanson Depo. (dkt.# 210) 18.) For doctors who provide services on an outpatient basis, "[if] their patients need to be admitted, they are admitted [to] a hospital with someone who has chosen to spend their entire day in the hospital taking care of those patients."   (*Id.* at 19.)   Even in the expert colloquy, all experts presumed that the outpatient physician would *not* continue to treat a complication requiring hospitalization, rather this would be for a surgeon at the hospital or the ER doctor to manage.   (5/29/14 Trial Tr. (dkt. #244) 66-67 (colloquy).)[25]

---

[25] For this reason, the court largely rejects Dr. Merrill's testimony about the importance of admitting privileges, which presumed that physicians will accompany their patients to the hospital and treat or at least be involved in their treatment.   (5/28/14 Trial Tr. (dkt. #233) 109-10 (Merrill).)    Dr. Merrill's testimony is also tainted by his direct involvement in advocating for the passage of the challenged Act, having proposed the admitting privileges requirement to Wisconsin Right to Life.   (*Id.* at 124-25 (Merrill); Exs. 92, 93.)

In particular, Dr. King testified that if a complication requiring hospitalization occurred under her care, she would not accompany the patient to the hospital: "My presence would not improve her ability to be transferred nor would it improve or hasten her care once she arrived at the hospital and the emergency department." (5/27/14 Trial Tr. (dkt. #243) 118 (King).)   Dr. King's impression is consistent with Dr. Pfleger's experience transferring three patients to the hospital over the course of her career (in which she has performed 15,000 abortions).   (5/27/14 Trial Tr. (dkt. #243) 187 (Pfleger).)   In each case, she spoke with the emergency room doctor, ob-gyn on call, or both, and provided documentation to go with the patient to the hospital, including a written summary of what she had done and what she presumed the complication to be. (*Id.* at 188.)

*Third*, emergency rooms treat patients without regard to whether the treating physician has admitting privileges.[26]   Emergency rooms operate by triaging patients depending on the seriousness of their condition, not based on whether a physician accompanies a patient or whether the outpatient provider has admitting privileges. (5/27/14 Trial Tr. (dkt. #243) 118-19 (King).)   Emergency room physicians are trained to manage obstetric-gynecological complications, and will consult with an ob-gyn when appropriate.  (*Id.* at 132.)

Dr. Stephen Hargarten, Professor and Chairman of Emergency Medicine at the Medical College of Wisconsin and Chief of Emergency Medicine at Froedtert Hospital,

---

[26] Federal law requires that a hospital with an emergency department is obligated to admit and to treat a patient requiring emergency care in all circumstances.  42 U.S.C. § 1395dd(b)(1).

has been practicing emergency medicine since 1976 and is board-certified in that field. (5/29/14 Trial Tr. (dkt. #244) 154 (Hargarten); Ex. 53 (Expert Report of Stephen Hargarten, M.D., MPH ("Hargarten Rept.")) ¶ 2.)  Dr. Hargarten testified that admitting privileges are not necessary when a patient arrives at the emergency department, because she is generally treated without knowing whether an admitting physician is "linked" with that patient.  (5/29/14 Trial Tr. (dkt. #244) 155 (Hargarten).)  "Our goal is the patient's safety.  Our goal is to initiate resuscitation and beginning to find out what's wrong and begin the initial raw treatment plan."  (*Id.*)  While Dr. Hargarten acknowledges that a call from a treating physician would certainly be helpful, he also testified that it makes no difference whether the physician referring a patient to the emergency room has admitting privileges or not.  (*Id.* at 160-61, 165-66.)

To counter Dr. Hargarten's testimony, defendants called Dr. James C. Anderson, who practices in the area of primary care and is board-certified in both emergency medicine and in family medicine.  (5/29/14 Trial Tr. (dkt. #244) 231-32 (Anderson).) While Dr. Anderson testified to the importance of admitting privileges in the emergency medicine setting, he had not practiced emergency medicine since 2005, and had never practiced medicine in Wisconsin.  (*Id.* at 243 (Anderson).)[27]

---

[27] Furthermore, Dr. Anderson, like Dr. Thorp, has been retained to provide testimony in several cases concerning abortion regulations, including similar challenges to admitting privileges requirements.  (5/29/14 Trial Tr. (dkt. #244) 244 (Anderson).)  The court shares the same concern it has with Dr. Thorp in light of Dr. Anderson's extensive involvement in lawsuits supporting abortion regulations.  *See supra* n.16.

*Fourth*, for complications arising at the clinic that are so severe as to require transportation to a hospital by ambulance, there is no assurance that a patient would be transferred to the hospital for which the treating physician has admitting privileges. (5/27/14 Trial Tr. (dkt. #243) 118 (King).)   Certainly a patient's or her physician's preference may be a consideration (Joint Stip. (dkt. #200) ¶ 17; Ex. 1092), but the EMS service is most likely to transport the patient to the closest hospital, which in many cases may not be -- or at least the Act does not require that it be -- the one where the treating physician has admitting privileges.  Indeed, this discrepancy is reflected in AMS's recent experience dealing with complications.   Despite AMS's transfer arrangement with Aurora-Sinai, approximately half of the time a complication requiring hospital care arises at AMS's clinic, the EMTs opt to take AMS's patients to Columbia-St. Mary's.  (5/27/14 Trial Tr. (dkt. #243) 41-42 (Ashlock); 5/29/14 Trial Tr. (dkt. #244) 188 (Christiansen).)  Similarly, Dr. King has admitting privileges at Froedtert Hospital, which is within 30 miles of PPW's Milwaukee-Jackson clinic, but is not the nearest hospital. (5/27/14 Trial Tr. (dkt. #243) 118 (King).)  Indeed, this is the very situation that Dr. Linn encountered in a case eventually requiring a hysterectomy:   an AMS patient experiencing complications was transferred to one hospital despite the treating physician having admitting privileges at another hospital.  (Ex. 1072 (Linn Rept.) ¶ 6; 5/28/14 Trial Tr. (dkt. #233) 37 (Linn).)

*Fifth*, for complications that occur after the procedure at home, there are additional challenges with defendants' assertion that admitting privileges will further the continuity of care.  Generally, complications from medical abortions will occur outside of

the clinic since that is where women are self-administering the second medication. (5/27/14 Trial Tr. (dkt. #243) 109 (King); 5/29/14 Trial Tr. (dkt. #244) 38-39 (colloquy).)  Plaintiffs provide information to patients, instructing them, in the case of an emergency, to go to the closest emergency room, which often will not be close to the clinic where the original procedure was performed.  (5/27/14 Trial Tr. (dkt. #243) 48-49 (Ashlock describing AMS's protocol); *id.* at 130 (King describing PPW's protocol).)

For example, approximately one-third of AMS's patients and 40% of PPW's Milwaukee-Jackson patients come from outside of Milwaukee County.  (5/27/14 Trial Tr. (dkt. #243) 51 (Ashlock), 131 (King.)  Eighty-nine percent of PPW's Appleton North abortion patients come from outside of the Appleton area.  (5/27/14 Trial Tr. (dkt. #243) 131 (King.)  Despite Dr. Thorp's testimony to the contrary (5/29/14 Trial Tr. (dkt. #244) 67 (Thorp)), it is simply not credible that plaintiffs' patients would nevertheless insist on transport to a hospital nearer where the physician who performed the original abortion has admitting privileges, especially in light of the likely distance from the patient's home, limitations on travel, and challenges to access to healthcare confronted by women living in poverty as discussed more below.

In summary, defendants have failed to offer credible evidence that the admitting privileges requirement furthers continuity of care in any meaningful way.  Indeed, the record demonstrates that:  (1) transfer agreements and a call to the hospital -- the former already required by law, and the latter not required by Act 37 -- already ensure continuity of care more effectively than admitting privileges; (2) there is no guarantee, nor is there a requirement, that a patient experiencing a complication be transferred to a hospital where

48

the treating provider has admitting privileges; and (3) often, complications will arise outside of the clinic and away from the hospital where the physician would be required to have admitting privileges.

### b.   Quality measurement / credentialing

Defendants also maintain that the requirement for hospital admitting privileges will help insure the quality of physicians providing abortions.  At first glance, this is likely defendants' strongest argument.  Indeed, there was a consensus among the experts during the colloquy that admitting privileges is an indication of quality of the physician, although unnecessary for physicians engaged in a strictly outpatient practice.  (5/29/14 Trial Tr. (dkt. #244) 59 (colloquy).)   Still, the specific requirement at issue here -- admitting privileges within 30 miles of abortion practice -- is a poor substitute for better measures of quality for several reasons.

*First*, defendants have advanced no reason why the requirement should be limited to hospitals within a thirty-mile radius if the reason for this requirement is simply a "stamp of approval."[28]  Indeed, absent the thirty-mile requirement, Act 37 would pose no barrier to Dr. Christiansen, who holds admitting privileges at Meriter Hospital in Madison, Wisconsin.  (5/29/14 Trial Tr. (dkt. #244) 191-92 (Christiansen).)  Similarly, the burden on PPW to maintain providers at the Appleton clinic would at least be

---

[28] Perhaps hospitals close to the location where the procedures took place are more likely to become aware of complications, but defendants have not made this argument, nor offered evidence to support it.  Moreover, as discussed, these incidents are so rare as to make a poor substitute for a physician's overall quality of care.  In any event, such an arbitrary requirement, left to private hospitals with differing business agendas, some of which understandably have nothing to do with a physician's ability, and no opportunity for appeal is fraught with its own set of problems.  *See* discussion *infra* Opinion IV.

lessened if there were no geographic limitation in the Act that would prevent medical staff with principal practices at other locations from working there part-time.

*Second*, justifying the admitting privileges requirement as a quality metric is undermined by the Act's failure to provide a grace period post-enactment, as well as by the lack of a rolling basis for new providers or renewals.  As indicated in the cases cited above, a number of states that have adopted a similar admitting privileges requirement of late at least include some flexibility as to compliance.  Even the challenged Texas statute provided a 100-day grace period within which to comply with the admitting privileges requirement.  *Abbott* II 748 F.3d at 604; *see also Van Hollen III*, 738 F.3d at 797 (describing grace periods in other states passing similar admitting privileges requirement ranging from 76 to 128 days in Mississippi, Alabama, Texas and North Dakota ).  While the Fifth Circuit upheld the constitutionality of the Texas law, the court order extended the 100-day grace period to bar enforcement against "abortion providers who timely applied for admitting privileges under the statute but are awaiting a response."  *Abbott II*, 748 F.3d at 604; *Van Hollen III*, 738 F.3d at 807 (Manion, J., concurring in entry of a preliminary injunction because of "Wisconsin's failure to include a reasonable time for compliance").

*Third*, the admitting privileges requirement does not measure the quality of care for those providers who exclusively practice in the outpatient setting.  (5/29/14 Trial Tr. (dkt. #244) 60-61 (Dr. Bulun acknowledging that for uncommon procedures like abortion, a physician with admitting privileges may not be the most qualified).)   In granting admitting privileges, hospitals are understandably concerned with an applicant's

*in*patient record of care.   Ironically, Drs. Christiansen and Smith are the most experienced providers of abortions in Wisconsin, and yet have no admitting privileges in the Milwaukee area.[29]   Indeed, Dr. Christiansen has been providing abortions since *Roe v. Wade*, has trained countless doctors in the procedures at the University of Wisconsin Medical School, and has repeatedly postponed full retirement in an effort to maintain services for women in Wisconsin.   The fact that he has no admitting privileges at a hospital in the Milwaukee-area in no way reflects a lack of quality or credentialing on his part.

*Fourth*, defendants have also failed to put forth any evidence why *admitting* privileges, as compared to "refer and follow" or other types of less stringent privileges, are necessary to ensure the quality of physicians providing abortion services.   The deposition testimony of Dr. Hanson once again proves insightful.   Hanson explains that her refer-and-follow privileges best fit her needs as a primary care physician, relying on hospitalists to treat her patients when they are in need of hospital care.

> [A]s a primary physician, [I] am expected by the payer community[30] to have hospital membership.   We have a category of membership, which is more recent, somewhere in the last four or five years, that is -- it's refer and follow.   And it basically means my patient is coming to the hospital.   I could come and say hello and talk to them.   I could look at their chart, but I am not -- I do not have privileges to write orders and engage in their direct care.

---

[29] Even the ob-gyn practice (or the genetic counselors affiliated with the practice) of one of defendants' experts refers patients to AMS for late-term abortions.   (5/28/14 Trial Tr. (dkt. #233) 132 (Merrill).)

[30] The court assumes that Dr. Hanson is referring to Medicare's requirement of credentialing for payment.   (*See* 5/28/14 Trial Tr. (dkt. #233) 91-92, 98 (Ostermann).)

(Hanson Depo. (dkt. #210) 19.)

To obtain refer-and-follow privileges, an applicant still must be screened for verification of references and other credentials, but those privileges do not require demonstration of an *in*patient record of care.  Dr. Smith holds this type of privileges at a hospital in the Milwaukee area (Smith Depo. (dkt. #211) 44), and in rejecting Dr. Christiansen's request for an application, Froedtert's credentials committee suggested that he may "choose to request membership in the Refer and Follow Staff category, which is specifically for the physician with an ambulatory-based practice" (Ex. 6).

In the abstract, the admitting privileges requirement may serve as a quality metric, but the State has failed to put forth any evidence justifying the more stringent aspects of the requirement -- the 30-mile geographical limitation, the lack of any grace-period, and the requirement for admitting as opposed to refer-and-follow or "affiliate" privileges.  As the Supreme Court explained in striking down a similar purported health regulation in *Akron,* "the State is obligated to make a reasonable effort to limit the effect of its regulations[.]"  462 U.S. at 434.  In enacting Act 37, the State has failed to do just that.

*Fifth*, the State's purported reliance on admitting privileges as a credentialing check also implicates plaintiffs' claim that the Act violates the non-delegation doctrine.  Not only is the State delegating quality monitoring in the hands of private entities with non-uniform criteria and with admitted interests having nothing to do with an individual doctor's quality of care, those interests run counter to granting privileges to abortion providers, who unquestionably offer little chance of hospital referrals and a real risk of controversy if formally associated with the hospital.  Without *any* procedure for

52

physicians to appeal or for the State to check those decisions, the State is at risk of violating the non-delegation doctrine. *See* discussion *infra* Opinion IV.

### c. Accountability / peer review

Finally, the State contends that hospital membership provides a conduit for holding physicians who mismanage complications accountable through peer review. Dr. Laube conceded that peer review is a benefit that one would have through admitting privileges, but contends that there are other ways to discipline providers (e.g., through medical boards). (5/29/14 Trial Tr. (dkt. #244) 65-66 (colloquy).) Consistent with that view, the parties and their experts agree that a failure to communicate with the receiving hospital would constitute patient abandonment or substandard medical care, and would subject the provider to disciplinary actions by the Medical Examining Board. (Ex. 1087 (Merrill Rept.) ¶ 3; 5/29 Trial Tr. (dkt. #244) 185 (Christiansen); 5/29/14 Trial Tr. (dkt. #244) 138 (Laube).) As a result, any peer review or accountability benefit to admitting privileges would be incremental at best to steps the Medical Examining Board would take in the face of patient abandonment or substandard care.[31]

---

[31] While defendants failed to put forth any evidence of substandard care provided to women seeking abortions in Wisconsin, defendants and their experts repeatedly cited to the relatively recent, thankfully isolated and yet tragic news stories detailing substandard, even criminal, care by abortion providers in other states, most notably that of Dr. Kermit Gosnell in Pennsylvania. (Defs.' Post-Trial Br. (dkt. #255) 58 n.38; Ex. 1072 (Linn Rept.) ¶ 4 ("If Pennsylvania had such a law as the Act here in Wisconsin, in my opinion, undoubtedly his egregious practices would have been subjected to peer review, discipline and license revocation long ago potentially preventing his medical malpractice and criminal behavior from continuing, and possibly saving lives.").) The problem with citing to the outrageous facts involving Dr. Gosnell is that there was no lack of regulations, but rather a lack of enforcement. Pennsylvania had at its disposal the ability to shut Gosnell down much earlier through the state's medical licensing regulations. If anything,

This purported justification suffers from the same weaknesses as the other two proffered by the State here.  For example, the Act does not require that the patient is treated at the hospital for which the treating physician has admitting privileges; nor does the Act require the treating provider to call the hospital to ensure continuity of care or otherwise manage the patient through her complication.  Similarly, the peer review or accountability rationale does not explain why the State failed to provide a grace period before enforcement of the provision, or why the State requires admitting privileges instead of some other form of hospital membership that would be easier to obtain and still bring the treating physician within the hospital's peer review system.

In addition to the tenuous link, if any, between the proffered justifications and the State's evidence, the State adopted this requirement in the face of opposition by *all* of Wisconsin's leading medical and public health associations, including the Wisconsin Medical Society, the Wisconsin Section of the American Congress of Obstetricians and Gynecologists, the Wisconsin Association of Local Health Departments and Boards, the Wisconsin Academy of Family Physicians, the Wisconsin Hospital Association, and the Wisconsin Public Health Association.  (5/29/14 Trial Tr. (dkt. #244) 139 (Laube); Joint Stip. (dkt. #200); Rose Aff., Ex. A (dkt. #49-1) 11.)  In *Akron*, the Court struck down

---

unwarranted regulations that reduce the availability of quality providers will create opportunities for illegal (and often dangerous) providers to take advantage of unmet demand, not seen since the *Roe v. Wade* decision itself.  (5/29/14 Trial Tr. (dkt. #235) 80 (Bulun).)  Indeed, Dr. Bulun explained that "[e]pidimologic data indicate an inverse relationship between the availability of legal abortion and resorting to illegal abortion associated with remarkable increased risks of death or morbidity," which includes "septic abortion, uterine infection, pelvic abscess, loss of uterus and/or ovaries [and] infertility." (Ex. 500.)

the hospitalization requirement in part because of the regulation's departure from accepted medical practice. *See Akron*, 462 U.S. at 431 ("The State's discretion . . . does not, however, permit it to adopt abortion regulations that depart from accepted medical practice.").

### C. Burdens

In determining whether the Act violates patients' Fourteenth Amendment liberty rights, the court must consider whether the Act poses an *undue* burden on women seeking abortions in Wisconsin. *See Karlin*, 188 F.3d at 481 (instructing courts to consider "(1) whether the . . . requirement was reasonably related to a legitimate state interest and (2) whether the [requirement] had the practical effect of imposing an undue burden"). On appeal, the Seventh Circuit instructed that the undue burden test "is not a matter of the number of women likely to be affected. '[A]n undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" *Van Hollen III*, 738 F.3d at 798 (quoting *Casey*, 505 U.S. at 877).

"Before viability, the State's interests are not strong enough to support a prohibition of abortion *or* the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846 (emphasis added). The Seventh Circuit in *Karlin* described this test as whether the regulation "prevents" women from seeking abortion. *See also Karlin*, 188 F.3d at 482 ("[T]o constitute an undue burden, a challenged state regulation must have a strong likelihood of *preventing* women from obtaining abortions rather than merely making abortions more difficult to obtain.").

55

The word "prevent" has many meanings; it can mean that one was prohibited or barred, or it can mean that a person lacked any meaningful opportunity.[32]  *See* New Oxford Am. Dictionary 1343 (2d ed. 2005) (defining prevent as "keep (something from happening or arising . . . [or] make (someone or something) unable to do something").  As described by *Casey*, "prevent" is not limited to regulations that prohibit abortion, but extends to regulations that present a substantial obstacle to access.  505 U.S. at 846.  With this legal framework in mind, the court considers: (i) the current landscape and likely future availability of physicians providing abortions in Wisconsin; (ii) the barriers plaintiffs may face in securing admitting privileges; and (iii) the likely effects of Act 37 on access to care.

---

[32] The State latched on to the term "prevent" in posing a question to one of plaintiffs' witnesses.  Specifically, an Assistant Attorney General representing defendants asked Dr. Henshaw, "[if] I decided I'm going to buy a Mercedes Benz but I cannot get financing for that car and I don't have the funds to buy it, am I prevented from buying a Mercedes Benz?"  (5/30/14 Trial Tr. (dkt. #234) 30 (Henshaw).)  While the court cut off this line of questioning as argumentative, Dr. Henshaw's response to defendants' question -- "I think you are" (*id.*) -- is entirely consistent with *Casey* and Seventh Circuit cases interpreting it.  The absurdity in the State's question is the seeming attempt to equate a Mercedes Benz to an abortion:   if the Assistant Attorney General who posed this question were to ask a woman facing an unwanted pregnancy whether being prevented from purchasing a Mercedes Benz because of lack of funds is like being prevented from obtaining an abortion because of lack of funds, the answer would most assuredly be "no."  The evidence is in the desperate steps to which some women resorted when no safe, legal option existed.  As Dr. Bulun observed, "I still have the view that if we restrict abortion, I don't think abortion will stop[.  P]eople will resort to illegal abortions . . . .  So should we do an experiment for this?  I don't think so."  (5/29/14 Trial Tr. (dkt. #235) (Bulun).)

### i.   Inadequate and threatened supply of physicians providing abortions in Wisconsin

Drs. Bulun, Laube and Thorp all agree that the number of abortion providers has declined in recent decades.  (5/29/14 Trial Tr. (dkt. #244) 72-73 (colloquy).)[33]  Between 1982 and 2005, the number of abortion providers in the United States decreased by 38%.  (Ex. 27 (Expert Report of Deborah Stulberg ("Stulberg Rept.")) ¶ 8.)  This general trend is reflected in Wisconsin:  over the past decade, the number of clinics providing abortions has dwindled from sixteen to four.  (Ex. 27 (Stulberg Rept.) at ¶ 7.)

Part of this decline may be because of the retirement of physicians who started providing abortions on the heels of *Roe v. Wade* in 1973.  As Dr. Christiansen described:

> The group of us that really went into it as a full-time activity after the *Roe/Wade* decision has pretty much aged out of that kind of procedure and so an increasing number of the procedures are provided by the Planned Parenthood Clinics and employed physicians.  And so it's an employed position rather than having your own practice.

(5/29/14 Trial Tr. (dkt. #244) 227.)  While this dynamic may not be problematic in and of itself, full-time, dedicated physicians are being replaced by PPW physicians, who are balancing their own, separate ob-gyn practices and academic commitments with providing abortions on a very occasional basis.  (5/27/14 Trial Tr. (dkt. #243) 303 (Huyck explaining that two new physicians who provide abortions on a limited basis for PPW "have very full practices . . . [a]nd that's one of the reasons that they have

---

[33] Dr. Thorp maintains, however, that this may be because "our society is progressing in its recognition of what constitutes human life," rather than harassment and threats faced by abortion providers.  (5/29/14 Trial Tr. (dkt. #244) 72-73 (colloquy).)  Dr. Thorp's assumption (or aspiration) is unsupported by studies of the causes of limited access.  (5/29/14 Trial Tr. (dkt. #235) (Laube citing studies).)

admitting privileges, but that limits the amount of time that they can provide for us").)
At minimum, this would require an increase in the total number of physicians providing
abortions in the face of pressures against their doing so.

Over this same period of time, abortions have also declined. *See* Guttmacher
Institute, *State-by-State Trends in Abortion in the United States, 1973-2011,* available at
http://www.guttmacher.org/presentations/state_ab_pt.html (last visited Mar. 16, 2015).
Some portion of the decline in providers may be a reflection of a decreased demand for
such services, whether because of well-documented increases in the effective use of
contraceptives or less well-documented moral choices. While that may be part of the
answer, it is not the complete answer, particularly in Wisconsin in light of PPW's current
wait times of three to four weeks to obtain an abortion (5/27/14 Trial Tr. (dkt. #243)
149 (King)), and both PPW and AMS's inability, or at least great difficulty, in recruiting
and retaining physicians to meet the demand (*see* discussion *infra* Opinion II.C.iv).

Dr. Deborah Stulberg, an assistant professor in the Department of Family
Medicine at the University of Chicago Pritzker School of Medicine with secondary
appointments in the Department of Obstetrics and Gynecology and the Maclean Center
for Clinical Medical Ethics, conducts research generally concerning reproductive health,
and is a founding board member and president of the Midwest Access Project, a non-
profit which aims to increase reproductive health access by providing comprehensive
training in reproductive health for family practitioners. (Ex. 27 (Stulberg Rept.)) ¶¶ 1,
4.) Based on her research and experience with MAP, Dr. Stulberg testified that it is very
difficult for abortion clinics to find and retain providers because of a combination of

58

factors, including:  (1) the history of harassment and violence toward clinics and providers; (2) difficulty in accessing training in procedures; (3) personal and professional stigmatization; and (4) contractual limitations instituted by hospitals or practice groups. (*Id.* at ¶ 6; 5/28/14 Trial Tr. (dkt. #233) 70-71 (Stulberg).)

Dr. Stulberg's research is consistent with plaintiffs' own experience.  For PPW, recruiting physicians to provide abortion services is difficult for several reasons, and would be made more taxing if physicians are required to obtain admitting privileges under Act 37 before beginning to provide services.  (5/27/14 Trial Tr. (dkt. #243) 150-51 (King).)  Dr. King also mentioned several barriers, including hospitals and physician groups that prohibit physicians from performing abortions.  (*Id.* at 153.)  For AMS, Dr. Christiansen recounted several attempts to recruit doctors that failed, in part, because of physician groups or hospital systems stating that a physician could not remain employed if she provided abortion services.  (5/29/14 Trial Tr. (dkt. #244) 226 (Christiansen).) Generally, the "residual stigma" surrounding abortion providers also proves to be a barrier to recruiting physicians.  (*Id.* at 226-27.)  Testifying based on his thirty years of counseling residents, Dr. Laube confirmed that physicians are denied the ability to provide abortions because of "physician pressures, hospital system pressures, social pressures, etc."  (5/29/14 Trial Tr. (dkt. #244) 75-76 (colloquy).)

Obviously the risk of becoming a target of harassment and protest presents an additional barrier for recruiting physicians.  (5/27/14 Trial Tr. (dkt. #243) 153 (King).) Teri Huyck, PPW's CEO, described the difficulties in recruiting and retaining physicians to provide abortion services:  "It's not an attractive place to provide abortions because of

59

the hostile environment."  (5/27/14 Trial Tr. (dkt. #243) 305 (Huyck).)  As an example,

when the Madison Surgery Center considered providing late second-trimester abortions a

few years ago, abortion opponents took out ads naming the physician who planned to

provide these services, picketed her home, and harassed her at the grocery store,

eventually resulting in her leaving the state.  (*Id.* at 306.)   In recent years, PPW's clinics

have also been the target of violence.  In 2011, a man from Marshfield was arrested and

convicted after travelling to Madison with the intent of killing a doctor providing

abortions at Planned Parenthood's Madison clinic.  (Ex. 27 (Stulberg Rept.) ¶ 10; *United

States v. Lang,* 12-cr-43-wmc (W.D. Wis.).)   In 2012, Planned Parenthood's Appleton

clinic was firebombed.  (Ex. 27 (Stulberg Rept.) ¶ 10.)

One of the most striking aspects of the trial was plaintiffs' testimony about their

personal experiences with harassment and threats.  Dr. King testified to being the target

of protestors:

> I am verbally harassed every time I go to Planned
> Parenthood.  Even when I'm going to the colposcopy clinic I
> may be harassed.  I've had protesters at my home.  I've had
> protesters march up and down my street.  They have gone
> door to door to my neighbors handing them pamphlets,
> videotapes, saying "We are here because a babykiller, Dr.
> King, lives in your neighborhood."  So, yes, I've been
> definitely the target of protest.

(5/27/14 Trial Tr. (dkt. #243) 153 (King).)  Similarly, Dr. Pfleger testified that

> every day I walk into the clinic people shout "murderer,"
> "baby killer," etc.  They picketed my offices when I was in
> private practice.   For approximately two years[,] I had
> picketers at home several times a week.  They surrounded my
> car and pulled the valve stems out of my tires when I dropped
> my two-year-old off at day care.  I had metallic things in the
> driveway that would give me flat tires.  I had slashed tires.  I

60

> had literature put in my car when it was in the garage.  I had
> a deer head in my driveway.

(5/27/14 Trial Tr. (dkt. #243) 206 (Pfleger).)  Dr. Christiansen also testified to being the subject of harassment and threats of violence over the course of his career, including hate mail, protests at his house, spray paint on his office door, locks glued shut in his car, and nails placed on his driveway.  (5/29/14 Trial Tr. (dkt #244) 253 (Christiansen).)[34]

Based on this evidence, the court finds that significant barriers to recruiting and retaining practitioners present a real and growing threat to the availability of abortion services in Wisconsin.  This is not to say that the State of Wisconsin has an affirmative duty to provide abortion services, but that the precarious availability of these services in the State is a relevant consideration in determining whether an additional, incremental regulation of private abortion providers further threatens access, constituting an undue burden on women seeking abortion services.

### ii.    Barriers to obtaining and maintaining admitting privileges

Plaintiffs also provided evidence demonstrating significant barriers to (1) obtaining admitting privileges, most notably the need to show a record of inpatient treatment of patients, and (2) maintaining benefits, if and when granted, because of requirements that physicians actually admit a certain number of patients for inpatient care.  Given that admission is rare, if not non-existent, for some of the remaining, leading

---

[34] While those who oppose abortions no doubt face their own brand of harassment and disdain for doing so, Drs. King, Pfleger and Christiansen's commitment to provide these services in the face of personal attacks (and other, more lucrative practice options) speaks to their character.   Dr. King's intelligence, courage, ability and commitment, was particularly marked by her articulate and compelling testimony at trial.

providers of full-time abortion services, and even less for part-time practitioners now replacing them, these barriers threaten the ability of AMS (immediately) and PPW (going forward) to provide abortion services in Wisconsin.

*First*, as for obtaining privileges, there are 17 hospitals within 30 miles of AMS. (Ex. 5 (consist of six Wheaton-Franciscan facilities, four Aurora facilities, three Froedtert facilities, three Columbia facilities, and Waukesha Memorial Hospital).)   For each of these hospitals, the medical staff bylaws require applicants to demonstrate "competence," which means current competence in the inpatient (or peer-reviewed outpatient setting)[35] of the particular procedure or procedures they seek to be eligible to perform in the hospital.   (Exs. 66 (FRE 1006 summary of Milwaukee hospitals' bylaws), 7, 75, 78, 97, 1104; 5/27/14 Trial Tr. (dkt. #243) 194-195, 201, 203 (Pfleger); *see also* Pls.' Post-Trial Br. (dkt. #248) 33 n.19.)   This requirement played out in plaintiffs' attempts to secure admitting privileges.   As detailed in the next section, describing the current status of plaintiffs' admitting privileges, both Drs. King and Pfleger were required to submit lengthy logs of inpatient care over the preceding year or two (Exs. 56, 60), and Drs. Christiansen and Smith were both ineligible because of their inability to show such a record.[36]

---

[35] While AMS submits reports to NAF, this reporting does not satisfy the peer-reviewed requirement of hospitals reviewing applications for admitting privileges.  (Pls.' Br. (dkt. #248) 35 & 35 n.21.)

[36] While one of defendants' experts, Dr. Linn, testified that his hospital, Columbia-St. Mary's in Milwaukee, only considers the quality of a physician's care in extending privileges, he also admitted that *none* of the 30 ob-gyns on staff at Columbia-St. Mary's has a practice consisting almost entirely of outpatient care.  (5/28/14 Trial Tr. (dkt. #243) 46, 53-54 (Linn).)

*Second*, as for maintaining those privileges, plaintiffs have demonstrated that a lack of inpatient admissions could threaten PPW physician's recently-gained privileges in Appleton, as well as Dr. Pfleger's privileges at Milwaukee hospitals (assuming she continues to devote the bulk of her time to providing abortions through PPW, rather than resume some sort of hospital practice).   All hospitals within 30 miles of AMS require doctors to treat a certain number of patients in the hospital per year, typically around 20 patients, to retain "active" staff privileges.   (Exs. 66 (FRE 1006 summary of Milwaukee hospitals' bylaws), 71, 72, 78, 97, 1040; Joint Stip. (dkt. #200) ¶ 33; Pls.' Post-Trial Br. (dkt. #248) 39 n.24.)   For "courtesy" privileges, all but one hospital requires that the physician have "active" privileges at some other hospital -- requiring a physician to admit a minimum number of patients per year at *some* hospital.   (*Id.*)[37]

In granting Drs. King, Pfleger and P2 admitting privileges, Appleton informed each that it would be reviewing five cases of the care they provide at the hospital within the next six months.   (Ex. 48, 68, 98; *see also* Ex. 65 (FRE 1006 summary of Appleton hospitals' bylaws).)   Because Dr. King does not expect to admit a patient at the Appleton hospital, she is concerned her admitting privileges will be lost.   (5/27/14 Trial Tr. (dkt. #243) 143 (King).)   Similarly, Dr. Pfleger is concerned about her ability to maintain her privileges at Aurora Sinai after they expire in May 2015 based on her lack of inpatient care.   (5/27/14 Trial Tr. (dkt. #243) 197 (Pfleger); Ex. 98 (email informing her that she will be reviewed in November 2014).)   The PPW physicians' concerns appear well-

---

[37] The exception is Froedtert, but it requires doctors to be members of the teaching staff in order to obtain any kind of staff privileges.  (Ex. 74.)

founded in light of Dr. Christiansen's experience with SwedishAmerican Hospital in Rockford, Illinois, where his request for renewal of privileges was denied because of a lack of patient admissions.  (5/29/14 Trial Tr. (dkt. #244) 194 (Christiansen); *see also* Ex. 1060 (Anderson Rept.) ¶ 10 (explaining that most, if not all hospitals, require credential review every two years).)

       Notwithstanding current law to the contrary, plaintiffs also credibly argue that the religious affiliation of hospitals, and in particular Catholic hospitals, may pose a continuing barrier to securing admitting privileges.  The record on whether religious-affiliated hospitals (amorphously grouped to include Catholic, Lutheran and Jewish hospitals, and perhaps others) would expressly decline to provide admitting privileges to a doctor performing abortions on that basis is less clear.  Dr. Hanson, the Chief Medical Officer for Wheaton Franciscan Healthcare, a Catholic institution, is quoted as stating in response to a journalist's inquiry that "Wheaton Franciscan Healthcare is a ministry of the Catholic church[.]   For that reason, if it's known to us that a doctor performs abortions and that doctor applies for privileges at one of our hospitals, our hospital board would not grant privileges."  (Hanson Depo. (dkt. #210) 29.)  Since then -- perhaps after having been apprised of the "Church Amendments," 42 U.S.C. §300a-7 -- Dr. Hanson walked back the statement attributed to her, testifying that Wheaton Franciscan does not "categorically deny admitting privileges to any doctor who provides abortions. . . . We understand the law.  We abide by the law, and we consider each case individually, every application."  (*Id.* at 51-52.)

Regardless, hospital bylaws suggest that religious objection to abortion will be a high hurdle for any physician who performs abortions when applying for staff privileges at a Catholic institution. For example, Wheaton Franciscan's and Columbia-St. Mary's hospital systems (collectively comprising a little over half of the 17 hospitals in the Milwaukee area) require physicians to abide by the Ethical and Religious Directives, which warn that "Catholic health care institutions need to be concerned about the danger of scandal in any association with abortions providers." (Ex. 72, 78.) *See* United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* 26 (5th ed. 2009), *available at* http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf (last visited Mar. 16, 2015). Wheaton requires a physician to sign a statement, as part of his or her application for medical staff membership, which states in pertinent part: "I declare that I presently do not advertise or solicit the performance of voluntary, elective abortions and that in the future such advertising or soliciting by, or on behalf of me, shall subject me to automatic dismissal from the Medical Staff(s) of such Hospital(s)." (Hanson Depo. (dkt. #210) 40; Ex. 72.)[38]

Still, religious hospitals, including a Catholic hospital in the Milwaukee area, have had physicians who perform abortions on staff. (5/28/14 Trial Tr. (dkt. #233) 43-44 (Linn testifying that Dr. Broekhuizen, former Medical Director for PPW, had admitting

---

[38] Perhaps there is some wiggle room in this requirement, as Dr. Linn suggests that physicians need only comply with it "while [] practicing in the hospital." (5/28/14 Trial Tr. (dkt. #233) 46-47 (Linn).)

privileges until recently at Columbia-St Mary's).)  Even in the context of Catholic institutions, therefore, there appears some possibility of obtaining and even keeping admitting privileges to physicians who perform abortions, and plaintiffs have failed to demonstrate that the concern about religious ideology is an impediment that extends to Lutheran and Jewish-affiliated facilities in the Milwaukee area.

In moving for summary judgment on their nondelegation doctrine claim, plaintiffs also focused on certain language in many hospitals bylaws that allow for the grant or denial of admitting privileges based on economic factors, but the evidence presented at trial did not support this theory.  Indeed, there was a consensus among the experts that economic factors, such as a cap on the number of physicians a hospital would allow to have admitting privileges, do not weigh in the decisionmaking process.   (5/29/14 Trial Tr. (dkt. #244) 56-57.)[39]

### iii.    Status of Plaintiffs' Admitting Privileges

At the time of the Act's passage, Drs. Christensen and Smith -- the only physicians providing abortion services at AMS -- did not have admitting privileges at a hospital within 30 miles of their clinic in Milwaukee, and they have been unsuccessful in securing those privileges to date.

Dr. Christiansen holds admitting privileges at Meriter Hospital in Madison, which he has held continuously since 1977, except for a recent two-month period when he had

---

[39] While some hospitals may have residency requirements, this too does not appear to be a major impediment to securing privileges, as perhaps best-evidenced by PPW doctors securing privileges in Appleton despite none of them residing in that area.

planned to retire. (5/29/14 Trial Tr. (dkt. #244) 191-92 (Christiansen).) In the past, Dr. Christiansen has been denied admitting privileges and had his privileges revoked because of either his failure to admit patients or the fact that he was out-of-state and could not identify another physician to act as his backup. (*Id.* at 193-94.) After the Act passed, Dr. Christiansen attempted to obtain admitting privileges at Aurora-Sinai Hospital and at Froedtert Hospital (in conjunction with the Medical College of Wisconsin), both located in Milwaukee and within 30 miles of AMS's clinic. (*Id.* at 195-200; Exs. 7, 8.) Dr. Christiansen testified that he limited his applications to those two hospitals because they "seemed like the most likely candidate to grant me privileges and they were the ones that were most appropriate." (5/29/14 Trial Tr. (dkt. #244) 213 (Christiansen).)

Aurora refused to send him an application because Dr. Christiansen could not document that he had "provided patient care in the hospital environment over the last twelve months." (Ex. 7 at AMS 00186.) Dr. Christiansen further testified that he tried to get in front of the Credentialing Committee, but his efforts fell short, and eventually, he "didn't think there was anything else [he] could do." (5/29/14 Trial Tr. (dkt. #244) 203-214 (Christiansen).) As for Froedtert, the Credentials Committee was "unable to act on [his] application as it did not have sufficient evidence of [his] current experience and competence for provision of care in the inpatient environment to allow it to assess [his] competence for the privileges requirement." (Ex. 6 at AMS00177; *see also* 5/29/14 Trial Tr. (dkt. #244) 209.) In response to this letter, Dr. Christiansen explained that he has not attended to any patients in a hospital for the last two years and asked if there was

any way for the hospital to accommodate his request for admitting privileges (rather than refer-and-follow privileges) in light of the demands of Act 37.  (Ex. 6 at AMS00179.)

Dr. Smith holds "affiliate" or refer-and-follow privileges at Aurora-Sinai, but those privileges do not allow him to admit patients.  (Smith Depo. (dkt. #211) 44; 5/27/14 Trial Tr. (dkt. #243) 56-57 (Ashlock).)  In July 2013, shortly after the Act was passed, Dr. Smith wrote a letter to the head of Aurora-Sinai's credentialing committee seeking admitting privileges.  (5/27/14 Trial Tr. (dkt. #243) 61 (Ashlock); Ex. 10C; Smith Depo. (dkt. #211) 44.)  Smith believed that Aurora-Sinai was his best chance at securing admitting privileges given that he had maintained affiliate privileges there for several years.  (5/27/14 Trial Tr. (dkt. #243) 61, 70 (Ashlock).)[40]  After receiving no response to his letter, AMS's director Wendy Ashlock followed up with other individuals at Aurora-Sinai, eventually receiving an application, which Smith completed.  (*Id.* at 62.; Exs. 10A, 10D, 10G, 10H.)  In a letter dated March 24, 2014, Dr. Smith was informed that he is not eligible for courtesy staff appointment (a category that does not require admission of 20 patients per year) because "Courtesy Staff appointees must hold an Active Staff or Associate Staff appointment at another hospital."  (5/27/14 Trial Tr. (dkt. #243) 68-69 (Ashlock); Ex. 11; Smith Depo. (dkt. #211) 81-83.)

While the court expressed frustration at Drs. Christiansen and Smith's failure to exhaust all opportunities, and to push for final decisions on outstanding applications before trial, their assessment that the chances of securing admitting privileges at a

---

[40] Smith also sent an email to Columbia-St. Mary's requesting an application for admitting privileges, but received no response.  (5/27/14 Trial Tr. (dkt. #243) 69-70 (Ashlock); Ex. 12; Smith Depo. (dkt. #211) 63-64.)

Milwaukee hospital are "slim to none" is credible, even more so as a descriptor of the chances of *retaining* these privileges for any length of time.  Both doctors attempted to secure privileges from hospitals with which they had the best connections, hoping that in light of the oddity of Act 37, those hospitals would ignore fairly standard threshold requirements for a record of inpatient care or active privileges at another hospital (which, in turn, would typically require a record of inpatient care at that hospital).  While perhaps an individual physician might pull strings or persuade a hospital to ignore standard credentialing requirements, the process involves a series of steps and a number of decisionmakers.  Understandably from purely a business model, the preponderance of the evidence is that hospitals are generally unwilling to bend their rules, even for physicians that they know and in the face of a regulation which they may find unnecessary.

As for PPW, at the time that Act 37 was passed, several of PPW's physicians did not have admitting privileges within 30 miles of the Appleton and Milwaukee clinics. (5/27/14 Trial Tr. (dkt. #243) 298 (Huyck).)[41]  According to PPW's CEO, Teri Huyck, if the Act had gone into effect immediately, as contemplated, PPW would have had to close its Appleton North clinic and would have had to reduce its capacity at Milwaukee Jackson by approximately 50%.  (*Id.*)  In particular, Dr. Pfleger did not have admitting privileges at a Milwaukee hospital at the time the Act was passed, but has since obtained privileges at two hospitals within 30 miles of the Milwaukee clinic.  (5/27/14 Trial Tr.

---

[41] All of the PPW physicians who perform abortions at the clinic in Madison had and have admitting privileges at a hospital within 30 miles of that clinic.  (Joint Stip. (dkt. #200) ¶ 4.)

(dkt. #243) 190-92 (Pfleger).)   As of trial, Drs. P1 and P3 also were able to secure admitting privileges at a hospital within 30 miles of PPW's Milwaukee-Jackson clinic. (Joint Stip. (dkt. #200) ¶ 3.).)

PPW physicians, Drs. P2 and P5, currently provide abortion services at the Appleton North health center.   (Joint Stip. (dkt. #200) ¶ 5.)   By the time of trial, Drs. King, P1 and P2 have admitting privileges at a hospital within 30 miles of the Appleton clinic as well.   (Joint Stip. (dkt. #200) ¶ 6.)[42]   Dr. King did not, however, have admitting privileges at the Appleton hospital at the time the Act was passed.   (5/27/14 Trial Tr. (dkt. #243) 103, 134 (King).)

While PPW doctors were able to secure admitting privileges, the process for doing so was both lengthy and tedious.   Dr. King described in detail her efforts to obtain admitting privileges at Appleton Medical Center:   a time-intensive, multi-step process which took approximately ten months from June 2013 to April 28, 2014.   (5/27/14 Trial Tr. (dkt. #243) 125-143 (King).)   Dr. Pfleger began the process of securing admitting privileges in Milwaukee in May 2013, but did not receive privileges at Froedtert Hospital until January 2014 and Aurora-Sinai until February 2014 (despite previously having admitting privileges at Aurora-Sinai for 20 years).   (5/27/14 Trial Tr. (dkt. #243) 191-93, 203-04 (Pfleger); Exs. 57A - 57H, 58A - 58D.)

The process of submitting both applications -- including requesting an application and preparing it -- obviously required time, as did engaging in regular communications

---

[42] Dr. Pfleger had also applied for privileges at Appleton Medical Center, but at the time of trial had yet to be granted admitting privileges.   (5/27/14 Trial Tr. (dkt. #243) 201-02; Ex. 56.)   Subsequently, Dr. Pfleger was granted privileges.   (Ex. 98.)

with the medical staff office, creating a list of all inpatient procedures, and participating in 20 to 30 hours of training on electronic medical record systems that they are unlikely to use.  (5/27/14 Trial Tr. (dkt. #243) 197-98 (Pfleger).)  Certainly, both doctors could have acted more diligently in responding to follow up requests from hospitals, but even these actions would have shaved off days or weeks, rather than months, from the process. In hospitals tied to academic institutions where credentialing is conditioned on receipt of an academic appointment, the process for receiving privileges may take between one to three months, as was Dr. Bulun's experience (5/29/14 Trial Tr. (dkt. #244) 50-51 (colloquy)), but the evidence suggest that for other physicians seeking admitting privileges, the process takes six to nine months.  This length of time will prove difficult for PPW if the Act goes into effect, because as explained by its CEO Huyck, "it's not viable to open and close and open and close a health center when it takes ten months to get admitting privileges if you have a new physician."  (5/27/14 Trial Tr. (dkt. #243) 299 (Huyck).)

Finally, PPW doctors were able to secure privileges by relying on their record of inpatient care based on their non-PPW practices, but those privileges were granted conditioned on future admission of a certain number of patients.  For example, Dr. King faces the loss of her admitting privileges under Appleton Medical Center's by-laws, which provide that "[i]n the case where a practitioner has little or no clinical activity at Appleton Medical Center-Theda Clark," the physician "may be evaluated as to the possible reason for no activity" and describes voluntary withdrawal of privileges or deferment pending data collection as possible consequences.  (5/27/14 Trial Tr. (dkt.

#243) 145, 171-72 (King); Ex. 68.)   Dr. Pfleger's admitting privileges at Aurora-Sinai expire in May 2015.  (5/27/14 Trial Tr. (dkt. #243) 197 (Pfleger); Ex. 98.)  Dr. Pfleger is similarly concerned that she will not be able to renew her privileges because of a lack of ongoing inpatient procedures.   (*Id.*)   CEO Huyck also testified to concern that the physicians who obtained admitting privileges in Appleton will not be able to maintain those privileges given a lack of inpatient admissions, and sway of political pressure on hospitals or physicians who have agreed to provide backup care.  (5/27/14 Trial Tr. (dkt. #243) 299 (Huyck).)

### iv.   Effect of Act 37 on Access to Abortion Services in Wisconsin
#### a.  Likely Closure of AMS

Plaintiffs have demonstrated that if Act 37 takes effect, AMS will likely close. Drs. Smith and Christiansen have not been able to obtain admitting privileges and are unlikely to be able to obtain those privileges because of the uniform, threshold requirement that applicants seeking admitting privileges demonstrate competence in inpatient care or peer-reviewed outpatient care.   Since there is currently no method provided to challenge whether the underlying reasons for a denial of privileges by these private decisionmakers has something to do with considerations of their medical competence (which is more likely than not with respect to both doctors), AMS is without a remedy.

Moreover, AMS has been unsuccessful to date in attempting to recruit a physician or physicians to take over Dr. Smith's and to a lesser-extent Dr. Christiansen's services. (5/29/14 Trial Tr. (dkt. #244) 226, 250 (Christiansen) (describing recruiting efforts);

Smith Depo. (dkt. #211) 37, 41-43 (efforts to recruit a physician after a doctor stopped working in January 2014 proved unsuccessful).)   Even if AMS were successful at recruiting, it is at best questionable whether a physician would have or be able to obtain the required admitting privileges, especially in light of the barriers to obtaining privileges described above and as faced by both Drs. Smith and Christiansen.  In light of all of this, the court credits Dr. Christiansen's opinion that AMS will have to close if the Act goes into effect.

Plaintiffs have also demonstrated that PPW will not be able to absorb the demand for abortions should AMS close.  Dr. King testified that the current wait time for PPW patients is three to four weeks.  (5/27/14 Trial Tr. (dkt. #243) 149 (King); 5/27/14 Trial Tr. (dkt. #243) 302 (Huyck describing 3-4 week wait time).)  Dr. Henshaw, a former senior fellow with the Guttmacher Institute, testified that a three week waiting list is "very unusual."  (5/30/14 Trial Tr. (dkt. #234) 9 (Henshaw).)  If AMS were to close, it would "overwhelm the capacity of the Planned Parenthood of Wisconsin clinics to accommodate" the 2,500 women who receive abortions at AMS in 2013.  (5/27/14 Trial Tr. (dkt. #243) 147-48 (King).)  Specifically, Dr. King noted the current shortage of physicians providing abortion services, which would be amplified by the closure of AMS. (*Id.* at 149.)  In 2013, PPW's Milwaukee-Jackson clinic provided approximately 1,500 abortions.  (*Id.*)  If AMS were to close and PPW attempted to absorb those patients, the annual number of abortions at that clinic would have to increase 160% from 1,500 to 4,000.  (*Id.* at 150.)  If AMS were to close, Dr. King acknowledged that PPW would consider taking over its space, but also credibly testified that current staffing and

73

difficulty in recruiting physicians left her uncertain about PPW's ability to do that.  (*Id.* at 177.)   Huyck similarly testified to the lack of space, support staff, equipment and infrastructure to absorb AMS's demand for abortion services.  (5/27/15 Trial Tr. (dkt. #243) 307 (Huyck).)

Defendants point out that PPW is attempting to recruit additional physicians at this time, including one through the Medical College of Wisconsin.  If PPW is successful in recruiting an additional physician -- a process which will likely take a year or more -- that would simply allow PPW to reduce the wait time for patients that are seeking PPW's abortion services now, and would not provide the bandwidth to absorb AMS's demand.  (5/27/14 Trial Tr. (dkt. #243) 305 (Huyck).)

Even if the court did not accept strong evidence of the short and long term structural barriers to PPW (or even more unlikely, a new entrant into a literally and figuratively inhospitable market place),[43] AMS is the only provider in Wisconsin currently offering abortions beyond 18.6 weeks of a woman's LMP.  Were PPW even willing to take up this demand in later term abortion services, Dr. King explained that PPW would have to seek a waiver from Planned Parenthoods' national office to expand its abortion services past 19.6 weeks LMP, and still may not be equipped to provide such care in light of training and space needs.  (5/27/14 Trial Tr. (dkt. #243) 151 (King).)

---

[43] Another deterrent to any new entrant (and indeed to PPW expanding into this space) is the uncertainty created by the Wisconsin Legislature's reported consideration of a ban on all such abortions past 20 weeks.  *See* Patrick Marley, *Scott Walker says he would sign ban on abortions after 20 weeks*, Journal Sentinel (Mar. 3, 2015), *available at* http://www.jsonline.com/news/statepolitics/walker-he-will-sign-abortion-ban-after-20-years-b99455459z1-294898821.html (last visited Mar. 16, 2015).

Teri Huyck similarly testified that "[b]ecause the demand for earlier abortions is so great and the training and equipment and facilities required for going beyond 18.6 [weeks] are so great that it just doesn't make sense" for PPW to attempt to fill AMS's shoes. (5/27/14 Trial Tr. (dkt. #243) 308 (Huyck).)

### b.  Burdens on Women Seeking Abortions in Wisconsin

The likely closure of AMS would result in at least three immediate, identifiable burdens on women seeking abortions in Wisconsin:   (1) significantly increased wait times; (2) required travel to Chicago or other locations; and (3) no inpatient option for women seeking abortions post 18.6 weeks LMP in Wisconsin.  *First*, as described above PPW's patients already experience a three to four week wait for treatment.  If the Act were to go into effect and AMS were to close, the court credits Dr. King's best estimate that women seeking abortions at the Milwaukee clinic would likely experience an eight to ten week wait time as PPW attempts to meet the demand in Milwaukee and the surrounding area.  (5/27/14 Trial Tr. (dkt. #243) 150 (King).)   These wait times have obvious ripple effects on the availability for all abortions, including those offering the safest, early-term procedures.   Necessarily, women will likely be pushed out of the window for receiving medication abortions (for PPW, up to nine weeks gestation), and could be pushed entirely out of the pre-viability zone, preventing some women from having an abortion at all.   Even if not out of the zone of pre-viability, the delay may result in some women not being able to have an abortion until the second trimester, when abortions are not only more expensive, but past the point where some women are comfortable having an abortion.  (5/30/14 Trial Tr. (dkt. #234) 8 (Henshaw).)  Increased

wait times will obviously also mean that women are receiving abortions later in gestation, which in turn increases health risk.  (5/27/14 Trial Tr. (dkt. #243) 149 (King).)[44]

*Second*, faced with a lack of options in Wisconsin, women will be required to travel out of state, most likely to Chicago to obtain abortions.  While a trip from Milwaukee to Chicago may not pose an issue for women of means (even relatively modest means), women seeking abortions nationally, particularly in Wisconsin, are poor, very poor. Nationally, 42% of women who seek abortions report being below the federal poverty line and 69% report being below 200% of the federal poverty line.[45]  (Ex. 16 (Expert Report of Jane Collins, Ph.D. ("Collins Rept.")) ¶ 20.)  In Wisconsin, PPW represents that 62% of its patients seeking abortion services are at or below 100% of the federal poverty threshold, and 84% are at or below 200% of the federal poverty threshold.  (*Id.*) AMS's director testified that about 50% of AMS's patients are living at or below the federal poverty level.  (5/27/14 Tr. (dkt. #243) 21-22, 53 (Ashlock).)  While some organizations provide funding or financial assistance for women at or below the poverty

---

[44] As described in the court's preliminary injunction opinion, other courts have found that the elimination of a substantial portion of abortion providers in a state constitutes a substantial obstacle to a woman's right to seek an abortion.  *Van Hollen II*, 2013 WL 3989238, at *17 (citing cases).

[45] In 2014, the federal poverty level for one person is $11,670, for a family of four, $23,850.  Office of The Assistant Secretary for Planning and Evaluation, U.S. Dep't of Health & Human Servs., "2014 Poverty Guidelines," *available at* http://aspe.hhs.gov/poverty/14poverty.cfm (last visited Mar. 16, 2015).  There are various causes for this, but one of them is that women of means are more able to afford and regularly use contraceptives.  *See* Richard V. Reeves & Joanna Venator, *Sex, Contraception, or Abortion? Explaining Cass Gaps in Unintended Childbearing*, Brookings Paper (Feb. 2015), *available at* http://www.brookings.edu/research/papers/2015/02/26-class-gaps-in-unintended-childbearing-reeves (last visited Mar. 16, 2015).

limit to cover the cost of the medical procedure, none of these organizations in Wisconsin provide funds to cover travel or other associated expenses, like child care. (5/27/14 Trial Tr. (dkt. #243) 278, 293, 309 (Collins).)

Jane Collins, a Professor of Community & Environmental Sociology and Gender & Women's Studies at the University of Wisconsin, Madison, who studies low-wage labor and poverty, estimates that the additional travel costs alone would run between $30 and $160. (Ex. 16 (Collins Rept.) p.22, ¶ 37.) Additional costs will include more time away from work and childcare. (*Id.* at ¶¶ 27, 35.) In addition to these out-of-pocket costs, there are other less quantifiable, albeit real costs that would be amplified if women were to travel to Chicago or other areas to seek abortions, like stress of travel to an unfamiliar area, and difficulties encountered in trying to keep the reason for the travel confidential from a boss, co-workers or an abusive partner. (*Id.* at ¶ 44.) According to one study, "[f]or women pulling together money to pay for the procedure as well as transportation and missed work, these relatively small amounts can prove impossible to procure and could prevent women from obtaining a wanted abortion." (*Id.* at ¶ 47 (citing Jones, R. K., Upadhyay, U. D., and Weitz, T., "At What Cost? Payment for Abortion Care by U.S. Women," *Women's Health Issues* 23(3): e173-e178, May 2013 p.12-13, *available at* http://www.guttmacher.org/pubs/journals/j.whi.2013.03.001.pdf (last visited Mar. 16, 2015)).) At some point, the additional costs associated with travel -- including gas, tolls, hotel room stays, bus tickets, lost wages and childcare -- may reach a "tipping point where [they] become too great for a household to bear and the woman would not

77

be able to get the abortion that she desired."   (5/27/14 Trial Tr. (dkt. #243) 264, 270 (Collins).)

Dr. Collins' conclusions are consistent with those of Dr. Henshaw.  As he testified, requiring travel to access abortion services has two main effects: (1) delaying abortion; and (2) for some women, not getting abortions they wanted.   (5/30/14 Trial Tr. (dkt. #234) 8 (Henshaw).) In reaching this conclusion, Dr. Henshaw relied on various studies measuring the impact of travel distance on the ability of women to obtain abortions.  (Ex. 17 (Expert Report of Stanley K. Henshaw, Ph.D. ("Henshaw Rept.")) ¶ 6-11 (discussing Silvie Colman & Ted Joyce, *Regulating Abortion: Impact on Patients & Providers in Texas*, 30 J. Pol'y Analysis & Mgmt. 775 (2011) (finding 69% decrease in the number of Texas women who obtained abortions after 15 weeks in the year after Texas adopted a regulation requiring all post-15 week abortions to be performed in an ambulatory surgery center, resulting in decreased availability and increased travel); Stephen Matthews *et al.*, *The Effects of Economic Conditions & Access to Reproductive Health Servs. on State Abortion Rates & Birthrates*, 29 Fam. Plan. Persp. 52 (1997) (concluding that an increase of 100 miles in the distance women must travel each way in order to reach the nearest abortion clinic was associated with a measurable reduction in the abortion rate); James D. Shelton, *et al.*, *Abortion Utilization: Does Travel Distance Matter?*, 8 Fam. Plan. Persp. 260 (1976) (studying travel distance on impact of abortions in Georgina, and finding that for every ten miles of distance from Atlanta, there was a decline of 6.7 abortions per 1,000 live

births)).)[46]  Based on these studies, Dr. Henshaw estimated that roughly 18 to 24 percent of women who would like to have an abortion would not do so because of the additional demands of travelling to Chicago or the surrounding area for an abortion.  (5/30/14 Trial Tr. (dkt. #234) 46 (Henshaw).)  In light of the record at trial, the court finds both Dr. Henshaw and his opinion in this regard credible.

*Third*, perhaps the most obvious ramification of AMS closing is that there will be no outpatient option (and very limited inpatient options) for women seeking abortions post 18.6-weeks LMP, since AMS is currently the only clinic providing those services in Wisconsin.  (5/27/14 Trial Tr. (dkt. #243) 25-26 (Ashlock), 308 (Huyck).)  Women with a diagnosis of a severe, lethal fetal anomaly sometimes have an option to obtain an abortion in a hospital setting.  (Stip. Facts (dkt. #200) ¶ 34.)  Though, as Dr. King testified, insurance may deny coverage for those abortions, and for those women, receiving an abortion in the hospital setting, the cost may prove too exorbitant.  (5/27/14

---

[46] In addition to raising questions of bias in the studies cited by Dr. Henshaw, defendants offered the opinion of expert Dr. Peter Uhlenberg, Professor of Sociology at the University of North Carolina-Chapel Hill, who called into question these studies and Dr. Henshaw's overall conclusion, stating that there is no causal link between travel and decreased abortions, rather there is simply a "correlation."  (Ex. 1085 (Expert Report of Peter Uhlenberg, Ph.D. ("Uhlenberg Rept.")); 5/30/14 Trial Tr. (dkt. #234) 55 (Uhlenberg).)  Dr. Uhlenberg conceded, however, that "at some critical point, an increase in travel distances would have an effect on abortion rates."  (5/30/14 Trial Tr. (dkt. #234) 63.)  In his testimony, Dr. Henshaw effectively responded to Dr. Uhlenberg's criticisms of the particular studies (5/30/14 Trial Tr. (dkt. #234) 63-64 (Henshaw)).  Thus, the court places little weight on Uhlenberg's general criticisms.  Plus, Dr. Uhlenberg's own testimony must be questioned given his extensive involvement in litigation concerning abortion regulations, including similar challenges to admitting privileges requirements.  (5/30/14 Trial Tr. (dkt. #234) 63-64 (Uhlenberg).)  *See also supra* n.16.  Absent some *specific* example of defects in the methodology or data relied upon in these studies, or evidence of contrary studies -- neither of which defendants offered -- the court finds not just a "correlation," but likely cause and effect.

79

Trial Tr. (dkt. #243) 146 (King).)[47]  Moreover, women may prefer an outpatient setting because "it's easier, it's cheaper, less of a procedure," and at least one study demonstrated that it was safer to have an abortion in an outpatient setting.  (5/29/14 Trial Tr. (dkt. #244) 223-24 (Christiansen).)

If AMS were to close, women past 18.6-weeks LMP would have to travel out of state, to a facility in Chicago, approximately 85 miles one way from the AMS clinic, or Minneapolis, approximately 275 miles one way from the AMS clinic.  (5/30/14 Trial Tr. (dkt. #234) 7.)[48]  The burden of travel described above would apply equally, if not more so, to women in the late second trimester of pregnancy.

### D. Balancing Benefits with Burdens

In remanding this matter for further proceedings, the Seventh Circuit explained that in considering whether the regulation would impose an undue burden on women seeking abortions, "[i]t is not a matter of the number of women likely to be affected." *Van Hollen III*, 738 F.3d at 798.  This statement is arguably at odds with the articulated standard in *Karlin*, in which another split panel of the Seventh Circuit explained that in determining whether a regulation constitutes an undue burden, the court should focus on "whether it will have the likely effect of preventing a *significant number* of women for

---

[47] For example, Dr. King testified that an abortion in a hospital-setting would likely cost ten times that in an outpatient setting.  (*Id.* at 158-59 (estimating that an abortion at PPW costs approximately $600).)

[48] There is a clinic in Des Plaines, Illinois, which is approximately 74 miles from AMS's clinic, but it only provides services to 20-weeks LMP.  (5/30/14 Trial Tr. (dkt. #234) 36-37; Ex. 1026.)  Regardless, women from Milwaukee or other parts of the state would still have to travel, with fewer public transportation options to do so.

whom the regulation is relevant from obtaining abortions." 188 F.3d at 481 (emphasis added). One explanation for this seeming disconnect is that the court in *Karlin* was reviewing a mandatory 24-hour waiting period regulation, a so-called "persuasion" regulation, where some decline in abortions would be consistent with the state interest at play. Here, however, the only interest at stake is the health of women seeking abortions. Therefore, there is no need to tease out the intended impact of a persuasion regulation -- encouraging women to maintain their pregnancies -- from the unintended (or at least improper) impact -- preventing women who want an abortion from obtaining one. Regardless, the Seventh Circuit's specific instruction in this case, leaves this court the task of balancing the evidence of health benefits with harms were the requirement of admitting privileges to be enforced in Wisconsin.

Whether the Act presents an undue burden depends on the relative benefits of the Act compared to the imposed burden. *Van Hollen III*, 738 F.3d at 798; *see also Strange*, 33 F. Supp. 3d at 1337 ("[T]he more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit."). For the reasons described above, plaintiffs have demonstrated by the greater weight of the evidence that a substantial number of women will be prevented from obtaining abortions (at least, safe ones) if Act 37 goes into effect. For those women accessing care in Wisconsin, increased wait times will push some women, particularly poor women, out of the pre-viability zone or to a point in time when a woman no longer feels comfortable terminating her pregnancy. In

81

addition, the increased costs -- both tangible and intangible of travel to Chicago -- will prevent other women, again particularly poor women, from obtaining abortions.  Most significantly, women seeking abortions post 18.6-weeks LMP will have to travel out of state to access care, and for some of those women travel will also likely prove to be an impediment.

Part of the burden of travel is the tangible cost component.  In *Akron*, the Supreme Court struck down a regulation requiring hospitalization for second trimester abortions in part because of the fact that second trimester abortions cost "more than twice as much in a hospital as in a clinic," and given the lack of hospitals providing such services, the "requirement may force women to travel to find available facilities, resulting in both financial expense and additional health risk."  462 U.S. at 434-35.  Even in *Casey*, while concluding that the increased cost of abortion due to recordkeeping and reporting provisions did not constitute an undue burden, recognizing that this fixed cost spread across a number of procedures would "[a]t most . . . increase the cost of some abortions by a slight amount," the Court also acknowledged that "at some point increased cost could become a substantial obstacle."  *Casey*, 505 U.S. at 901.  Here, the increased costs of travel and related expenses will not be incurred and spread by the health care law, but will fall entirely on the individual woman seeking an abortion.  For *Casey*'s cautionary language to have any meaning, courts must recognize that increased costs due to regulations create a tipping point where travel and the attendant costs prevent women from accessing wanted abortions.  Plaintiffs demonstrated at trial that the increased costs associated with traveling out-of-state to access abortion services constitute a substantial

obstacle, and in turn an undue burden on women's ability to access safe, affordable services.

In addition to preventing women from seeking abortions, the Act would also impose significant health risks on women in Wisconsin.  First, women who continue unwanted pregnancies will face increased risks associated with childbirth, as well as attendant health concerns.  Second, in the face of lack of access to safe, affordable and timely abortions, women may seek out unregulated options.  During the colloquy, Dr. Laube cited studies demonstrating that unsafe abortions contribute approximately 12-15% of worldwide maternal mortality.  (5/29/14 Trial Tr. (dkt. #244) 81 (colloquy).) Even Dr. Thorp conceded that "the more restrictive you make a law, the more likely there are to be violations of the law."  (*Id.* at 78-79.)[49]  The court agrees with Dr. Bulun that significantly limiting access to abortions in Wisconsin -- here, by closing a provider that accounts for approximately 40% of abortions in Wisconsin -- is an unacceptable experiment for women's health.

### III.   Improper Purpose Claim

So far, the court has considered whether Act 37's *effect* poses an undue burden.  In *Casey*, the Court also held that a regulation is unconstitutional if its *purpose* is to "plac[e]

---

[49] Nevertheless, Dr. Thorp described a study from Chile on which he worked, which purportedly showed a *decline* in maternal deaths after abortions were banned.  (5/29/14 Trial Tr. (dkt. #244) 77-78 (colloquy).)  There are several apparent problems with this study, including that deaths from illegal abortions are unlikely to be reported and increased access to contraception may have reduced the number of abortions (and, in turn, the number of deaths from abortions).  (*Id.* at 80-81.)  In any event, as Dr. Bulun cogently pointed out, this was decidedly *not* the experience in the United States before *Roe*.  (*Id.* at 81-82.)

a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877.   Determining whether legislation was motivated by an improper purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including "[t]he historical background of the decision," "[d]epartures from normal procedural sequence," "the specific sequence of events leading up [to] the challenged decision," and "[t]he legislative or administrative history." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).   In considering this claim, the court is also mindful of the Seventh Circuit's admonition that "[d]iscovering the intent behind a statute is difficult at best because of the collective character of a legislature, and may be impossible with regard to the admitting-privileges statutes."   *Van Hollen III*, 738 F.3d at 791.   Frankly, I would much prefer to default to a finding that such a discovery is "impossible," being highly reticent to presume both for personal and public policy reasons to discern the "collective intent" of another branch of government, even in the face of an almost completely one-sided record, but as an officer of the court, have been instructed that this is an appropriate endeavor in extreme cases.   I find no reasonable doubt that the Act's purpose was to prevent women from accessing abortion for a variety reasons.

First, as described above in the facts section, the legislative record is devoid of *any* medical rationale for the bill.   Indeed, *all* Wisconsin medical organizations opposed the bill, and the only doctor who presented testimony, similarly opposed it.   *See supra* Facts II.B.   Even imputing knowledge of the opinion of a few doctors in Wisconsin that there

would be a benefit for this legislation, some of whom testified at trial, any assertion that the impact on health overall would be positive was dubious from the beginning.

Second, plaintiffs were given two weekend days to comply with the requirement. The lack of any grace period is strong evidence that the legislation's intent was to cripple abortion clinics, rather than protect women's health in the face of complications. Indeed, as described above, of the admitting privileges requirements currently being challenged in federal courts, Wisconsin's statute is unique in its failure to provide any grace period. *See supra* Opinion II.B.iii.b.

Third, the legislation inexplicably singles out abortion procedures for special treatment when the evidence demonstrates that abortion is at least as safe as, and often much safer than, other outpatient procedures regularly performed in this State. *See supra* Opinion II.B.ii.b. Even defendant's expert, Dr. Thorp, conceded that there was no reason to target abortion procedures:

> THE COURT: [W]hat I'm hearing is that no matter what the outpatient procedure, . . . the doctor should have admitting privileges at a hospital.
>
> DR. THORP: I would agree with that.
>
> THE COURT: All right. Is there any reason why it's more or less necessary for an abortion procedure than for others?
>
> DR. THORP: Not that I'm aware of.

(5/29/14 Trial Tr. (dkt. #244) 68 (colloquy).) Despite this, the Wisconsin Legislature failed to consider, and to the court's knowledge has never considered, requiring hospital admitting privileges for any other outpatient procedure. *See supra* Opinion II.B.i.

85

Fourth, and even more telling, added to Act 37 is the extraordinary provision of a civil remedy to the father or grandparent of the "aborted unborn child" if performed by a doctor who lacked admitting privileges, regardless of whether the doctor's patient was in any way injured as a result of the lack of admitting privileges.  *See supra* Facts II.A; *see also Van Hollen III*, 738 F.3d at 791.  The staggering breadth of potential liability created by this remedy removes almost any doubt that the motivation behind this legislation was to restrict the provision of abortions themselves.[50]

While none of these reasons alone would necessarily suffice to meet plaintiffs' high burden, when considered together, the only reasonable conclusion is that the legislation was motivated by an improper purpose, namely to restrict the availability of abortion services in Wisconsin.  In light of the lack of any grace period to achieve compliance and creation of unusual risk of civil liability, the court is also compelled to conclude that the purpose included creating a "substantial obstacle" as well.  Accordingly, the court further finds a violation of plaintiffs' patients' Fourteenth Amendment rights based on an improper purpose.  At the very least, the evidence of an improper purpose bolsters plaintiffs' claim premised on the effect of the Act.

## IV.   Nondelegation Doctrine Claim

The court also must revisit plaintiffs' claim that the Act impermissibly delegates discretion over whether they may practice their chosen profession to private entities without adequate oversight in violation of the Fourteenth Amendment.  In its opinion on

---

[50] More cynically, perhaps the motive was to pander to those who sincerely object to the legality of any abortion procedure, knowing that the law would not pass judicial review, but I simply decline to attribute such a motivation to our state's legislature.

plaintiffs' motion for summary judgment, the court relied on plaintiffs' evidence that "under the bylaws, hospitals may reserve the right to assess an application for privileges based on the hospital's own needs and financial resources, and can therefore deny privileges to physicians who are otherwise qualified." *Van Hollen IV*, 23 F. Supp. 3d at 961. The court found that a hospital's business needs did "not appear to further any legitimate *state* interest, at least with respect to the providing of constitutionally protected abortion services." *Id.* at *8. As such, the court concluded that plaintiffs' claim had merit, though declined to enter judgment in plaintiffs' favor on that claim given (1) the lack of showing "of hospitals actually exercising their discretion to deny privileges for reasons unrelated to a legitimate state interest" and (2) the "possibility that Wis. Stat. § 50.36(4) may provide an avenue for State oversight." *Id.* at *11.

During trial, defendants failed to develop this second basis for denying plaintiffs' motion for summary judgment, effectively conceding that the statutory provision does not provide a mechanism by which the State could intervene, for example by providing a waiver to the admission privilege because the physician's qualifications were not at issue. Still, at trial, plaintiffs' theory that hospitals deny privileges based on their own economic interests unraveled. Indeed, all experts agreed that economic factors do not implicate admitting privileges. (5/29/14 Trial Tr. (dkt. #244) 56-57 (colloquy).) In other words, there is no "cap" in terms of the number of physicians who could gain privileges, at least not in an open system.

The question remains, however, whether the hospitals' requirement that physicians have a record of *in*patient care -- a factor plaintiffs established at trial is a basis

for hospitals uniformly denying admitting privileges -- is related to a legitimate state interest.  For the reasons discussed next in its decision on plaintiffs' patients' Fourteenth Amendment liberty claim, the court concludes that the requirement of inpatient care serves no legitimate state interest, nor is it a requirement that plaintiffs can realistically meet.  In other words, the admitting privileges requirement -- which, in turn, requires a record of inpatient care -- does not further a legitimate state interest, and therefore, the State cannot impose this requirement through third parties, at least in the admitted absence of a waiver or some other mechanism to ensure due process.  *Van Hollen IV*, 23 F. Supp. 3d at 965-67.  Accordingly, the court further finds that the Act violates plaintiffs' Due Process rights as an unconstitutional delegation (Count II).

## V.   Equal Protection / Substantive Due Process Claims

Finally, as the Seventh Circuit acknowledged, "[a]n issue of equal protection of the laws is lurking in this case."  *Van Hollen III*, 738 F.3d at 790.  At trial, plaintiffs demonstrated that the State lacked a rational basis for singling out abortion providers. (*See* 5/29/14 Trial Tr. (dkt. #244) 68 (Thorp conceding that there is no reason to treat abortion providers differently).)  Perhaps acknowledging as much in their post-trial briefing, the State changed arguments, now asserting that abortion is different because of the State's interest in human life.  (Defs.' Post-Trial Br. (dkt. #255) 73-74.)  While the State certainly has a recognized interest in human life, it has repeatedly conceded that the only interest at stake *here* is the health of women seeking abortions, and not any interest in persuading women to choose childbirth over abortion.  (Prelim. Inj. Hearing Tr. (dkt. #73) 45, 52, 54, 56.)  *See also Van Hollen III*, 738 F.3d at 791 ("[T]he state on

its side does not defend the statute as protecting fetal life but only as protecting the health of women who have abortions."); *id.* at 795 ("The state concedes that its only interest pertinent to this case is in the health of women who obtain abortions.").   The State cannot completely change its argument after trial without unfairly prejudicing plaintiffs' case.   Even if it could, the State's original position is compelled by *Casey*, which requires that a challenged regulation "designed to foster the health of a woman seeking an abortion" must similarly be health-related.   *Van Hollen II*, 2013 WL 3989238, at *12 & n.27.

The court is mindful of the Supreme Court's admonition in *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483 (1955), that

> [e]vils in the same field may be of different dimensions and proportions, requiring different remedies.   Or so the legislature may think.   Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.   The legislature may select one phase of one field and apply a remedy there, neglecting the others.

*Id.* at 489 (internal citations omitted).   Even so, the Supreme Court also recognized an exception to this general rule where the differential treatment is discriminatory.   *Id.* ("The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.").   Based on the court's earlier finding that the Legislation was adopted pursuant to an improper purpose -- namely, to restrict access to abortion, prevent women from obtaining wanted abortions, and hinder abortion providers' ability to provide such services -- the court further finds that plaintiffs have demonstrated that Act 37 violates their substantive Due Process and Equal Protection rights (Counts IV and V).   *See*

*Planned Parenthood of Ind. and Ky., Inc. v. Comm'r, Ind. Dep't of Health*, No. 1:13–cv–01335–JMS–MJD, 2014 WL 6851930, at *17-22 (S.D. Ind. Dec. 3, 2014) (finding statutes that treated "abortion clinics" differently than "physician's offices" and ambulatory centers or hospitals where abortions were performed violated the abortion provider plaintiff's equal protection rights).

ORDER

IT IS ORDERED that:

1) Section 1 of 2013 Wisconsin Act 37 (Senate Bill 206), codified at Wis. Stat. § 253.095 is unconstitutional under the Fourteenth Amendment to the United States Constitution;

2) plaintiffs' motion to seal plaintiffs' trial exhibits 32, 36, 37 and 38 (dkt. #224) is GRANTED;

3) plaintiffs' motions to supplement the trial record (dkt. ##247, 253) are GRANTED IN PART AND DENIED IN PART as described above;

4) plaintiffs' motion for permanent injunction (dkt. #248) is GRANTED. Defendants are hereby enjoined from enforcing Section 1 of 2013 Wisconsin Act 37, codified at  Wis. Stat. § 253.095;

5) defendants' motion to strike plaintiffs' motion for permanent injunction (dkt. #252) is DENIED;

6) plaintiffs may seek an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.  Plaintiffs' motion and accompanying materials are due on or before [3 weeks]; defendants may file a response [2 weeks]; any reply is due [1 week]; and

7)  the clerk of court is directed to enter judgment in favor of plaintiffs consistent
    with this opinion and close this case.

Entered this 20th day of March, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge